UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - -

MELISSA TROSTLE,

                          Plaintiff,

          - against -   Civil No: 1:13-CV-0709

THE STATE OF NEW YORK,
THERESA KNAPP-DAVID, AND
DOUG BOTSFORD,

                          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - -


          DEPOSITION of Defendant, by its Agent, DARREN

AYOTTE, held on the 17th day of October 2014, commencing

at 3:21 p.m., at the Law Offices of Elmer Robert Keach,

III, P.C., One Pine West Plaza, Suite 109, Washington

Avenue Extension, Albany, New York  12205-5531, before

Jeanne O'Connell, Registered Professional Reporter and

Notary Public in and for the State of New York.

NOV 10

ORIGINAL

```
 1    APPEARANCES:

 2    For the Plaintiff:

 3    Law Offices of Elmer Robert Keach, III, P.C.
      One Pine West Plaza, Suite 109
 4    Washington Avenue Extension
      Albany, New York  12205-5531
 5    By:  Elmer Robert Keach, III, Esq.

 6

      For the Defendants:
 7
      Eric T. Schneiderman,
 8    Attorney General of the State of New York
      615 Erie Boulevard West
 9    Syracuse, New York  13204-2465
      By:  Heather R. Rubinstein,
10    Assistant Attorney General

11

12

13

14

15

16

17

18

19

20

21

22

23
```

1           S T I P U L A T I O N S

2     It is hereby stipulated and agreed by
      and between the attorneys for the respective
3     parties hereto that:

4     All rights provided by the C.P.L.R.,
      and Part 221 of the Uniform Rules for the
5     Conduct of Depositions, including the right
      to object to any question, except as to form, or to move
6     to strike any testimony at this examination is reserved;
      and in addition, the failure to object to any question
7     or to move to strike any testimony at this examination
      shall not be a bar or waiver to make such motion at,and
8     is reserved to the trial of this action.

9     This deposition may be sworn to by the
      witness being examined before a Notary Public other than
10    the Notary Public before whom this examination was
      begun, but the failure to do so or to return the
11    original of this deposition to counsel, shall not be
      deemed a waiver of the rights provided by Rule 3116 of
12    the C.P.L.R., and shall be controlled thereby.

13    The filing of the original of this
      deposition is waived.
14
      IT IS FURTHER STIPULATED, that a copy
15    of this examination shall be furnished to the attorney
      for the witness being examined without charge.
16

17

18

19

20

21

22

23

1   DARREN AYOTTE, after first having been duly sworn, was

2   examined and testified as follows:

3   EXAMINATION

4   BY MR. KEACH:

5      Q.   Mr. Ayotte, as you know, my name is Bob Keach.

6   We apparently came across each other last week at a

7   restaurant over in East Greenbush.   I'm a civil rights

8   lawyer.   You're being deposed in my office here in

9   Albany.

10       I'm going to go a little quicker with your

11  examination.   We've had a long day.   And I also think

12  that you have some tangential role in this.   So, your

13  examination won't be as thorough.   I can assure you you

14  will be out of here at five o'clock sharp, to the extent

15  that you have childcare issues and the like to deal

16  with.

17       You understand that I'm not -- that Ms. Trostle

18  is not suing you, correct?

19      A.   I do.

20      Q.   You're here as a third party to provide

21  information that may be relevant to her claims against

22  others employed by your agency, correct?

23      A.   I do.

1    Q.   I'm going to ask you a series of spoken

2    questions.   You need to provide me with a spoken

3    response.   Our court reporter cannot take down a shake

4    or nod of the head.

5    A.   Okay.

6    Q.   You also have to wait until I finish my question,

7    and I will try to show you the same courtesy in return;

8    although, I didn't do such a hot job of that with the

9    last witness we had.   But we don't want to talk over

10   each other.   That's bad in depositions.

11       If you need a break for any reason, you simply

12   need to ask me, and I will accommodate your request for

13   a break.   I just ask you not ask me for a break when

14   there's a question pending, meaning a posed question to

15   you and you haven't responded, or when I'm questioning

16   you about a document.

17       Is there anything going on today of an emergent

18   nature that you think would distract you from these

19   proceedings?

20   A.   No.

21   Q.   And finally, I'm not a perfect examiner.   If I

22   ask you a question and you don't understand it, let me

23   know, and I'll take the steps necessary to make sure you

1    understand them.   On the flip side, if you answer my

2    questions, I'm going to assume you understood them.

3        Does that sound fair?

4    A.   Yes.

5    Q.   How long have you been working for the Department

6    of Correctional Services for?

7    A.   I've been with the department od correctional

8    services for 17 and a half years.

9    Q.   And we established sharing stories amongst

10   ourselves here at the table that you initially worked as

11   a corrections officer in the Department of Correctional

12   Services.

13   A.   Yes.

14   Q.   How long did you work as a CO for?

15   A.   I was a CO for about six years, just over six

16   years.

17   Q.   And where did you work at?

18   A.   I started out of the corrections academy as a

19   correctional officer trainee at Coxsackie Correctional

20   Facility.   I then worked at Sing Sing, Bedford Hills,

21   and then Greenhaven Correctional Facility.

22   Q.   And then, once you left Greenhaven and come to

23   central office, have you stayed at central office since?

1     A.   Yes.

2     Q.   What job titles have you held in central office?

3     A.   I was a senior administrative assistant.  I was

4   an associate personnel administrator.  I have been an

5   assistant director of personnel.  And I am now the

6   director of personnel.

7     Q.   Well, director of personnel is different than

8   being the director of human resources, right?

9     A.   Yes, it is.

10    Q.   You're subordinate to the director of human

11  resources.

12    A.   No.  There currently is no director of human

13  resources.  I am serving in that capacity as the

14  director of personnel.

15    Q.   And your predecessor in that would have been

16  Mr. Martuscello.

17    A.   Yes.

18    Q.   In June of 2011 what was your title?

19    A.   Assistant director of personnel.

20    Q.   And what does the assistant director of personnel

21  do?

22    A.   Well, there's several of us.  My position was, I

23  was assistant director of personnel over our local

1  operations unit, which was tasked with being a liaison

2  advisor to our correctional facilities, our personnel

3  officers in the correctional facilities.

4      Q.  So, you're the liaison for the correctional

5  facilities.

6      A.  That is correct.

7      Q.  And so, if they had personnel questions, they

8  would call you.

9      A.  My staff that I supervised and me, as well.  Yes.

10     Q.  And did you get involved in decisions about

11  whether or not to entertain notices of discipline

12  against subordinate employees of the Department of

13  Corrections?

14     A.  No.  Personnel is not charged with discipline of

15  employees.  That's charged to the office of labor

16  relations.

17     Q.  Well, so what role would you play in demoting

18  provisional employees, if any?

19     A.  Provisional employees have no I believe it's

20  Article 75 rights.  So we would be responsible for

21  pursuing any probationary terminations, provisional

22  terminations, or temporary terminations of employees

23  that have those statuses.

1    Q.   And did you know Mrs. Trostle prior to your

2    involvement in the decision to demote her from her

3    position in the office of classification and movement?

4    A.   No.  I did not and do not know Mrs. Trostle.

5    Q.   So, how did it come to pass that you became

6    involved in Mrs. Trostle's demotion?

7    A.   From what I can ascertain from the documents,

8    there was a termination log prepared by Jean Daniels,

9    who is an associate personnel administrator.  That

10   termination log requires review and signature by several

11   different people.  Normally, that wouldn't have fell in

12   to my area.  I'm assuming that either the assistant

13   director over that area was out that day, and that's why

14   it came to me.

15   Q.   Well, I appreciate you clarifying that for me.

16        Ordinarily, this type of terminating a

17   provisional employee or demoting them would not have

18   ended up on your desk.

19   A.   It may have if it was a facility employee.  This

20   was a central office employee.  In the bureau of

21   personnel we have the local operations unit, which is

22   where I worked at the time, and then we have main office

23   personnel.  There's another assistant director over in

1    the office of personnel that that would have normally

2    gone to if the person was in that day.  So it must have

3    come to me because that person was not in that day.  We

4    cover for each other if someone is not there.  Then the

5    paperwork would come to the next person.

6       Q.  I understand.  Was Jean Daniels one of your

7    subordinates?

8       A.  She would have been a subordinate in the bureau

9    of personnel, but she didn't work directly for me.  She

10   worked for the assistant director over main office

11   personnel.

12      Q.  Who was the assistant director over main office

13   personnel?

14      A.  I don't know exactly at that time.  It could have

15   been Carol McCowski, but I don't know if Carol McCowski

16   retired around that time.  And the person there now is

17   Susan Edwards.  So, I'm not exactly sure who was there

18   at that period of time.

19      Q.  What documentation were you provided to support

20   Mrs. Trostle's demotion back to her hold item besides

21   the document that's referred to as a termination log or

22   a termination request?

23      A.  I believe there is some supporting documentation

1    from the office of classification and movement.

2        Q.   And do you remember what that documentation was?

3        A.   Yeah.  It was to/from, I believe, from a memo, a

4    memo, a to/from, a memorandum.

5        Q.   I heard that term a little too much.

6             Well, I'm going to show you a document that we

7    previously marked as Plaintiff's Exhibit 4 and

8    Plaintiff's Exhibit 1, and I'd -- well, I showed this to

9    you at the same time I pose a different question.

10            What documentation did you review prior to your

11   testimony today?

12       A.   I reviewed the term log.  And now that I'm

13   looking at this, this was attached to the term log.  I

14   looked at it last week.

15       Q.   Did you look at anything else to prepare for your

16   testimony today?

17       A.   No.

18       Q.   And when you reviewed that, what role did you

19   play independently in determining that Ms. Trostle

20   should be terminated?

21       A.   When I reviewed it at the time that I was signing

22   off on the termination log.

23       Q.   Yes.

1    A.  I reviewed this -- basically, my responsibility

2  is to review the term log as prepared by the person

3  preparing the term log, subordinate, and then I compare

4  what's written here to what the supporting documentation

5  is that is supplied by the program area and make sure

6  that it's written -- it reflects -- the term log

7  reflects what is provided to us in the supporting

8  documentation.

9    Q.  Who's the person responsible for making the

10  determination that Mrs. Trostle should be demoted and

11  sent back to Greene Correctional Facility?

12    A.  The ultimate termination.

13    Q.  Yes.

14    A.  Like someone who terminated her from her

15  provisional position.

16    Q.  Yes.

17    A.  That would have been Dan Martuscello, director of

18  personnel at the time.

19    Q.  And do you know what order that was circulated,

20  meaning that particular document?

21    A.  Yeah.  They are circulated in the same manner

22  each and every time.  It would go to either the senior

23  personnel administrator, who would prepare this.  It

1    would go to an associate personnel administrator, an

2    assistant director.  And then it would make its way down

3    to the director of personnel, simultaneously going to

4    the office of diversity management for signature.

5        Q.  Well, here's what I'm trying to figure out:  If

6    you're told by someone that you don't supervise that a

7    determination has been made to terminate somebody, are

8    you just -- I don't use this term pejoratively you

9    understand, but are you pretty much just a rubber stamp

10   as part of that process, where you have to sign off on

11   decisions that others have made or do you have

12   independent input into it?

13       A.  Yeah.  If I didn't think that the termination log

14   or if the personnel employee reflected exactly or

15   reflected in the termination log what was reflected in

16   the supporting documentation, I would certainly ask the

17   associate personnel administrator, in this case Jean

18   Daniels, say, listen, this isn't what this reflects or

19   this isn't -- it's not -- there's questions.  There

20   might be questions I would have to ask.

21       Q.  If it didn't match up.

22       A.  Correct.

23       Q.  How about beyond that, how abut the decision

1    itself, the termination decision, would you have the

2    ability to overrule that or do you just -- you're just

3    required to sign these forms?

4        A.   Yeah.   If I didn't think that there was

5    justification for a termination, then I wouldn't send

6    that down to the director.   I would then go back to

7    the -- or direct the employee to go back to the program

8    area and say, this isn't -- there's not enough here for

9    termination.

10       Q.   Has that ever happened?

11       A.   Yeah.   Sure.   I've asked for different things.

12       Q.   And when you say termination, do you mean

13   termination from provisional position or a demotion and

14   return to her hold item?

15       A.   I've done it in both cases, whether it's a

16   probationary termination or a provisional termination or

17   a temporary employee being terminated.

18       Q.   Did you have any conversations with Douglas

19   Botsford at any point in time about Melissa Trostle?

20       A.   No, I did not.

21       Q.   Did you have any conversations with Theresa

22   Knapp-David at any point in time about Melissa Trostle?

23       A.   No, I did not.

1    Q.   Did you have any conversations with any

2    individuals that are reflected in the signature log on

3    the termination request about Mrs. Trostle?

4    A.   I don't know if I had any conversations at this

5    time about this stuff here.  No.  I don't remember.

6    Q.   You don't have any recollection.

7    A.   I do not.

8    Q.   Did you review your e-mails to see whether or not

9    you had any e-mail about Mrs. Trostle?

10   A.   I did not.

11   Q.   Now, you believe that the memorandum put forward

12   by Mr. Botsford is sufficient to justify terminating

13   someone and returning them to their hold item.

14   A.   I do and I did.  Yes.

15   Q.   And why is that?

16   A.   Well, it reflects -- the memo, to me, reflects an

17   employee who either demonstrated, according to the memo,

18   that she was excessively using the telephone, that she

19   had some issues with being tardy to work, and

20   additionally, the director, director of class and

21   movement, Douglas Botsford, is saying that her work did

22   not rise to the level of dedication and professionalism

23   that he would have expected in the office.

1    Q.   And that's because of her tardiness and using the

2  phone.

3    A.   Yeah.   I'm sure that's what the memo says.

4    Q.   Now, at the time that you reviewed that, do you

5  know whether or not Mrs. Trostle had been given an

6  opportunity to pay for her phone calls?

7    A.   I do not know that.

8    Q.   Do you know how Mrs. Trostle's phone use compares

9  to other employees in the office of classification and

10  movement?

11    A.   I don't know that, either.

12    Q.   Do you know whether or not other individuals in

13  the office of classification and movement had also

14  failed to pay for their phone calls?

15    A.   I do not know that.

16    Q.   Do you know whether or not other individuals in

17  the office of classification and movement were violating

18  state policies as it relates to the use of the phones

19  for personal reasons?

20    A.   I do not know that.

21    Q.   If I told you that all of the employees in the

22  office of classification and movement, and not just

23  Mrs. Trostle, were violating New York State Department

1    of Correctional Services directives about using the

2    phones for personal reasons, would that change your

3    opinion about whether or not her termination was

4    justified?

5        A.   No.   Probably not.

6        Q.   Well, what if only Mrs. Trostle was singled out

7    and no one was subjected to any sort of penalty for

8    doing that, would that cause you any concern?

9        A.   Yes.

10       Q.   And would that cause you to question the

11   underlying decision to terminate her employment if that

12   were true?

13       A.   Yes.

14       Q.   Would it cause you concern if Douglas Botsford

15   admitted that he routinely used his state-issued

16   telephone to make personal calls?

17       A.   Could you repeat the question, I'm sorry.

18       Q.   Would it cause you concern, in reviewing

19   Mrs. Trostle's use of the phone, that Douglas Botsford,

20   her own supervisor, admitted that he routinely used his

21   phone to make personal calls during work hours?

22       A.   So would it concern me that Doug --

23       Q.   Would it concern you that Mr. Botsford was doing

1    exactly the same thing as Mrs. Trostle?

2                MS. RUBINSTEIN:  Objection.

3                THE WITNESS:  I guess it would depend

4           on the amount of calls, the length of the

5           calls, and whether the calls were being

6           reimbursed or not.  The department does

7           allow for some personal calls to be made, as

8           long as the employee reimburse -- pays for

9           the phone calls.

10   BY MR. KEACH:

11       Q.  Well, those calls were only to be made in

12   emergency situations with the supervisor's approval;

13   isn't that right?

14       A.  I don't know the directive off the top of my

15   head, what it says, but I know that the department does

16   allow employees to make calls as long as they pay for

17   the calls.

18       Q.  I'm going to show you Exhibit 13.  Ask if you

19   could take a look at that for me, and tell me if you

20   recognize it.

21       A.  I recognize that it is the Department of

22   Corrections state-produced telephone equipment and

23   services.

1    Q.   And would you agree with me that that directive

2  says that individuals should only be using state-issued

3  telephones to make phone calls if there are emergency

4  situations?

5    A.   Well, it says that, "state-furnished telephone

6  equipment and services are to be used solely for the

7  performance of official state business, except in cases

8  of emergency.  At most facilities public telephones have

9  been installed in or near the state offices for personal

10  convenience of employees.  Employees may use these

11  telephones to conduct personal business before or after

12  normal working hours or at authorized meal or rest

13  periods.  For those situations where it may be necessary

14  to make the occasional call of limited duration, you

15  must get authorizations from your supervisor."

16         Yeah.  It does say that.  I think that this

17  directive is more directed toward facility staff than it

18  is the staff in central office.

19    Q.   To my knowledge, there's no directive to staff in

20  central office, right?

21    A.   That's correct.  That I'm aware of.

22    Q.   And you would agree with me that directives are

23  to be followed by people who work for DOCCS, isn't it?

1     A.   Yes.

2     Q.   And so, have you ever used your state-issued

3 phone to make personal calls that aren't emergencies?

4     A.   Have I?

5     Q.   Yes.

6     A.   Yes, I have.

7     Q.   Well, I want you to assume that everyone in the

8 office of classification and movement was making

9 personal phone calls of -- on state-issued phones, and

10 some were doing it more than Mrs. Trostle.

11       Would it cause you concern that those individuals

12 were not subjected to any sort of penalty for engaging

13 in the same conduct that Mrs. Trostle was demoted for?

14     A.   I would expect that the same rules be applied to

15 everybody in a particular office.

16     Q.   And if the same rules are not applied, that would

17 cause you concern as someone who's involved in personnel

18 for the Department of Corrections, wouldn't it?

19     A.   Yes, it would.

20     Q.   And if people weren't being subjected to the same

21 rules, would that cause you to question why one

22 individual in a group of people was singled out?

23     A.   If someone was singled out, that would cause me

1  concern.  Yes, it would.

2     Q.  And it would also cause concern that that person

3  may have been singled out for an impermissible reason

4  under the law, wouldn't it?

5           MS. RUBINSTEIN:  Objection.

6           THE WITNESS:  I guess I don't

7        understand the question.

8  BY MR. KEACH:

9     Q.  If someone was singled out for conduct that was

10 the same as everyone else, wouldn't it cause you concern

11 that that person being singled out may be a pretext for

12 some impermissible reason to affect that person's

13 employment?

14           MS. RUBINSTEIN:  Objection.

15           THE WITNESS:  It would cause me concern

16        if anybody is singled out for any reason.

17        It would cause me concern.

18 BY MR. KEACH:

19    Q.  If someone was singled out because they made a

20 complaint about racial discrimination in the workplace,

21 that would cause you concern, wouldn't it?

22    A.  Absolutely it would cause me concern.

23    Q.  Were you aware at the time that Mrs. Trostle was

1    subject for termination that she had already started the

2    process of complaining about racial discrimination in

3    the workplace by talking to her supervisor?

4         A.   No, I was not aware of that.

5         Q.   And would you agree with me that the first

6    step -- one of the options that you had as an employee

7    of the Department of Correctional Services, if you're

8    facing racial discrimination in the workplace, is to

9    complain to the supervisor before taking additional

10   action?

11        A.   That's one step.  You can also file a complaint

12   directly with the office of diversity management.  You

13   could seek out any manager or supervisor and make a

14   complaint, if you didn't feel comfortable going to your

15   supervisor.

16        Q.   My understanding is, you could have gone -- you

17   had one of three options to start the process.  The

18   first option is complain to your supervisor, the second

19   option is -- or any supervisor, the second option is

20   complain to diversity management, and the third option

21   is to just go right to EOC, right?

22        A.   I don't know how people go -- I don't know if

23   they exhaust -- whether or not they have to go to ODM

1    first, diversity management first, before they go to

2    EOC.  I'm not really sure about that.  But, yeah, I

3    imagine that that was an option they could exercise.

4        Q.   But one of the options is go to a supervisor and

5    complain to start the process.

6        A.   That could be an option.  Yes.

7        Q.   And would it also cause you concern if someone --

8    if the process to terminate someone from employment with

9    the Department of Corrections started immediately upon

10   their having to go out on emergency medical leave, which

11   would be covered by the Family Medical Leave Act?

12       A.   Would it cause me concern if the process to

13   terminate somebody started when somebody was exercising

14   the right to go out on family medical leave?

15       Q.   Yes.

16       A.   Yeah.  It would probably cause me concern.  I

17   would probably want to ask additional questions about

18   that.

19       Q.   And the information you were given by

20   Mr. Botsford didn't mention that he began his

21   investigation into Mrs. Trostle's conduct the day that

22   she had to go out for emergency surgery for her kidneys.

23       A.   I was not aware that she was out of work for

1    emergency surgery, nor did I have any conversation with

2    Douglas Botsford other than the memo here.

3       Q.   Do you agree with me that that's something that

4    should have been presented to you as part of your review

5    of Mrs. Trostle's demotion?

6               MS. RUBINSTEIN:   Objection.

7               THE WITNESS:   If that is, in fact,

8          true, then, yeah, it's something that

9          probably should have been brought to

10         people's attention.

11   BY MR. KEACH:

12      Q.   As well as a complaint about racial

13   discrimination in the workplace; fair to say?

14      A.   Yes.

15      Q.   Again, I think you've already answered this, but

16   I just want to be thorough.

17              If you had known either of those things, that

18   would have caused you as a supervisor to take a second

19   look at this to make sure that what was happening was

20   appropriate; fair to say?

21              MS. RUBINSTEIN:   Objection.

22              THE WITNESS:   Absolutely.   Yes.

23   BY MR. KEACH:

1    Q.  And do you know whether or not Mrs. Trostle was

2    ever provided with an opportunity to reimburse the state

3    for the $7 of phone calls that's in Mr. Botsford's memo?

4    A.  I don't know that.  I know the employees get a

5    monthly phone bill, and at that point they have an

6    opportunity to pay for whatever calls they might have

7    made during that period.

8    Q.  And if Mrs. Trostle wouldn't have been given a

9    copy of that phone bill and given an opportunity to pay

10   for the calls, that would have caused some concern,

11   wouldn't it?

12   A.  If she wasn't -- I'm sorry.

13   Q.  If she never was given her phone bills by her

14   superiors, that they weren't given to her, wouldn't that

15   cause some concern?

16   A.  Yes.  If she did not receive her phone calls, how

17   would she know what calls...

18   Q.  To pay for.

19   A.  Correct.

20   Q.  Was there any sort of conference with yourself

21   and the other people involved in making this decision

22   about what to do with Mrs. Trostle?

23   A.  No.  There was no conference.

1    Q.   And what was the length of your consideration of

2    this entire situation?

3         I mean, I just want to step back.  My

4    understanding was that somehow this memo would come to

5    you with the memorandum attached to it, right?

6    A.   Yes.  This would come to me with the supporting

7    documentation.  I would take a review of it.

8    Q.   How did you get it?  Did it come as a physical

9    paper file or did you get it e-mailed to you?

10   A.   No.  I'm sure it came as a paper file like most

11   of them do.  Probably Jean Daniels walked it over to me

12   after she prepared it for my review and signature.

13   Q.   And so, do you remember Jean handing it to you,

14   or do you have any independent recollection of your

15   review of these documents?

16   A.   No, I do not.

17   Q.   I mean, we can confirm that's your signature,

18   though.

19   A.   Yes.  That is absolutely my signature.

20   Q.   Let's assume you pick this thing up.  How much

21   consideration would you have given it before you signed

22   your name?

23        How long would you have looked at this for --

1     A.   Well, I would look --

2     Q.   -- five minutes, ten minutes?

3          MS. RUBINSTEIN:  Objection.

4          THE WITNESS:  I would look at it as

5     long as it took for me to make an educated

6     decision and put my signature on there.  My

7     signature is on there.  So, I would make

8     sure that it was -- in my opinion, that the

9     provisional termination was justified and

10    supported by the supporting documentation.

11 BY MR. KEACH:

12    Q.   I understand you don't have any specific memory,

13 but you have the two documents in front of you now.

14         How long do you think it would have taken you --

15 and we'll let the record reflect that you're giving me

16 an approximation.

17         How long do you think it would have taken you to

18 look at Exhibit 4, look at the attachment, Exhibit 1,

19 reach your conclusion, and sign your name?

20         MS. RUBINSTEIN:  Objection.

21         THE WITNESS:  I don't know.  15, 20

22    minutes.

23 BY MR. KEACH:

1     Q.   And just so we're clear, you have no recollection

2  of seeing any other supporting documentation for that

3  memo besides Douglas Botsford's memorandum and the

4  termination request that you have.

5     A.   That is correct.

6     Q.   And you had no conversations with anybody about

7  the situation before signing your name, based on

8  Mr. Botsford's recommendation.

9     A.   No.   Not that I remember.   No.

10     Q.   And I may have already asked you this.   I just

11  want to be clear.

12     You had no interaction or knowledge of

13  Mrs. Trostle before you received this memorandum; fair

14  to say?

15     A.   Fair to say.   Yes.

16     Q.   And you had no opportunity to observe anything

17  that was going on in the office of classification and

18  movement because that's not where your office is; fair

19  to say?

20     A.   Yes.   That's fair to say.

21     Q.   Do you work at the central campus here, the

22  Harriman campus?

23     A.   I do.   My office is in building number two.

1    Q.    And was it in building two in May and June of

2    2011?

3    A.    Yes.

4    Q.    And what floor is classification and movement on?

5    A.    They are on the third floor.

6    Q.    And what floor are you on?

7    A.    I am on the first floor and was then, as well.

8    Q.    Have you told me everything that you can recall

9    about your review of Mrs. Trostle's termination?

10   A.    Yes, I have.

11   Q.    Did you talk with anyone about Mrs. Trostle's

12   termination after she left central office and went to

13   Greene?

14   A.    No.

15   Q.    Were you ever contacted by Herman Reinhold about

16   her?

17   A.    I don't remember.  I don't remember.  I don't

18   believe so, though.

19   Q.    When did you first learn that Mrs. Trostle had

20   sued the state?

21   A.    I had -- now, as the assistant director, I

22   believe that was Brian Rider or...

23   Q.    Let me cut you off.  I don't want you to tell me

1    the substance of any conversations you had with any

2    lawyers that work for the state government, either in

3    the attorney general's office or in the Department of

4    Correctional Services, okay?  Because you have a

5    privilege with those individuals that I don't want to

6    implicate by my question.

7            So, if your answer would be, I learned about this

8    from counsel, that should be the end of the answer, not

9    to tell me about the conversation.

10   A.   Yes.  I learned about this from counsel.

11   Q.   Did you review a copy of the complaint?

12   A.   No, I have not.

13   Q.   Have you ever provided any statements about this

14   to anybody?

15   A.   No.

16   Q.   Now, if someone is occasionally late to work, do

17   you feel that would justify their termination if they're

18   in a management position?

19   A.   Define occasionally, because it could make a

20   difference.

21   Q.   We'll define it from this.  The comment here is

22   that Mrs. Trostle was late over the course of, say,

23   seven months on -- looks like she was late to work

1   coming in ten times and was late returning from lunch

2   two times.

3        Well, let me step back.  You don't know whether

4   there's any documentation about Mrs. Trostle being late

5   to work, do you?

6     A.   I don't off the top of my head.  No.

7     Q.   And you would agree with me that if a supervisor

8   has a concern about a subordinate being late for work,

9   that there's a policy in place that would allow for

10  additional monitoring of that person to ensure that

11  they're in compliance with the hours of work, correct?

12    A.   Yes.

13    Q.   And do you know whether or not Ms. Trostle was

14  ever given the opportunity to participate in such a

15  monitoring program?

16    A.   I don't.  But I think the memo says something

17  about her being counselled on occasions.

18    Q.   But informal counseling means, hey, I told you

19  not to be late, right?

20    A.   It's an informal conversation between the

21  supervisor and the employee.  Yes.

22    Q.   Let's assume that someone is late once a week by

23  two or three minutes, would you agree that that is a

```
1    situation where someone deserves to be terminated from
2    their employment?
3                 MS. RUBINSTEIN:  Objection.
4                 THE WITNESS:  I believe that if
5            somebody is late once a week for two to
6            three minutes, then there's an issue with
7            that employee, and I think that that issue
8            should be addressed.
9    BY MR. KEACH:
10     Q.  Do you think that someone should be fired for
11   that, in the absence of an effort to ensure compliance?
12                MS. RUBINSTEIN:  Objection.
13                THE WITNESS:  I believe that, depending
14           on how long it's going on for, yes, I do
15           believe that the employee could be
16           terminated for something like that.
17   BY MR. KEACH:
18     Q.  But wouldn't it be fair to say that that employee
19   would be terminated for tardiness issues after being
20   given a number of different opportunities to comply?
21     A.  It depends on the status of the employee.  I
22   mean, provisional employees really have no right to
23   their job, and especially managers and assistant
```

1    director position.  I think that would hold -- as a

2    department, as an agency, we hold those people to a

3    higher standard.  I think that they should be at work,

4    they should be at work on time, and they should only be

5    off when they're scheduled to be off from work.

6        Q.  Well, I can appreciate that.  I guess what I'm

7    trying to determine, however, is:  You supervise people,

8    don't you?

9        A.  Yes, I do.

10       Q.  Have you had to terminate provisional employees

11   that you supervise?

12       A.  No, I have not.

13       Q.  Have you had to terminate anybody that you

14   supervised?

15       A.  Ever.

16       Q.  Yeah.

17       A.  Just let me think.  I don't think that I've had

18   to terminate anybody that I directly supervised.  No.

19       Q.  Now, did you have to go to any schools to learn

20   how to be a good supervisor when you started working at

21   DOCCS?

22           After you left Greenhaven and came to central

23   office, did you have to go to school to learn how to be

1    a good supervisor?

2        A.   No.   I wasn't a supervisor right away when I left

3    Greenhaven and came to central office.   But they do --

4    the department does offer supervisory training,

5    team-building training, things like that.

6        Q.   And you've been to it.

7        A.   I have been to different ones.   Yes.

8        Q.   And did you learn in that training about how to

9    be a supervisor about the need to keep appropriate

10   records if you have concerns about what your employees

11   are doing so that down the road, if you have to take

12   adverse action against them, you've got the record

13   there?

14              MS. RUBINSTEIN:   Objection.

15              THE WITNESS:   I'm a believer in

16         documentation.   So I think that, speaking

17         for myself as a supervisor, if I was having

18         an issue with an employee, I would be

19         documenting the issues.

20   BY MR. KEACH:

21       Q.   And that documentation, that is something that

22   goes throughout the Department of Correctional Services

23   in terms of keeping appropriate documentation, doesn't

1  it?

2     A.   Yeah.  We are a documentation-driven agency.

3     Q.   Yeah.  Absolutely.  I've seen -- I've done

4  other -- I told you I've done other cases.  And I've

5  seen -- in inmate cases, I mean, there's a lot of

6  documentation that corrections officers generate when

7  inmates act up so that you have a record and you can --

8  if you have to press charges, you've got all your memos

9  and stuff, right?

10    A.   Yes.

11    Q.   And so, if there was no documentation about

12 Mrs. Trostle being late that was compiled by her

13 supervisors and Mrs. Trostle denied being late, that

14 would be a cause for some concern, wouldn't it?

15           MS. RUBINSTEIN:  Objection.

16           THE WITNESS:  I mean.  That would

17       cause -- there obviously would be a dispute

18       as to whether she was or she wasn't with her

19       supervisor.

20 BY MR. KEACH:

21    Q.   Right.  Well, in this instance, how would that

22 dispute get worked out?

23       Because Ms. Trostle denies that she was late all

1  the time, and there were no contemporaneous records

2  taken by the supervisors to document that before they

3  made the decision, so, how would that issue get worked

4  out, or is the supervisor believed and the employee not

5  believed?

6           MS. RUBINSTEIN:  Objection.

7           THE WITNESS:  In this matter right

8      here.

9           MR. KEACH:  Yeah.

10          THE WITNESS:  Yeah.  I mean, i would

11      take the supervisor's word.  The supervisor

12      is the manager of the unit and he's

13      reporting to me that one of his employees is

14      late.  I don't know what other documentation

15      the supervisor has or not in his possession.

16 BY MR. KEACH:

17    Q.  Can you explain to me why Mrs. Trostle was never

18 given an opportunity to respond to the allegations in

19 this memo.

20    A.  I can't give you an explanation as to that.  I

21 don't know.  She's a provisional employee.  There's not

22 a lot of rights that provisional employees have with

23 regard to holding the position, not the same rights that

1    a permanent employee would have.  So, I can't answer why

2    she wasn't given an opportunity to respond to the

3    allegations.

4        Q.   Taking aside the provisional versus permanent

5    employee, wouldn't you think it would be good employment

6    practice, if you're going to make allegations against

7    someone, that you at least give them an opportunity to

8    explain themselves?

9                MS. RUBINSTEIN:  Objection.

10               THE WITNESS:  I think, in my current

11               capacity, if I had an employee in the same

12               situation and they approached me about it, I

13               would be willing to listen to them.

14   BY MR. KEACH:

15       Q.   And do you think that that employee should have

16   been given an opportunity to see this memo and comment

17   about it before a decision was made to terminate her

18   employment?

19               MS. RUBINSTEIN:  Objection.

20               THE WITNESS:  No.  Not necessarily.

21   BY MR. KEACH:

22       Q.   Well, are you aware that this memo was prepared

23   when Mrs. Trostle was on family medical leave?

1     A.   I do not.  I am not aware of that.

2     Q.   And are you aware that the day of her termination

3   was the very day that she returned from family medical

4   leave?

5     A.   I am not aware of that.

6     Q.   And would you agree with me that, if Mrs. Trostle

7   had -- there's a comment here in Exhibit 1 about her

8   being on the phone one day for 80 minutes.

9          Do you see that?

10    A.   Yeah.  There were over 80 minutes on one day,

11  okay.

12    Q.   And wouldn't you agree before terminating

13  Mrs. Trostle, in part because of her making 80 minutes

14  of long distance calls in one day, that it would have

15  been appropriate to at least ask her what those calls

16  were about?

17          MS. RUBINSTEIN:  Objection.

18          THE WITNESS:  I believe that 80

19       minutes -- that one 80-minute phone call --

20       or there were over 80 minutes -- so, I'm not

21       saying there was one call.  It says that

22       there was one day that there was over 80

23       minutes of calls.  I believe that that is

1          excessive.  And I don't know that I would

2          ask her what those phone calls were about.

3  BY MR. KEACH:

4     Q.  What if your mother was in the hospital in Puerto

5  Rico and was unconscious and you were talking to your

6  family members about what to do with your mother and her

7  medical condition, and you had to spend that long on the

8  phone trying to figure it out, would you deem that to be

9  excessive?

10          MS. RUBINSTEIN:  Objection.

11          THE WITNESS:  I would excuse myself

12          from work, ask a supervisor for some time

13          off so I could handle those personal

14          matters.

15  BY MR. KEACH:

16     Q.  But let's assume that wasn't an option.  If you

17  had -- your parent was in the hospital and you had to

18  address their medical care when they're in Puerto Rico

19  and you had to spend 80 minutes on the phone doing that,

20  would you feel that's inappropriate in your own position

21  if you had to do that?

22          MS. RUBINSTEIN:  Objection.

23          THE WITNESS:  Yes, I do.  I do.  I

```
 1          think that you would have to excuse yourself

 2          from work and take care of it.  If it

 3          requires you to be on the phone for that

 4          long during your workday, I would say that

 5          you should be excusing yourself from work to

 6          take care of that business.

 7   BY MR. KEACH:

 8      Q.  I'm asking you to assume that that wasn't an

 9   option that particular day because it was really busy,

10   you had a lot to do, you had a lot of things going on,

11   and you couldn't leave the office for an extended period

12   of time.  So, under that hypothetical, you couldn't

13   leave.  You knew that day that the governor was coming

14   to visit the department of personnel in an hour and a

15   half, and you had to be there.  That wouldn't change

16   your opinion.

17      A.  Would it change my opinion about being on the

18   phone?  I still -- I have to say that I think 80 minutes

19   of long distance phone calls in one day is excessive.  I

20   don't know.  I can't answer the question.  I don't know

21   how I would handle that.

22      Q.  Yeah.  You don't know how you would handle it

23   until you're in that situation, right?
```

1     A.   That is correct.

2     Q.   And so, if Mrs. Trostle's 80 minutes of phone

3 calls on that particular day were related to her mother

4 in the hospital, that may cause you to take a different

5 view of the situation.

6          Even if you felt it was excessive, even if you

7 felt she should have excused herself, that would have

8 caused you to look at this differently, wouldn't it?

9               MS. RUBINSTEIN:  Objection.

10               THE WITNESS:  I don't know.  I mean, if

11          we're talking about everything, probably

12          not.

13 BY MR. KEACH:

14     Q.   Well, what do you mean by everything?

15     A.   Well, if we're talking about 31 long distance

16 personal calls totaling over 230 minutes, withstanding,

17 however -- whatever time period we're talking about, and

18 then 80 minutes on a particular day.

19     Q.   Time frame is 14 months.

20     A.   Okay.

21     Q.   So I did this the last time.  I'm not going to do

22 it to you because we all want to get out of here today.

23 But we added up the time she spent calling 800 numbers

1    with the time that she spent on the calls, and we

2    figured out that it added to 2.92 minutes per day on

3    average that Mrs. Trostle spent on the phone attending

4    to personal matters.

5         Now, you said you used your phone to attend to

6    personal matters, right?

7    A.   I have.  Yes.

8    Q.   Do you have school-age children?

9    A.   I do.

10   Q.   Did you ever have to deal with calls from your

11   kids' school?

12   A.   I have not, fortunately enough.

13   Q.   Well, did you ever have to call and deal with

14   childcare issues after work and stuff like that with

15   your wife?

16   A.   I don't know that I have.

17   Q.   If you averaged out your time, do you spend three

18   hours a day making personal phone calls off your

19   state-issued phone?

20   A.   No, I do not.

21   Q.   Can you see how some people with young children

22   may have to do that?

23   A.   Three hours a day.

1    Q.  No, no, no.  I didn't mean three hours a day.  I

2  mean three minutes a day.  Let me go back.  You caught

3  me there.  I appreciate you clarifying that for me.

4        Do you spend three minutes a day making personal

5  phone calls off your state-issued phone?

6    A.  No, I do not.

7    Q.  Can you see how someone else may have to spend

8  three minutes a day making personal phone calls off

9  their state-issued phone if they have young kids?

10              MS. RUBINSTEIN:  Objection.

11              THE WITNESS:  Not being in that

12          situation, I guess I can't answer the

13          question.  Because I have different luxuries

14          than some people.

15  BY MR. KEACH:

16    Q.  But if you learn that one of your subordinates

17  who had young kids and was the primary caregiver for her

18  kids averaged three minutes a day making personal phone

19  calls on the state system, would that cause you any

20  great concern?

21    A.  Well, if we're talking about average or we're

22  talking about a compilation of one day.  I mean, it

23  would cause me concern if there was a half a day where

```
 1    they were on the phone or three days that they spent

 2    half a day on the phone making telephone calls as

 3    opposed to the two minutes a day spanning 14 months.

 4    So, yeah, I mean, we're looking at different things

 5    there, in my opinion.

 6        Q.  I remember in the last examination I actually

 7    gave the state the benefit of the doubt and stated it

 8    was 12 months, not 14.  So there would actually be three

 9    minutes a day -- using those numbers would be three

10    minutes a day for 12 months, 50 weeks work in a year,

11    and then a seven-and-a-half-hour workday.

12            So, but the three minutes a day workday on the

13    phone doing personal matters, that would not cause you

14    any great concern, would it?

15                MS. RUBINSTEIN:  Objection.

16                THE WITNESS:  It would depend on if it

17            was interfering with other work that was

18            being done, because you got to look at the

19            totality of it.  As a manager, that's what I

20            would do.

21    BY MR. KEACH:

22        Q.  But there's no indication in the memo from

23    Mr. Botsford that the average three minutes of phone
```

1    calls a day was interfering with other work that

2    Mrs. Trostle had to do, is there?

3        A.   Let me just look at it again.  Well, it talks

4    about that he considers her use of the phone to such an

5    extent for personal reasons inappropriate.  As manager,

6    Ms. Trostle cannot function effectively or present a

7    positive example to her subordinates by consuming over

8    700 minutes of personal calls and not reimbursing the

9    state for the phone charges.  So, there is some

10   reference to that it may have been having an impact on

11   the operation.

12       Q.   Well, I'm just trying to figure out -- and maybe

13   you can explain it to me -- how does someone being on

14   the phone for an average of three minutes a day

15   interfere with their ability to be a manager?

16           I don't understand that.

17               MS. RUBINSTEIN:  Objection.

18               MR. KEACH:  I'll be honest with you.  I

19           mean, I can't figure out how someone making

20           three minutes of personal phone calls a day

21           would interfere with anything, let alone

22           their ability to be a manager.

23               MS. RUBINSTEIN:  Objection.

1              THE WITNESS:  You're talking about an

2         average, right?  So, if we're talking about

3         a half a day's worth of phone calls or 80

4         minutes of phone calls in a day, that could

5         have an impact.  But if you spread it out

6         over the 12 months that you described, I

7         guess it doesn't look like it could have an

8         impact.  But if you're talking about 80

9         minutes in one day, that could have an

10        impact on the operation.

11   BY MR. KEACH:

12     Q.   But actually, sir, if we took that 80 minutes out

13   of there, there'd be actually a lot less, wouldn't it,

14   in terms of her making personal phone calls during the

15   day?

16          Because we got 700 minutes.  We take out 10

17   percent.  So, now we're probably down to about two and a

18   half minutes a day.

19          I'm just trying to figure it out.  I understand

20   you got this memo.  You reviewed it.  You saw the

21   supervisor recommended her termination.  You took a

22   quick look at the memo and said, yeah, the way this was

23   written up this justifies what Mr. Botsford recommended.

```
1              We can agree that that's the process, right?
2                   MS. RUBINSTEIN:  Objection.
3                   THE WITNESS:  Yes.
4    BY MR. KEACH:
5       Q.   And the reason I'm getting into these issues is
6    that I'm sure you can understand from Mrs. Trostle's
7    perspective there was certainly more to the story, and
8    that she believes that this is all just trumped up to
9    get rid of her versus being legitimate.
10             Again, I'm just asking you, from the perspective
11   of someone that supervises these things, if you were not
12   looking at Mrs. Trostle, if we're looking at someone
13   else, if someone comes to you says, this employee was on
14   the phone for three minutes a day and I want them
15   terminated, you wouldn't agree that that's appropriate,
16   would you?
17                  MS. RUBINSTEIN:  Objection.
18                  THE WITNESS:  Again, I'd have to see
19             what they -- I'd have to ask them how it's
20             impacting the operation.  I'd have to ask if
21             it's interfering with other duties, what's
22             it preventing them from doing.
23   BY MR. KEACH:
```

1    Q.   Under DOCCS policy, shouldn't that person be

2    given an opportunity to pay for those phone calls in

3    lieu of being terminated?

4              MS. RUBINSTEIN:   Objection.

5              THE WITNESS:   Every employee has an

6         opportunity to reimburse for their personal

7         phone calls on a monthly basis.

8    BY MR. KEACH:

9    Q.   Let's assume that someone didn't pay for their

10   phone calls and it comes to the attention of the

11   department -- of their supervisor, okay?  Now, I forget

12   what the math is and I'm not going to burden you with it

13   now, but I seem to remember that there's a $7 phone bill

14   added up to roughly about three cents a day in personal

15   calls being made, I think was about the math.  It's

16   probably a little less.

17             So, let's assume someone is making three cents a

18   day in personal phone calls.  Actually, it'd be less

19   than three cents a day.  I think it was less than a cent

20   a day when I worked it out the last time, because we're

21   only talking about 280 minutes over the course of a

22   year.

23             So, if someone made less than a cent a day in

1  personal phone calls on the state and didn't reimburse

2  the state for their 50 cents a month phone bill, do you

3  think that's appropriate to terminate them from their

4  employment, or wouldn't you just want them to pay their

5  bill and do a better job going forward?

6          MS. RUBINSTEIN:  Objection.

7          THE WITNESS:  Again, I think you have

8      to look at the totality of the situation.

9  BY MR. KEACH:

10    Q.  Well, I'm only asking you about that particular

11  issue.  If one of your subordinates, you learned, made

12  50 cents a month of personal phone calls on state

13  equipment and just because they didn't feel like it,

14  they didn't want to review records, they just threw them

15  in the garbage, didn't look at it because they were busy

16  doing other things or just lazy or whatever, and so you

17  learned 14 months later that that person didn't pay 50

18  cents a month for their personal calls and nothing else,

19  what would you do?

20    A.  I would probably have a conversation with the

21  person working for me about it and explain to them that

22  they're responsible for paying for the phone calls.

23    Q.  And you'd say, you owe seven bucks, you're going

1    to pay the state back for the phone calls right now,

2    accurate?

3                    MS. RUBINSTEIN:   Objection.

4    BY MR. KEACH:

5        Q.   You make them pay for the calls.

6        A.   I would point out to them they owe the state

7    money for the phone calls.

8        Q.   And you would expect them to pay for it.

9        A.   I would expect them.   I expect them to pay for it

10   on a monthly basis.

11       Q.   And then you would also expect them going forward

12   to appropriately review their records and make sure they

13   pay for the calls.

14       A.   Yes.   If I talked to them about the situation, I

15   would expect them to remedy the situation.

16       Q.   And you're not aware of there being any effort to

17   talk with Mrs. Trostle about her 50 cents a month phone

18   bill before this incident, correct?

19       A.   Other than anything in the memo, I'm not aware of

20   any other conversation had about it.

21       Q.   And would you agree with me, sir, in the absence

22   of other factors, that someone should be given an

23   opportunity to pay for those calls before they lose

1   their job, get demoted, and have a $20,000 a year pay

2   deduction?

3                    MS. RUBINSTEIN:  Objection.

4                    THE WITNESS:  Again, you'd have to take

5            the totality of the situation into account.

6   BY MR. KEACH:

7       Q.  I understand.  I'm just talking about that issue.

8       A.  Serving in this capacity, former capacity, and

9   serving in my capacity now, I don't take any of these

10  terminations lightly.  I think that they all deserve

11  consideration, and everybody deserves to have things

12  looked at objectively before a decision is made.

13      Q.  I appreciate that.  So you would agree with me

14  that you would expect Mr. Botsford and Ms. Knapp-David

15  to also look at things objectively before making

16  decisions that are conveyed to you, correct?

17      A.  I would expect any manager or supervisor working

18  for the Department of Correctional Services to make

19  a well-thought-out and educated decision before a

20  decision was made.

21      Q.  And if I could convince you -- and I'm not

22  suggesting I've done that in this deposition.  But if I

23  could convince you that Ms. Trostle was treated

1    differently than others that were employed in her agency

2    and that led to her termination, that would cause you

3    concern, wouldn't it?

4              MS. RUBINSTEIN:  Objection.

5              THE WITNESS:  Again, like I said

6         earlier, it would cause me concern if

7         anybody was being treated differently than

8         the rest of the people in a particular

9         office.

10   BY MR. KEACH:

11     Q.  You would agree with me that you relied on what

12   Mr. Botsford said when you made your decision to sign

13   that paper to terminate Mrs. Trostle's employment,

14   right?

15             MS. RUBINSTEIN:  Objection.

16             THE WITNESS:  I relied on the

17        determination that was provided to me in

18        support of the termination log that was

19        prepared by Jean Daniels.  Yes.

20   BY MR. KEACH:

21     Q.  And if you learned that Mr. Botsford, in fact,

22   made false statements in his memorandum in support of

23   Ms. Trostle's termination, that would cause you concern

```
 1    as someone who signed off on her being terminated from

 2    her provisional position, wouldn't it?

 3                 MS. RUBINSTEIN:  Objection.

 4                 THE WITNESS:  Yes, it would.

 5    BY MR. KEACH:

 6      Q.  I probably already asked this.  I want to be

 7    thorough and wrap things up.

 8           You never talked to Theresa Knapp-David about

 9    Mrs. Trostle ever, correct?

10      A.  No.  I don't remember having any conversation

11    with anybody about Mrs. Trostle ever.

12      Q.  And that's the same for Mr. Botsford.

13      A.  Yes.  That is correct.

14                 MR. KEACH:  I'm going to take a little

15           break here and collect my thoughts.

16                 Give me a moment.

17                 (Recess taken.)

18    BY MR. KEACH:

19      Q.  There was an investigation into what happened

20    with Ms. Trostle's demotion by diversity management

21    after Mrs. Trostle filed a formal written complaint with

22    diversity management upon her return from medical leave.

23           Do you know anything about that investigation?
```

1     A.   I do not.

2     Q.   There was some comment made by a woman with the

3  last name of Brooks that people had reviewed her

4  determination and made edits to it.   And some of those

5  edits had concerns about the fact that Mrs. Trostle was

6  not allowed to pay for her phone calls and the like.

7          Do you know anything about that?

8     A.   I do not.

9     Q.   Did you have any role at the time of reviewing

10 determinations made by the office of diversity

11 management?

12    A.   No.

13    Q.   Do you have that role now?

14    A.   I do not.

15    Q.   Well, who would review determinations made by the

16 office of diversity management?

17    A.   Determinations as a result of an investigation?

18    Q.   Yeah.

19    A.   The office of diversity management would.   They

20 would be conducting investigation.   There's a director.

21 And then we also -- now we have a deputy commissioner

22 over there.   But I don't know how exactly how that would

23 play out.

1    Q.   So, you would never get involved in that, is what

2    you're telling me.

3    A.   Not unless I was questioned as part of the

4    investigation.  I'm not charged with conducting the

5    investigation or questioning witnesses or anything like

6    that.

7    Q.   Were you questioned as part of the investigation?

8    A.   No.

9    Q.   What role does your office play now in addressing

10   complaints made by employees of the Department of

11   Correctional Services to the EOC or Division of Human

12   Rights?

13   A.   My office doesn't play any role with that.  If

14   someone came to me with a complaint, I would forward

15   that complaint to the office of diversity management.

16   Q.   That's where all that stuff is handed over,

17   diversity management, correct?

18   A.   Yes.

19   Q.   And that's outside your purview of supervision

20   even as the director of personnel.

21   A.   That is correct.

22   Q.   So, decisions made about complaints to diversity

23   management, those would be made by diversity management.

1    And then if there was some discipline to be taken as a

2    result of that, that would be referred to -- if it was a

3    Section 75 employee, that would be referred to labor

4    relations.

5        A.   Yes.   That's correct.

6        Q.   And if something happened at diversity management

7    that referred to a management/confidential or

8    provisional employee, that would then be sent to you --

9    no.

10            That would go to human resources; am I right?

11       A.   I am the director of personnel.   I oversee the

12   bureau of personnel, which is oftentimes referred to as

13   human resources.   We are the human resources office.

14   It's called personnel.

15       Q.   If someone wanted to take action against an

16   employee of the Department of Correctional Services

17   because of what happened in a diversity management

18   investigation, that would come to your office.

19            MS. RUBINSTEIN:   Objection.

20   BY MR. KEACH:

21       Q.   If the employee -- excuse me, if the employee was

22   a provisional employee.

23       A.   If the diversity management conducted an

1     investigation and their findings were such that a

2     provisional employee had conducted some misconduct or

3     wasn't acting appropriately, then, yes, that would come

4     to me because the employee would be provisional.

5        Q.   What if it's a management/confidential employee,

6     like someone who is in the role of associate

7     commissioner, what would happen then?

8        A.   Associate commissioners serve at the pleasure of

9     the commissioner.  So it probably wouldn't come to me.

10    It would probably go to the commissioner or deputy

11    commissioner for review.  They would be permanent

12    employees.

13       Q.   Now, I'm in the process of wrapping this up.  I'm

14    just doing this so I can clarify what my understanding

15    is, not because I want you to get into the particulars

16    of these incidents.

17            But I know that there have been problems in the

18    Office of the Inspector General of the Department of

19    Corrections with sexual harassment in the workplace, and

20    that individuals have retired or been demoted and the

21    like.

22            Are you aware of that, just yes or no?

23            MS. RUBINSTEIN:   Objection.

1              THE WITNESS:   I am aware that there

2          were some issues over there and people have

3          retired.

4    BY MR. KEACH:

5      Q.   What role, if any, did you play in addressing

6    problems with the office of inspector general?

7                MS. RUBINSTEIN:   Objection.

8                THE WITNESS:   None.

9    BY MR. KEACH:

10     Q.   Would that have been handled by the commissioner

11   or the acting commissioner?

12               MS. RUBINSTEIN:   Objection.

13               THE WITNESS:   I don't know.

14   BY MR. KEACH:

15     Q.   It's been represented in this case that personnel

16   made the recommendation of the penalty that Mrs. Trostle

17   should bear in terms of being returned to her hold item.

18          Do you know anything about that?

19     A.   I guess I don't understand the question.

20     Q.   At the bottom of the memo from Mr. Botsford to

21   Mr. Martuscello, it says that Mrs. Trostle should be --

22   it's our recommendation that Mrs. Trostle be returned to

23   the hold item.

1     A.   Okay.

2     Q.   Do you see that?

3     A.   Yes.

4     Q.   And it's been represented in this case by other

5  deponents that personnel was the one that made the

6  recommendation to return Mrs. Trostle to her hold item

7  versus them accepting the recommendation of the

8  supervisors.

9          Do you know anything about that?

10    A.   No.  I mean, we would be -- personnel would be

11  responsible for processing the termination of the

12  provisional employee, and the employee would fall back

13  to wherever their hold was.  That's part of the process.

14    Q.   So, I just want to be clear.

15         To your knowledge, personnel wasn't the one that

16  made that determination to send Ms. Trostle back to the

17  hold item.

18    A.   No.  The recommendation of the termination came

19  in the form of the memo here from Mr. Botsford to Dan

20  Martuscello.  The termination was processed.  She was a

21  provisional employee who was terminated from her

22  provisional position.  And she landed at where her

23  permanent hold was.

1    Q.  So, I just want to be clear.  Before Mr. Botsford

2    sent that memo to Mr. Martuscello, personnel wouldn't

3    get involved at all, would it?

4              MS. RUBINSTEIN:  Objection.

5              THE WITNESS:  No.  I mean, we'd be made

6         aware of the situation by the manager of the

7         area, the program manager of the area, the

8         supervisor.

9    BY MR. KEACH:

10   Q.  When you got the memo.

11   A.  Right.

12   Q.  You wouldn't get involved before the memo came

13   out; fair to say?

14   A.  There may be -- I mean, there may be a phone

15   call.  I don't know about in this situation, but there

16   may be a situation where someone calls and says, we got

17   this situation going on.  We're preparing the

18   documentation to send down to you for review and

19   consideration of the termination, whatever.  That often

20   happens with facilities.  Call and say, hey, we have a

21   probationary employee who just --

22   Q.  Isn't working out.

23   A.  -- came in with a cell phone, say.  We're

1  preparing documentation to send up to you for your

2  review.

3     Q.   Did Mrs. Trostle have an opportunity, when she

4  was recommended for demotion from the position of

5  assistant director, to return to being a classification

6  analyst?

7     A.   I don't know if she had an opportunity to do

8  that.

9     Q.   If that was also a provisional position at this

10  time, would she have the ability to do that?

11     A.   No.  She'd only have a right to the permanent

12  hold she had, the hold on her last permanent position.

13     Q.   But would there be anything that would preclude

14  her from being able to say, it's not working out with

15  you as a supervisor, we're going to send you back to

16  your position as a classification analyst, and you can

17  work in the position now going forward, you're not going

18  to be the supervisor anymore?

19     A.   She'd have no rights to that.  There may be other

20  considerations.  Maybe there wasn't a vacancy to

21  consider, things like that.  I don't know what the --

22     Q.   But there wouldn't be any prohibition to that

23  being done here as an alternative to sending her back to

```
 1   her hold item, would there?

 2                MS. RUBINSTEIN:  Objection.

 3                THE WITNESS:  She didn't have any

 4           rights to that.  But, yeah, I don't know.  I

 5           don't know if anything would preclude her

 6           from going back to where she was serving

 7           provisional in one of those positions

 8           before.

 9   BY MR. KEACH:

10     Q.  Yeah.  She was a provisional as a classification

11   analyst, and then she became the assistant director.

12           So I'm just trying to figure out if -- let's

13   assume that she wanted to be a classification analyst

14   again, they had room for her, and she wanted to stay and

15   work in central office for economic reasons.

16           There would be no prohibition to her doing that;

17   fair to say?

18                MS. RUBINSTEIN:  Objection.

19                THE WITNESS:  No.  I don't believe so.

20           I mean, I don't know what the consideration

21           would be.  But, no, if she served

22           provisionally in the title before, I don't

23           see why she wouldn't have been able to serve
```

1          provisionally in the title again.  But she

2          didn't have a right to that, though.

3                MR. KEACH:  I understand that.

4                I think that answers my question.

5                I don't have any more for you.

6                (Deposition concluded at 4:28 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
1   STATE OF NEW YORK      )

2   COUNTY OF

3

4   I, DARREN AYOTTE, do hereby certify that I have read the

5   foregoing record of my testimony taken at the time and

6   place noted in the heading hereof and that it is a true

7   and correct transcript of the same and the whole

8   thereof.

9

10

11

12

13                          _____
                                        DARREN AYOTTE
14  Subscribed and sworn to

15  before me this _____ day

16  of _____, 2014

17

18

19

20

21  _____

22

23
```

1        C E R T I F I C A T I O N

2

3

4    I, Jeanne O'Connell, Registered Professional Reporter

5    and Notary Public in and for the State of New York, do

6    hereby certify that the foregoing to be a true and

7    accurate transcription of the stenographic notes as

8    taken by me of the aforesaid proceedings.

9

10

11

12    __11/10/14_____                _____
         Date                            Jeanne O'Connell
13

14

15

16

17

18

19

20

21

22

23

## $

**$20,000** [1] - 51:1

## 1

**1** [3] - 11:8, 27:18, 38:7
**10** [1] - 46:16
**109** [2] - 1:14, 2:3
**12** [3] - 44:8, 44:10, 46:6
**12205-5531** [2] - 1:15, 2:4
**13** [1] - 18:18
**13204-2465** [1] - 2:9
**14** [4] - 41:19, 44:3, 44:8, 49:17
**15** [1] - 27:21
**17** [1] - 6:8
**17th** [1] - 1:12
**1:13-CV-0709** [1] - 1:5

## 2

**2.92** [1] - 42:2
**20** [1] - 27:21
**2011** [2] - 7:18, 29:2
**2014** [2] - 1:12, 64:16
**221** [1] - 3:4
**230** [1] - 41:16
**280** [1] - 48:21

## 3

**31** [1] - 41:15
**3116** [1] - 3:11
**3:21** [1] - 1:13

## 4

**4** [2] - 11:7, 27:18
**4:28** [1] - 63:6

## 5

**50** [5] - 44:10, 49:2, 49:12, 49:17, 50:17

## 6

**615** [1] - 2:8

## 7

**7** [2] - 25:3, 48:13
**700** [2] - 45:8, 46:16
**75** [2] - 8:20, 56:3

## 8

**80** [13] - 38:8, 38:10, 38:13, 38:18, 38:20, 38:22, 39:19, 40:18, 41:2, 41:18, 46:3, 46:8, 46:12
**80-minute** [1] - 38:19
**800** [1] - 41:23

## A

**ability** [4] - 14:2, 45:15, 45:22, 61:10
**able** [2] - 61:14, 62:23
**absence** [2] - 32:11, 50:21
**absolutely** [4] - 21:22, 24:22, 26:19, 35:3
**abut** [1] - 13:23
**academy** [1] - 6:18
**accepting** [1] - 59:7
**accommodate** [1] - 5:12
**according** [1] - 15:17
**account** [1] - 51:5
**accurate** [2] - 50:2, 65:7
**Act** [1] - 23:11
**act** [1] - 35:7
**acting** [2] - 57:3, 58:11
**action** [4] - 3:8, 22:10, 34:12, 56:15
**added** [3] - 41:23, 42:2, 48:14
**addition** [1] - 3:6
**additional** [3] - 22:9, 23:17, 31:10
**additionally** [1] - 15:20
**address** [1] - 39:18
**addressed** [1] - 32:8
**addressing** [2] - 55:9, 58:5
**administrative** [1] - 7:3
**administrator** [5] - 7:4, 9:9, 12:23, 13:1, 13:17
**admitted** [2] - 17:15, 17:20

**adverse** [1] - 34:12
**advisor** [1] - 8:2
**affect** [1] - 21:12
**aforesaid** [1] - 65:8
**age** [1] - 42:8
**agency** [4] - 4:22, 33:2, 35:2, 52:1
**Agent** [1] - 1:11
**agree** [13] - 19:1, 19:22, 22:5, 24:3, 31:7, 31:23, 38:6, 38:12, 47:1, 47:15, 50:21, 51:13, 52:11
**agreed** [1] - 3:2
**Albany** [3] - 1:15, 2:4, 4:9
**allegations** [1] - 36:18, 37:3, 37:6
**allow** [3] - 18:7, 18:16, 31:9
**allowed** [1] - 54:6
**alone** [1] - 45:21
**alternative** [1] - 61:23
**amount** [1] - 18:4
**analyst** [4] - 61:6, 61:16, 62:11, 62:13
**AND** [1] - 1:7
**answer** [6] - 6:1, 30:7, 30:8, 37:1, 40:20, 43:12
**answered** [1] - 24:15
**answers** [1] - 63:4
**APPEARANCES** [1] - 2:1
**applied** [2] - 20:14, 20:16
**appreciate** [4] - 9:15, 33:6, 43:3, 51:13
**approached** [1] - 37:12
**appropriate** [6] - 24:20, 34:9, 34:23, 38:15, 47:15, 49:3
**appropriately** [2] - 50:12, 57:3
**approval** [1] - 18:12
**approximation** [1] - 27:16
**area** [6] - 9:12, 9:13, 12:5, 14:8, 60:7
**Article** [1] - 8:20
**ascertain** [1] - 9:7
**aside** [1] - 37:4
**Assistant** [1] - 2:10
**assistant** [14] - 7:3, 7:5, 7:19, 7:20, 7:23, 9:12, 9:23, 10:10, 10:12, 13:2, 29:21, 32:23, 61:5, 62:11
**associate** [6] - 7:4,

9:9, 13:1, 13:17, 57:6, 57:8
**assume** [9] - 6:2, 20:7, 26:20, 31:22, 39:16, 40:8, 48:9, 48:17, 62:13
**assuming** [1] - 9:12
**assure** [1] - 4:13
**at,and** [1] - 3:7
**attached** [2] - 11:13, 26:5
**attachment** [1] - 27:18
**attend** [1] - 42:5
**attending** [1] - 42:3
**attention** [2] - 24:10, 48:10
**attorney** [2] - 3:15, 30:3
**Attorney** [2] - 2:8, 30:3
**attorneys** [1] - 3:2
**authorizations** [1] - 19:15
**authorized** [1] - 19:12
**Avenue** [2] - 1:15, 2:4
**average** [5] - 42:3, 43:21, 44:23, 45:14, 46:2
**averaged** [2] - 42:17, 43:18
**aware** [13] - 19:21, 21:23, 22:4, 23:23, 37:22, 38:1, 38:2, 38:5, 50:16, 50:19, 57:22, 58:1, 60:6
**Ayotte** [1] - 4:5
**AYOTTE** [4] - 1:12, 4:1, 64:4, 64:13

## B

**bad** [1] - 5:10
**bar** [1] - 3:7
**based** [1] - 28:7
**basis** [2] - 48:7, 50:10
**bear** [1] - 58:17
**became** [2] - 9:5, 62:11
**Bedford** [1] - 6:20
**began** [1] - 23:20
**begun** [1] - 3:10
**believer** [1] - 34:15
**believes** [1] - 47:8
**benefit** [1] - 44:7
**better** [1] - 49:5
**between** [2] - 3:2, 31:20
**beyond** [1] - 13:23
**bill** [6] - 25:5, 25:9,

48:13, 49:2, 49:5, 50:18
**bills** [1] - 25:13
**Bob** [1] - 4:5
**BOTSFORD** [1] - 1:7
**Botsford** [17] - 14:19, 15:12, 15:21, 17:14, 17:19, 17:23, 23:20, 24:2, 44:23, 46:23, 51:14, 52:12, 52:21, 53:12, 58:20, 59:19, 60:1
**Botsford's** [3] - 25:3, 28:3, 28:8
**bottom** [1] - 58:20
**Boulevard** [1] - 2:8
**break** [4] - 5:11, 5:13, 53:15
**Brian** [1] - 29:22
**Brooks** [1] - 54:3
**brought** [1] - 24:9
**bucks** [1] - 49:23
**building** [3] - 28:23, 29:1, 34:5
**burden** [1] - 48:12
**bureau** [3] - 9:20, 10:8, 56:12
**business** [3] - 19:7, 19:11, 40:6
**busy** [2] - 40:9, 49:15
**BY** [38] - 4:4, 18:10, 21:8, 21:18, 24:11, 24:23, 27:11, 27:23, 32:9, 32:17, 34:20, 35:20, 36:16, 37:14, 37:21, 39:3, 39:15, 40:7, 41:13, 43:15, 44:21, 46:11, 47:4, 47:23, 48:8, 49:9, 50:4, 51:6, 52:10, 52:20, 53:5, 53:18, 56:20, 58:4, 58:9, 58:14, 60:9, 62:9

## C

**C.P.L.R** [2] - 3:4, 3:12
**calls..** [1] - 25:17
**campus** [2] - 28:21, 28:22
**cannot** [2] - 5:3, 45:6
**capacity** [5] - 7:13, 37:11, 51:8, 51:9
**care** [3] - 39:18, 40:2, 40:6
**caregiver** [1] - 43:17
**Carol** [2] - 10:15
**case** [3] - 13:17, 58:15, 59:4

**cases** [4] - 14:15, 19:7, 35:4, 35:5
**caught** [1] - 43:2
**caused** [3] - 24:18, 25:10, 41:8
**cell** [1] - 60:23
**cent** [2] - 48:19, 48:23
**central** [11] - 6:23, 7:2, 9:20, 19:18, 19:20, 28:21, 29:12, 33:22, 34:3, 62:15
**cents** [7] - 48:14, 48:17, 48:19, 49:2, 49:12, 49:18, 50:17
**certainly** [2] - 13:16, 47:7
**certify** [2] - 64:4, 65:6
**change** [3] - 17:2, 40:15, 40:17
**charge** [1] - 3:15
**charged** [3] - 8:14, 8:15, 55:4
**charges** [2] - 35:8, 45:9
**childcare** [2] - 4:15, 42:14
**children** [2] - 42:8, 42:21
**circulated** [2] - 12:19, 12:21
**civil** [1] - 4:7
**Civil** [1] - 1:5
**claims** [1] - 4:21
**clarify** [1] - 57:14
**clarifying** [2] - 9:15, 43:3
**class** [1] - 15:20
**classification** [13] - 9:3, 11:1, 16:9, 16:13, 16:17, 16:22, 20:8, 28:17, 29:4, 61:5, 61:16, 62:10, 62:13
**clear** [4] - 28:1, 28:11, 59:14, 60:1
**CO** [2] - 6:14, 6:15
**collect** [1] - 53:15
**comfortable** [1] - 22:14
**coming** [2] - 31:1, 40:13
**commencing** [1] - 1:12
**comment** [4] - 30:21, 37:16, 38:7, 54:2
**commissioner** [7] - 54:21, 57:7, 57:9, 57:10, 57:11, 58:10, 58:11
**commissioners** [1] -

57:8
**compare** [1] - 12:3
**compares** [1] - 16:8
**compilation** [1] - 43:22
**compiled** [1] - 35:12
**complain** [4] - 22:9, 22:18, 22:20, 23:5
**complaining** [1] - 22:2
**complaint** [8] - 21:20, 22:11, 22:14, 24:12, 30:11, 53:21, 55:14, 55:15
**complaints** [2] - 55:10, 55:22
**compliance** [2] - 31:11, 32:11
**comply** [1] - 32:20
**concern** [27] - 17:8, 17:14, 17:18, 17:22, 17:23, 20:11, 20:17, 21:1, 21:2, 21:10, 21:15, 21:17, 21:21, 21:22, 23:7, 23:12, 23:16, 25:10, 25:15, 31:8, 35:14, 43:20, 43:23, 44:14, 52:3, 52:6, 52:23
**concerns** [2] - 34:10, 54:5
**concluded** [1] - 63:6
**conclusion** [1] - 27:19
**condition** [1] - 39:7
**conduct** [4] - 19:11, 20:13, 21:9, 23:21
**Conduct** [1] - 3:5
**conducted** [2] - 56:23, 57:2
**conducting** [2] - 54:20, 55:4
**conference** [2] - 25:20, 25:23
**confirm** [1] - 26:17
**consider** [1] - 61:21
**consideration** [5] - 26:1, 26:21, 51:11, 60:19, 62:20
**considerations** [1] - 61:20
**considers** [1] - 45:4
**consuming** [1] - 45:7
**contacted** [1] - 29:15
**contemporaneous** [1] - 36:1
**controlled** [1] - 3:12
**convenience** [1] - 19:10
**conversation** [6] - 24:1, 30:9, 31:20, 49:20, 50:20, 53:10

**conversations** [6] - 14:18, 14:21, 15:1, 15:4, 28:6, 30:1
**conveyed** [1] - 51:16
**convince** [2] - 51:21, 51:23
**copy** [3] - 3:14, 25:9, 30:11
**correct** [17] - 4:18, 4:22, 8:6, 13:22, 19:21, 25:19, 28:5, 31:11, 41:1, 50:18, 51:16, 53:9, 53:13, 55:17, 55:21, 56:5, 64:7
**Correctional** [12] - 6:6, 6:11, 6:19, 6:21, 12:11, 17:1, 22:7, 30:4, 34:22, 51:18, 55:11, 56:16
**correctional** [5] - 6:7, 6:19, 8:2, 8:3, 8:4
**Corrections** [5] - 8:13, 18:22, 20:18, 23:9, 57:19
**corrections** [3] - 6:11, 6:18, 35:6
**counsel** [3] - 3:11, 30:8, 30:10
**counseling** [1] - 31:18
**counselled** [1] - 31:17
**COUNTY** [1] - 64:2
**course** [3] - 30:22, 48:21
**court** [1] - 5:3
**COURT** [1] - 1:1
**courtesy** [1] - 5:7
**cover** [1] - 10:4
**covered** [1] - 23:11
**Coxsackie** [1] - 6:19
**current** [1] - 37:10
**cut** [1] - 29:23

**D**

**Dan** [2] - 12:17, 59:19
**Daniels** [5] - 9:8, 10:6, 13:18, 26:11, 52:19
**DARREN** [4] - 1:11, 4:1, 64:4, 64:13
**Date** [1] - 65:12
**David** [3] - 14:22, 51:14, 53:8
**DAVID** [1] - 1:7
**day's** [1] - 46:3
**days** [1] - 44:1
**deal** [3] - 4:15, 42:10, 42:13
**decision** [12] - 9:2,

13:23, 14:1, 17:11, 25:21, 27:6, 36:3, 37:17, 51:12, 51:19, 51:20, 52:12
**decisions** [4] - 8:10, 13:11, 51:16, 55:22
**dedication** [1] - 15:22
**deduction** [1] - 51:2
**deem** [1] - 39:8
**deemed** [1] - 3:11
**Defendant** [1] - 1:11
**Defendants** [2] - 1:8, 2:6
**define** [2] - 30:19, 30:21
**demonstrated** [1] - 15:17
**demote** [1] - 9:2
**demoted** [4] - 12:10, 20:13, 51:1, 57:20
**demoting** [2] - 8:17, 9:17
**demotion** [6] - 9:6, 10:20, 14:13, 24:5, 53:20, 61:4
**denied** [1] - 35:13
**denies** [1] - 35:23
**Department** [14] - 6:5, 6:11, 8:12, 16:23, 18:21, 20:18, 22:7, 23:9, 30:3, 34:22, 51:18, 55:10, 56:16, 57:18
**department** [7] - 6:7, 18:6, 18:15, 33:2, 34:4, 40:14, 48:11
**deponents** [1] - 59:5
**deposed** [1] - 4:8
**DEPOSITION** [1] - 1:11
**Deposition** [1] - 63:6
**deposition** [4] - 3:9, 3:11, 3:13, 51:22
**depositions** [1] - 5:10
**Depositions** [1] - 3:5
**deputy** [2] - 54:21, 57:10
**described** [1] - 46:6
**deserve** [1] - 51:10
**deserves** [2] - 32:1, 51:11
**desk** [1] - 9:18
**determination** [5] - 12:10, 13:7, 52:17, 54:4, 59:16
**determinations** [3] - 54:10, 54:15, 54:17
**determine** [1] - 33:7
**determining** [1] - 11:19

**difference** [1] - 30:20
**different** [9] - 7:7, 9:11, 11:9, 14:11, 32:20, 34:7, 41:4, 43:13, 44:4
**differently** [3] - 41:8, 52:1, 52:7
**direct** [1] - 14:7
**directed** [1] - 19:17
**directive** [4] - 18:14, 19:1, 19:17, 19:19
**directives** [2] - 17:1, 19:22
**directly** [3] - 10:9, 22:12, 33:18
**director** [27] - 7:5, 7:6, 7:7, 7:8, 7:10, 7:12, 7:14, 7:19, 7:20, 7:23, 9:13, 9:23, 10:10, 10:12, 12:17, 13:2, 13:3, 14:6, 15:20, 29:21, 33:1, 54:20, 55:20, 56:11, 61:5, 62:11
**discipline** [3] - 8:11, 8:14, 56:1
**discrimination** [4] - 21:20, 22:2, 22:8, 24:13
**dispute** [2] - 35:17, 35:22
**distance** [3] - 38:14, 40:19, 41:15
**distract** [1] - 5:18
**DISTRICT** [2] - 1:1, 1:1
**diversity** [16] - 13:4, 22:12, 22:20, 23:1, 53:20, 53:22, 54:10, 54:16, 54:19, 55:15, 55:17, 55:22, 55:23, 56:6, 56:17, 56:23
**Division** [1] - 55:11
**DOCCS** [3] - 19:23, 33:21, 48:1
**document** [5] - 5:16, 10:21, 11:6, 12:20, 36:2
**documentation** [20] - 10:19, 10:23, 11:2, 11:10, 12:4, 12:8, 13:16, 26:7, 27:10, 28:2, 31:4, 34:16, 34:21, 34:23, 35:2, 35:6, 35:11, 36:14, 60:18, 61:1
**documentation-driven** [1] - 35:2
**documenting** [1] - 34:19
**documents** [3] - 9:7,

26:15, 27:13
**done** [6] - 14:15, 35:3, 35:4, 44:18, 51:22, 61:23
**doubt** [1] - 44:7
**DOUG** [1] - 1:7
**Doug** [1] - 17:22
**Douglas** [6] - 14:18, 15:21, 17:14, 17:19, 24:2, 28:3
**down** [6] - 5:3, 13:2, 14:6, 34:11, 46:17, 60:18
**driven** [1] - 35:2
**duly** [1] - 4:1
**duration** [1] - 19:14
**during** [4] - 17:21, 25:7, 40:4, 46:14
**duties** [1] - 47:21

## E

**e-mail** [1] - 15:9
**e-mailed** [1] - 26:9
**e-mails** [1] - 15:8
**East** [1] - 4:7
**economic** [1] - 62:15
**edits** [2] - 54:4, 54:5
**educated** [2] - 27:5, 51:19
**Edwards** [1] - 10:17
**effectively** [1] - 45:6
**effort** [2] - 32:11, 50:16
**either** [6] - 9:12, 12:22, 15:17, 16:11, 24:17, 30:2
**Elmer** [3] - 1:13, 2:3, 2:5
**emergencies** [1] - 20:3
**emergency** [6] - 18:12, 19:3, 19:8, 23:10, 23:22, 24:11
**emergent** [1] - 5:17
**employed** [2] - 4:22, 52:1
**employee** [36] - 9:17, 9:19, 9:20, 13:14, 14:7, 14:17, 15:17, 18:8, 22:6, 31:21, 32:7, 32:15, 32:18, 32:21, 34:18, 36:4, 36:21, 37:1, 37:5, 37:11, 37:15, 47:13, 48:5, 56:3, 56:8, 56:16, 56:21, 56:22, 57:2, 57:4, 57:5, 59:12, 59:21, 60:21

**employees** [18] - 8:12, 8:15, 8:18, 8:19, 8:22, 16:9, 16:21, 18:16, 19:10, 25:4, 32:22, 33:10, 34:10, 36:13, 36:22, 55:10, 57:12
**employment** [8] - 17:11, 21:13, 23:8, 32:2, 37:5, 37:18, 49:4, 52:13
**end** [1] - 30:8
**ended** [1] - 9:18
**engaging** [1] - 20:12
**ensure** [2] - 31:10, 32:11
**entertain** [1] - 8:11
**entire** [1] - 26:2
**EOC** [3] - 22:21, 23:2, 55:11
**equipment** [3] - 18:22, 19:6, 49:13
**Eric** [1] - 2:7
**Erie** [1] - 2:8
**especially** [1] - 32:23
**Esq** [1] - 2:5
**established** [1] - 6:9
**exactly** [5] - 10:14, 10:17, 13:14, 18:1, 54:22
**EXAMINATION** [1] - 4:3
**examination** [7] - 3:6, 3:7, 3:10, 3:15, 4:11, 4:13, 44:6
**examined** [3] - 3:9, 3:15, 4:2
**examiner** [1] - 5:21
**example** [1] - 45:7
**except** [2] - 3:5, 19:7
**excessive** [4] - 39:1, 39:9, 40:19, 41:6
**excessively** [1] - 15:18
**excuse** [3] - 39:11, 40:1, 56:21
**excused** [1] - 41:7
**excusing** [1] - 40:5
**exercise** [1] - 23:3
**exercising** [1] - 23:13
**exhaust** [1] - 22:23
**Exhibit** [6] - 11:7, 11:8, 18:18, 27:18, 38:7
**expect** [8] - 20:14, 50:8, 50:9, 50:11, 50:15, 51:14, 51:17
**expected** [1] - 15:23
**explain** [4] - 36:17, 37:8, 45:13, 49:21

**explanation** [1] - 36:20
**extended** [1] - 40:11
**Extension** [2] - 1:15, 2:4
**extent** [2] - 4:14, 45:5

## F

**facilities** [5] - 8:2, 8:3, 8:5, 19:8, 60:20
**facility** [2] - 9:19, 19:17
**Facility** [3] - 6:20, 6:21, 12:11
**facing** [1] - 22:8
**fact** [3] - 24:7, 52:21, 54:5
**factors** [1] - 50:22
**failed** [1] - 16:14
**failure** [2] - 3:6, 3:10
**fair** [10] - 6:3, 24:13, 24:20, 28:13, 28:15, 28:18, 28:20, 32:18, 60:13, 62:17
**fall** [1] - 59:12
**false** [1] - 52:22
**Family** [1] - 23:11
**family** [4] - 23:14, 37:23, 38:3, 39:6
**fell** [1] - 9:11
**felt** [2] - 41:6, 41:7
**figure** [5] - 13:5, 39:8, 45:12, 45:19, 46:19, 62:12
**figured** [1] - 42:2
**file** [3] - 22:11, 26:9, 26:10
**filed** [1] - 53:21
**filing** [1] - 3:13
**finally** [1] - 5:21
**findings** [1] - 57:1
**finish** [1] - 5:6
**fired** [1] - 32:10
**first** [7] - 4:1, 22:5, 22:18, 23:1, 29:7, 29:19
**five** [2] - 4:14, 27:2
**flip** [1] - 6:1
**floor** [4] - 29:4, 29:5, 29:6, 29:7
**followed** [1] - 19:23
**follows** [1] - 4:2
**foregoing** [2] - 64:5, 65:6
**forget** [1] - 48:11
**form** [2] - 3:5, 59:19
**formal** [1] - 53:21
**former** [1] - 51:8

**forms** [1] - 14:3
**fortunately** [1] - 42:12
**forward** [5] - 15:11, 49:5, 50:11, 55:14, 61:17
**frame** [1] - 41:19
**front** [1] - 27:13
**function** [1] - 45:6
**furnished** [2] - 3:15, 19:5
**FURTHER** [1] - 3:14

## G

**garbage** [1] - 49:15
**General** [3] - 2:8, 2:10, 57:18
**general** [1] - 58:6
**general's** [1] - 30:3
**generate** [1] - 35:6
**given** [14] - 16:5, 23:19, 25:8, 25:9, 25:13, 25:14, 26:21, 31:14, 32:20, 36:18, 37:2, 37:16, 48:2, 50:22
**government** [1] - 30:2
**governor** [1] - 40:13
**great** [2] - 43:20, 44:14
**Greenbush** [1] - 4:7
**Greene** [2] - 12:11, 29:13
**Greenhaven** [4] - 6:21, 6:22, 33:22, 34:3
**group** [1] - 20:22
**guess** [6] - 18:3, 21:6, 33:6, 43:12, 46:7, 58:19

## H

**half** [7] - 6:8, 40:15, 43:23, 44:2, 44:11, 46:3, 46:18
**handed** [1] - 55:16
**handing** [1] - 26:13
**handle** [3] - 39:13, 40:21, 40:22
**handled** [1] - 58:10
**harassment** [1] - 57:19
**Harriman** [1] - 28:22
**head** [3] - 5:4, 18:15, 31:6
**heading** [1] - 64:6
**heard** [1] - 11:5

**Heather** [1] - 2:9
**held** [2] - 1:12, 7:2
**hereby** [3] - 3:2, 64:4, 65:6
**hereof** [1] - 64:6
**hereto** [1] - 3:3
**Herman** [1] - 29:15
**herself** [1] - 41:7
**higher** [1] - 33:3
**Hills** [1] - 6:20
**hold** [14] - 10:20, 14:14, 15:13, 33:1, 33:2, 58:17, 58:23, 59:6, 59:13, 59:17, 59:23, 61:12, 62:1
**holding** [1] - 36:23
**honest** [1] - 45:18
**hospital** [3] - 39:4, 39:17, 41:4
**hot** [1] - 5:8
**hour** [2] - 40:14, 44:11
**hours** [6] - 17:21, 19:12, 31:11, 42:18, 42:23, 43:1
**Human** [1] - 55:11
**human** [6] - 7:8, 7:10, 7:12, 56:10, 56:13
**hypothetical** [1] - 40:12

## I

**Ill** [3] - 1:14, 2:3, 2:5
**imagine** [1] - 23:3
**immediately** [1] - 23:9
**impact** [4] - 45:10, 46:5, 46:8, 46:10
**impacting** [1] - 47:20
**impermissible** [2] - 21:3, 21:12
**implicate** [1] - 30:6
**inappropriate** [2] - 39:20, 45:5
**incident** [1] - 50:18
**incidents** [1] - 57:16
**including** [1] - 3:5
**independent** [2] - 13:12, 26:14
**independently** [1] - 11:19
**indication** [1] - 44:22
**individual** [1] - 20:22
**individuals** [7] - 15:2, 16:12, 16:16, 19:2, 20:11, 30:5, 57:20
**informal** [2] - 31:18, 31:20
**information** [2] - 4:21, 23:19

inmate [1] - 35:5
inmates [1] - 35:7
input [1] - 13:12
Inspector [1] - 57:18
inspector [1] - 58:6
installed [1] - 19:9
instance [1] - 35:21
interaction [1] - 28:12
interfere [2] - 45:15, 45:21
interfering [3] - 44:17, 45:1, 47:21
investigation [10] - 23:21, 53:19, 53:23, 54:17, 54:20, 55:4, 55:5, 55:7, 56:18, 57:1
involved [7] - 8:10, 9:6, 20:17, 25:21, 55:1, 60:3, 60:12
involvement [1] - 9:2
IS [1] - 3:14
issue [6] - 32:6, 32:7, 34:18, 36:3, 49:11, 51:7
issued [7] - 17:15, 19:2, 20:2, 20:9, 42:19, 43:5, 43:9
issues [7] - 4:15, 15:19, 32:19, 34:19, 42:14, 47:5, 58:2
IT [1] - 3:14
it'd [1] - 48:18
item [8] - 10:20, 14:14, 15:13, 58:17, 58:23, 59:6, 59:17, 62:1
itself [1] - 14:1

## J

Jean [6] - 9:8, 10:6, 13:17, 26:11, 26:13, 52:19
Jeanne [3] - 1:16, 65:4, 65:12
job [5] - 5:8, 7:2, 32:23, 49:5, 51:1
June [2] - 7:18, 29:1
justification [1] - 14:5
justified [2] - 17:4, 27:9
justifies [1] - 46:23
justify [2] - 15:12, 30:17

## K

KEACH [42] - 4:4,

18:10, 21:8, 21:18, 24:11, 24:23, 27:11, 27:23, 32:9, 32:17, 34:20, 35:20, 36:9, 36:16, 37:14, 37:21, 39:3, 39:15, 40:7, 41:13, 43:15, 44:21, 45:18, 46:11, 47:4, 47:23, 48:8, 49:9, 50:4, 51:6, 52:10, 52:20, 53:5, 53:14, 53:18, 56:20, 58:4, 58:9, 58:14, 60:9, 62:9, 63:3
Keach [4] - 1:13, 2:3, 2:5, 4:5
keep [1] - 34:9
keeping [1] - 34:23
kidneys [1] - 23:22
kids [3] - 43:9, 43:17, 43:18
kids' [1] - 42:11
KNAPP [1] - 1:7
Knapp [3] - 14:22, 51:14, 53:8
KNAPP-DAVID [1] - 1:7
Knapp-David [3] - 14:22, 51:14, 53:8
knowledge [3] - 19:19, 28:12, 59:15
known [1] - 24:17

## L

labor [2] - 8:15, 56:3
landed [1] - 59:22
last [8] - 4:6, 5:9, 11:14, 41:21, 44:6, 48:20, 54:3, 61:12
late [13] - 30:16, 30:22, 30:23, 31:1, 31:4, 31:8, 31:19, 31:22, 32:5, 35:12, 35:13, 35:23, 36:14
law [1] - 21:4
Law [2] - 1:13, 2:3
lawyer [1] - 4:8
lawyers [1] - 30:2
lazy [1] - 49:16
learn [5] - 29:19, 33:19, 33:23, 34:8, 43:16
learned [5] - 30:7, 30:10, 49:11, 49:17, 52:21
least [2] - 37:7, 38:15
leave [7] - 23:10, 23:14, 37:23, 38:4,

40:11, 40:13, 53:22
Leave [1] - 23:11
led [1] - 52:2
left [4] - 6:22, 29:12, 33:22, 34:2
legitimate [1] - 47:9
length [2] - 18:4, 26:1
less [5] - 46:13, 48:16, 48:18, 48:19, 48:23
level [1] - 15:22
liaison [2] - 8:1, 8:4
lieu [1] - 48:3
lightly [1] - 51:10
limited [1] - 19:14
listen [2] - 13:18, 37:13
local [2] - 7:23, 9:21
log [13] - 9:8, 9:10, 10:21, 11:12, 11:13, 11:22, 12:2, 12:3, 12:6, 13:13, 13:15, 15:2, 52:18
look [15] - 11:15, 18:19, 24:19, 27:1, 27:4, 27:18, 41:8, 44:18, 45:3, 46:7, 46:22, 49:8, 49:15, 51:15
looked [3] - 11:14, 26:23, 51:12
looking [4] - 11:13, 44:4, 47:12
looks [1] - 30:23
lose [1] - 50:23
lunch [1] - 31:1
luxuries [1] - 43:13

## M

mail [1] - 15:9
mailed [1] - 26:9
mails [1] - 15:8
main [3] - 9:22, 10:10, 10:12
management [17] - 13:4, 22:12, 22:20, 23:1, 30:18, 53:20, 53:22, 54:11, 54:16, 54:19, 55:15, 55:17, 55:23, 56:6, 56:17, 56:23
management/ confidential [2] - 56:7, 57:5
manager [9] - 22:13, 36:12, 44:19, 45:5, 45:15, 45:22, 51:17, 60:6, 60:7
managers [1] - 32:23

manner [1] - 12:21
marked [1] - 11:7
Martuscello [5] - 7:16, 12:17, 58:21, 59:20, 60:2
match [1] - 13:21
math [2] - 48:12, 48:15
matter [1] - 36:7
matters [4] - 39:14, 42:4, 42:6, 44:13
McCowski [2] - 10:15
meal [1] - 19:12
mean [18] - 14:12, 26:3, 26:17, 32:22, 35:5, 35:16, 36:10, 41:10, 41:14, 43:1, 43:2, 43:22, 44:4, 45:19, 59:10, 60:5, 60:14, 62:20
meaning [2] - 5:14, 12:20
means [1] - 31:18
medical [7] - 23:10, 23:14, 37:23, 38:3, 39:7, 39:18, 53:22
Medical [1] - 23:11
Melissa [2] - 14:19, 14:22
MELISSA [1] - 1:3
members [1] - 39:6
memo [22] - 11:3, 11:4, 15:16, 15:17, 16:3, 24:2, 25:3, 26:4, 28:3, 31:16, 36:19, 37:16, 37:22, 44:22, 46:20, 46:22, 50:19, 58:20, 59:19, 60:2, 60:10, 60:12
memorandum [6] - 11:4, 15:11, 26:5, 28:3, 28:13, 52:22
memory [1] - 27:12
memos [1] - 35:8
mention [1] - 23:20
might [2] - 13:20, 25:6
minutes [36] - 27:2, 27:22, 31:23, 32:6, 38:8, 38:10, 38:13, 38:19, 38:20, 38:23, 39:19, 40:18, 41:2, 41:16, 41:18, 42:2, 43:2, 43:4, 43:8, 43:18, 44:3, 44:9, 44:10, 44:12, 44:20, 45:8, 45:14, 45:20, 46:4, 46:9, 46:12, 46:16, 46:18, 47:14, 48:21
misconduct [1] - 57:2

moment [1] - 53:16
money [1] - 50:7
monitoring [2] - 31:10, 31:15
month [4] - 49:2, 49:12, 49:18, 50:17
monthly [3] - 25:5, 48:7, 50:10
months [7] - 30:23, 41:19, 44:3, 44:8, 44:10, 46:6, 49:17
most [2] - 19:8, 26:10
mother [3] - 39:4, 39:6, 41:3
motion [1] - 3:7
move [2] - 3:5, 3:7
movement [10] - 9:3, 11:1, 15:21, 16:10, 16:13, 16:17, 16:22, 20:8, 28:18, 29:4
MR [42] - 4:4, 18:10, 21:8, 21:18, 24:11, 24:23, 27:11, 27:23, 32:9, 32:17, 34:20, 35:20, 36:9, 36:16, 37:14, 37:21, 39:3, 39:15, 40:7, 41:13, 43:15, 44:21, 45:18, 46:11, 47:4, 47:23, 48:8, 49:9, 50:4, 51:6, 52:10, 52:20, 53:5, 53:14, 53:18, 56:20, 58:4, 58:9, 58:14, 60:9, 62:9, 63:3
MS [38] - 18:2, 21:5, 21:14, 24:6, 24:21, 27:3, 27:20, 32:3, 32:12, 34:14, 35:15, 36:6, 37:9, 37:19, 38:17, 39:10, 39:22, 41:9, 43:10, 44:15, 45:17, 45:23, 47:2, 47:17, 48:4, 49:6, 50:3, 51:3, 52:4, 52:15, 53:3, 56:19, 57:23, 58:7, 58:12, 60:4, 62:2, 62:18
must [2] - 10:2, 19:15

## N

name [5] - 4:5, 26:22, 27:19, 28:7, 54:3
nature [1] - 5:18
near [1] - 19:9
necessarily [1] - 37:20
necessary [2] - 5:23, 19:13

**need** [4] - 5:2, 5:11, 5:12, 34:9
**never** [4] - 25:13, 36:17, 53:8, 55:1
**NEW** [3] - 1:1, 1:6, 64:1
**New** [7] - 1:15, 1:17, 2:4, 2:8, 2:9, 16:23, 65:5
**next** [1] - 10:5
**none** [1] - 58:8
**normal** [1] - 19:12
**normally** [2] - 9:11, 10:1
**NORTHERN** [1] - 1:1
**Notary** [4] - 1:17, 3:9, 3:10, 65:5
**noted** [1] - 64:6
**notes** [1] - 65:7
**nothing** [1] - 49:18
**notices** [1] - 8:11
**number** [2] - 28:23, 32:20
**numbers** [2] - 41:23, 44:9

## O

**o'clock** [1] - 4:14
**O'Connell** [3] - 1:16, 65:4, 65:12
**object** [2] - 3:5, 3:6
**objection** [38] - 18:2, 21:5, 21:14, 24:6, 24:21, 27:3, 27:20, 32:3, 32:12, 34:14, 35:15, 36:6, 37:9, 37:19, 38:17, 39:10, 39:22, 41:9, 43:10, 44:15, 45:17, 45:23, 47:2, 47:17, 48:4, 49:6, 50:3, 51:3, 52:4, 52:15, 53:3, 56:19, 57:23, 58:7, 58:12, 60:4, 62:2, 62:18
**objectively** [2] - 51:12, 51:15
**observe** [1] - 28:16
**obviously** [1] - 35:17
**occasional** [1] - 19:14
**occasionally** [2] - 30:16, 30:19
**occasions** [1] - 31:17
**October** [1] - 1:12
**od** [1] - 6:7
**ODM** [1] - 22:23
**OF** [4] - 1:1, 1:6, 64:1, 64:2

**offer** [1] - 34:4
**Office** [1] - 57:18
**office** [42] - 4:8, 6:23, 7:2, 8:15, 9:3, 9:20, 9:22, 10:1, 10:10, 10:12, 11:1, 13:4, 15:23, 16:9, 16:13, 16:17, 16:22, 19:18, 19:20, 20:8, 20:15, 22:12, 28:17, 28:18, 28:23, 29:12, 30:3, 33:23, 34:3, 40:11, 52:9, 54:10, 54:16, 54:19, 55:9, 55:13, 55:15, 56:13, 56:18, 58:6, 62:15
**officer** [2] - 6:11, 6:19
**officers** [2] - 8:3, 35:6
**Offices** [1] - 1:13, 2:3
**offices** [1] - 19:9
**official** [1] - 19:7
**often** [1] - 60:19
**oftentimes** [1] - 56:12
**once** [3] - 6:22, 31:22, 32:5
**one** [22] - 10:6, 17:7, 20:21, 22:6, 22:11, 22:17, 23:4, 36:13, 38:8, 38:10, 38:14, 38:19, 38:21, 38:22, 40:19, 43:16, 43:22, 46:9, 49:11, 59:5, 59:15, 62:7
**One** [2] - 1:14, 2:3
**ones** [1] - 34:7
**operation** [2] - 45:11, 46:10, 47:20
**operations** [2] - 8:1, 9:21
**opinion** [5] - 17:3, 27:8, 40:16, 40:17, 44:5
**opportunities** [1] - 32:20
**opportunity** [15] - 16:6, 25:2, 25:6, 25:9, 28:16, 31:14, 36:18, 37:2, 37:7, 37:16, 48:2, 48:6, 50:23, 61:3, 61:7
**opposed** [1] - 44:3
**option** [8] - 22:18, 22:19, 22:20, 23:3, 23:6, 39:16, 40:9
**options** [2] - 22:6, 22:17, 23:4
**or..** [1] - 29:22
**order** [1] - 12:19
**ordinarily** [1] - 9:16
**original** [2] - 3:11,

3:13
**ourselves** [1] - 6:10
**outside** [1] - 55:19
**overrule** [1] - 14:2
**oversee** [1] - 56:11
**owe** [2] - 49:23, 50:6
**own** [2] - 17:20, 39:20

## P

**P.C** [2] - 1:14, 2:3
**p.m** [2] - 1:13, 63:6
**paper** [3] - 26:9, 26:10, 52:13
**paperwork** [1] - 10:5
**parent** [1] - 39:17
**Part** [1] - 3:4
**part** [6] - 13:10, 24:4, 38:13, 55:3, 55:7, 59:13
**participate** [1] - 31:14
**particular** [7] - 12:20, 20:15, 40:9, 41:3, 41:18, 49:10, 52:8
**particulars** [1] - 57:15
**parties** [1] - 3:3
**party** [1] - 4:20
**pass** [1] - 9:5
**pay** [18] - 16:6, 16:14, 18:16, 25:6, 25:9, 25:18, 48:2, 48:9, 49:4, 49:17, 50:1, 50:5, 50:8, 50:9, 50:13, 50:23, 51:1, 54:6
**paying** [1] - 49:22
**pays** [1] - 18:8
**pejoratively** [1] - 13:8
**penalty** [3] - 17:7, 20:12, 58:16
**pending** [1] - 5:14
**people** [13] - 9:11, 19:23, 20:20, 20:22, 22:22, 25:21, 33:2, 33:7, 42:21, 43:14, 52:8, 54:3, 58:2
**people's** [1] - 24:10
**per** [1] - 42:2
**percent** [1] - 46:17
**perfect** [1] - 5:21
**performance** [1] - 19:7
**period** [4] - 10:18, 25:7, 40:11, 41:17
**periods** [1] - 19:13
**permanent** [6] - 37:1, 37:4, 57:11, 59:23, 61:11, 61:12
**person** [12] - 10:2,

10:3, 10:5, 10:16, 12:2, 12:9, 21:2, 21:11, 31:10, 48:1, 49:17, 49:21
**person's** [1] - 21:12
**personal** [28] - 16:19, 17:2, 17:16, 17:21, 18:7, 19:9, 19:11, 20:3, 20:9, 39:13, 41:16, 42:4, 42:6, 42:18, 43:4, 43:8, 43:18, 44:13, 45:5, 45:8, 45:20, 46:14, 48:6, 48:14, 48:18, 49:1, 49:12, 49:18
**personnel** [35] - 7:4, 7:5, 7:6, 7:7, 7:14, 7:19, 7:20, 7:23, 8:2, 8:7, 8:14, 9:9, 9:21, 9:23, 10:1, 10:9, 10:11, 10:13, 12:18, 12:23, 13:1, 13:3, 13:14, 13:17, 20:17, 40:14, 55:20, 56:11, 56:12, 56:14, 58:15, 59:5, 59:10, 59:15, 60:2
**perspective** [2] - 47:7, 47:10
**phone** [60] - 16:2, 16:6, 16:8, 16:14, 17:19, 17:21, 18:9, 19:3, 20:3, 20:9, 25:3, 25:5, 25:9, 25:13, 25:16, 38:8, 38:19, 39:2, 39:8, 39:19, 40:3, 40:18, 40:19, 41:2, 42:3, 42:5, 42:18, 42:19, 43:5, 43:8, 43:9, 43:18, 44:1, 44:2, 44:13, 44:23, 45:4, 45:9, 45:14, 45:20, 46:3, 46:4, 46:14, 47:14, 48:2, 48:7, 48:10, 48:13, 48:18, 49:1, 49:2, 49:12, 49:22, 50:1, 50:7, 50:17, 54:6, 60:14, 60:23
**phones** [3] - 16:18, 17:2, 20:9
**physical** [1] - 26:8
**pick** [1] - 26:20
**Pine** [2] - 1:14, 2:3
**place** [2] - 31:9, 64:6
**Plaintiff** [2] - 1:4, 2:2
**Plaintiff's** [2] - 11:7, 11:8
**play** [6] - 8:17, 11:19,

54:23, 55:9, 55:13, 58:5
**Plaza** [2] - 1:14, 2:3
**pleasure** [1] - 57:8
**point** [4] - 14:19, 14:22, 25:5, 50:6
**policies** [1] - 16:18
**policy** [2] - 31:9, 48:1
**pose** [1] - 11:9
**posed** [1] - 5:14
**position** [15] - 7:22, 9:3, 12:15, 14:13, 30:18, 33:1, 36:23, 39:20, 53:2, 59:22, 61:4, 61:9, 61:12, 61:16, 61:17
**positions** [1] - 62:7
**positive** [1] - 45:7
**possession** [1] - 36:15
**practice** [1] - 37:6
**preclude** [2] - 61:13, 62:5
**predecessor** [1] - 7:15
**prepare** [2] - 11:15, 12:23
**prepared** [5] - 9:8, 12:2, 26:12, 37:22, 52:19
**preparing** [3] - 12:3, 60:17, 61:1
**present** [1] - 45:6
**presented** [1] - 24:4
**press** [1] - 35:8
**pretext** [1] - 21:11
**pretty** [1] - 13:9
**preventing** [1] - 47:22
**previously** [1] - 11:7
**primary** [1] - 43:17
**privilege** [1] - 30:5
**probationary** [3] - 8:21, 14:16, 60:21
**problems** [2] - 57:17, 58:6
**proceedings** [2] - 5:19, 65:8
**process** [9] - 13:10, 22:2, 22:17, 23:5, 23:8, 23:12, 47:1, 57:13, 59:13
**processed** [1] - 59:20
**processing** [1] - 59:11
**produced** [1] - 18:22
**Professional** [2] - 1:16, 65:4
**professionalism** [1] - 15:22
**program** [4] - 12:5, 14:7, 31:15, 60:7
**prohibition** [2] -

61:22, 62:16
**provide** [2] - 4:20, 5:2
**provided** [7] - 3:4,
3:11, 10:19, 12:7,
25:2, 30:13, 52:17
**provisional** [24] -
8:18, 8:19, 8:21,
9:17, 12:15, 14:13,
14:16, 27:9, 32:22,
33:10, 36:21, 36:22,
37:4, 53:2, 56:8,
56:22, 57:2, 57:4,
59:12, 59:21, 59:22,
61:9, 62:7, 62:10
**provisionally** [2] -
62:22, 63:1
**Public** [4] - 1:17, 3:9,
3:10, 65:5
**public** [1] - 19:8
**Puerto** [2] - 39:4,
39:18
**pursuing** [1] - 8:21
**purview** [1] - 55:19
**put** [2] - 15:11, 27:6

**Q**

**questioned** [2] - 55:3,
55:7
**questioning** [2] - 5:15,
55:5
**questions** [6] - 5:2,
6:2, 8:7, 13:19,
13:20, 23:17
**quick** [1] - 46:22
**quicker** [1] - 4:10

**R**

**racial** [4] - 21:20, 22:2,
22:8, 24:12
**reach** [1] - 27:19
**read** [1] - 64:4
**really** [3] - 23:2, 32:22,
40:9
**reason** [5] - 5:11,
21:3, 21:12, 21:16,
47:5
**reasons** [4] - 16:19,
17:2, 45:5, 62:15
**receive** [1] - 25:16
**received** [1] - 28:13
**Recess** [1] - 53:17
**recognize** [2] - 18:20,
18:21
**recollection** [3] - 15:6,
26:14, 28:1
**recommendation** [6] -
28:8, 58:16, 58:22,

59:6, 59:7, 59:18
**recommended** [3] -
46:21, 46:23, 61:4
**record** [4] - 27:15,
34:12, 35:7, 64:5
**records** [4] - 34:10,
36:1, 49:14, 50:12
**reference** [1] - 45:10
**referred** [5] - 10:21,
56:2, 56:3, 56:7,
56:12
**reflect** [1] - 27:15
**reflected** [4] - 13:14,
13:15, 15:2
**reflects** [5] - 12:6,
12:7, 13:18, 15:16
**regard** [1] - 36:23
**Registered** [2] - 1:16,
65:4
**reimburse** [4] - 18:8,
25:2, 48:6, 49:1
**reimbursed** [1] - 18:6
**reimbursing** [1] - 45:8
**Reinhold** [1] - 29:15
**related** [1] - 41:3
**relates** [1] - 16:18
**relations** [2] - 8:16,
56:4
**relevant** [1] - 4:21
**relied** [2] - 52:11,
52:16
**remedy** [1] - 50:15
**remember** [5] - 11:2,
15:5, 26:13, 28:9,
29:17, 44:6, 48:13,
53:10
**repeat** [1] - 17:17
**Reporter** [2] - 1:16,
65:4
**reporter** [1] - 5:3
**reporting** [1] - 36:13
**represented** [2] -
58:15, 59:4
**request** [4] - 5:12,
10:22, 15:3, 28:4
**required** [1] - 14:3
**requires** [2] - 9:10,
40:3
**reserved** [2] - 3:6, 3:8
**resources** [6] - 7:8,
7:11, 7:13, 56:10,
56:13
**respective** [1] - 3:2
**respond** [2] - 36:18,
37:2
**responded** [1] - 5:15
**response** [1] - 5:3
**responsibility** [1] -
12:1
**responsible** [4] - 8:20,

12:9, 49:22, 59:11
**rest** [2] - 19:12, 52:8
**restaurant** [1] - 4:7
**result** [2] - 54:17, 56:2
**retired** [3] - 10:16,
57:20, 58:3
**return** [6] - 3:10, 5:7,
14:14, 53:22, 59:6,
61:5
**returned** [3] - 38:3,
58:17, 58:22
**returning** [2] - 15:13,
31:1
**review** [16] - 9:10,
11:10, 12:2, 15:8,
24:4, 26:7, 26:12,
26:15, 29:9, 30:11,
49:14, 50:12, 54:15,
57:11, 60:18, 61:2
**reviewed** [7] - 11:12,
11:18, 11:21, 12:1,
16:4, 46:20, 54:3
**reviewing** [2] - 17:18,
54:9
**Rico** [2] - 39:5, 39:18
**rid** [1] - 47:9
**Rider** [1] - 29:22
**rights** [8] - 3:4, 3:11,
4:7, 8:20, 36:22,
36:23, 61:19, 62:4
**Rights** [1] - 55:12
**rise** [1] - 15:22
**road** [1] - 34:11
**Robert** [3] - 1:13, 2:3,
2:5
**role** [9] - 4:12, 8:17,
11:18, 54:9, 54:13,
55:9, 55:13, 57:6,
58:5
**room** [1] - 62:14
**roughly** [1] - 48:14
**routinely** [2] - 17:15,
17:20
**rubber** [1] - 13:9
**RUBINSTEIN** [38] -
18:2, 21:5, 21:14,
24:6, 24:21, 27:3,
27:20, 32:3, 32:12,
34:14, 35:15, 36:6,
37:9, 37:19, 38:17,
39:10, 39:22, 41:9,
43:10, 44:15, 45:17,
45:23, 47:2, 47:17,
48:4, 49:6, 50:3,
51:3, 52:4, 52:15,
53:3, 56:19, 57:23,
58:7, 58:12, 60:4,
62:2, 62:18
**Rubinstein** [1] - 2:9
**Rule** [1] - 3:11

**rules** [3] - 20:14,
20:16, 20:21
**Rules** [1] - 3:4

**S**

**saw** [1] - 46:20
**scheduled** [1] - 33:5
**Schneiderman** [1] -
2:7
**school** [3] - 33:23,
42:8, 42:11
**school-age** [1] - 42:8
**schools** [1] - 33:19
**second** [3] - 22:18,
22:19, 24:18
**Section** [1] - 56:3
**see** [8] - 15:8, 37:16,
38:9, 42:21, 43:7,
47:18, 59:2, 62:23
**seeing** [1] - 28:2
**seek** [1] - 22:13
**seem** [1] - 48:13
**send** [5] - 14:5, 59:16,
60:18, 61:1, 61:15
**sending** [1] - 61:23
**senior** [2] - 7:3, 12:22
**sent** [3] - 12:11, 56:8,
60:2
**series** [1] - 5:1
**serve** [2] - 57:8, 62:23
**served** [1] - 62:21
**Services** [9] - 6:6,
6:12, 17:1, 22:7,
30:4, 34:22, 51:18,
55:11, 56:16
**services** [2] - 6:8,
18:23, 19:6
**serving** [4] - 7:13,
51:8, 51:9, 62:6
**seven** [3] - 30:23,
44:11, 49:23
**seven-and-a-half-
hour** [1] - 44:11
**several** [2] - 7:22, 9:10
**sexual** [1] - 57:19
**shake** [1] - 5:3
**shall** [4] - 3:7, 3:11,
3:12, 3:15
**sharing** [1] - 6:9
**sharp** [1] - 4:14
**show** [3] - 5:7, 11:6,
18:18
**showed** [1] - 11:8
**side** [1] - 6:1
**sign** [4] - 13:10, 14:3,
27:19, 52:12
**signature** [8] - 9:10,
13:4, 15:2, 26:12,

26:17, 26:19, 27:6,
27:7
**signed** [2] - 26:21,
53:1
**signing** [2] - 11:21,
28:7
**simply** [1] - 5:11
**simultaneously** [1] -
13:3
**Sing** [2] - 6:20
**singled** [8] - 17:6,
20:22, 20:23, 21:3,
21:9, 21:11, 21:16,
21:19
**situation** [15] - 26:2,
28:7, 32:1, 37:12,
40:23, 41:5, 43:12,
49:8, 50:14, 50:15,
51:5, 60:6, 60:15,
60:16, 60:17
**situations** [3] - 18:12,
19:4, 19:13
**six** [2] - 6:15
**solely** [1] - 19:6
**someone** [30] - 10:4,
12:14, 13:6, 15:13,
20:17, 20:23, 21:9,
21:19, 23:7, 23:8,
30:16, 31:22, 32:1,
32:10, 37:7, 43:7,
45:13, 45:19, 47:11,
47:12, 47:13, 48:9,
48:17, 48:23, 50:22,
53:1, 55:14, 56:15,
57:6, 60:16
**sorry** [2] - 17:17,
25:12
**sort** [3] - 17:7, 20:12,
25:20
**sound** [1] - 6:3
**spanning** [1] - 44:3
**speaking** [1] - 34:16
**specific** [1] - 27:12
**spend** [5] - 39:7,
39:19, 42:17, 43:4,
43:7
**spent** [4] - 41:23,
42:1, 42:3, 44:1
**spoken** [2] - 5:1, 5:2
**spread** [1] - 46:5
**staff** [4] - 8:9, 19:17,
19:18, 19:19
**stamp** [1] - 13:9
**standard** [1] - 33:3
**start** [2] - 22:17, 23:5
**started** [5] - 6:18,
22:1, 23:9, 23:13,
33:20
**state** [23] - 16:18,
17:15, 18:22, 19:2,

19:5, 19:7, 19:9,
20:2, 20:9, 25:2,
29:20, 30:2, 42:19,
43:5, 43:9, 43:19,
44:7, 45:9, 49:1,
49:2, 49:12, 50:1,
50:6
**STATE** [2] - 1:6, 64:1
**State** [4] - 1:17, 2:8,
16:23, 65:5
**state-furnished** [1] -
19:5
**state-issued** [7] -
17:15, 19:2, 20:2,
20:9, 42:19, 43:5,
43:9
**state-produced** [1] -
18:22
**statements** [2] -
30:13, 52:22
**STATES** [1] - 1:1
**status** [1] - 32:21
**statuses** [1] - 8:23
**stay** [1] - 62:14
**stayed** [1] - 6:23
**stenographic** [1] -
65:7
**step** [4] - 22:6, 22:11,
26:3, 31:3
**steps** [1] - 5:23
**still** [1] - 40:18
**STIPULATED** [1] -
3:14
**stipulated** [1] - 3:2
**stories** [1] - 6:9
**story** [1] - 47:7
**strike** [2] - 3:6, 3:7
**stuff** [4] - 15:5, 35:9,
42:14, 55:16
**subject** [1] - 22:1
**subjected** [3] - 17:7,
20:12, 20:20
**subordinate** [5] -
7:10, 8:12, 10:8,
12:3, 31:8
**subordinates** [4] -
10:7, 43:16, 45:7,
49:11
**Subscribed** [1] -
64:14
**substance** [1] - 30:1
**sued** [1] - 29:20
**sufficient** [1] - 15:12
**suggesting** [1] - 51:22
**suing** [1] - 4:18
**Suite** [2] - 1:14, 2:3
**superiors** [1] - 25:14
**supervise** [3] - 13:6,
33:7, 33:11
**supervised** [3] - 8:9,

33:14, 33:18
**supervises** [1] - 47:11
**supervision** [1] -
55:19
**supervisor** [28] -
17:20, 19:15, 22:3,
22:9, 22:13, 22:15,
22:18, 22:19, 23:4,
24:18, 31:7, 31:21,
33:20, 34:1, 34:2,
34:9, 34:17, 35:19,
36:4, 36:11, 36:15,
39:12, 46:21, 48:11,
51:17, 60:8, 61:15,
61:18
**supervisor's** [2] -
18:12, 36:11
**supervisors** [3] -
35:13, 36:2, 59:8
**supervisory** [1] - 34:4
**supplied** [1] - 12:5
**support** [2] - 10:19,
52:18, 52:22
**supported** [1] - 27:10
**supporting** [7] -
10:23, 12:4, 12:7,
13:16, 26:6, 27:10,
28:2
**surgery** [2] - 23:22,
24:1
**Susan** [1] - 10:17
**sworn** [3] - 3:9, 4:1,
64:14
**Syracuse** [1] - 2:9
**system** [1] - 43:19

**T**

**table** [1] - 6:10
**talks** [1] - 45:3
**tangential** [1] - 4:12
**tardiness** [2] - 16:1,
32:19
**tardy** [1] - 15:19
**tasked** [1] - 8:1
**team** [1] - 34:5
**team-building** [1] -
34:5
**telephone** [5] - 15:18,
17:16, 18:22, 19:5,
44:2
**telephones** [3] - 19:3,
19:8, 19:11
**temporary** [2] - 8:22,
14:17
**ten** [2] - 27:2, 31:1
**term** [7] - 11:5, 11:12,
11:13, 12:2, 12:3,
12:6, 13:8

**terminate** [10] - 13:7,
17:11, 23:8, 23:13,
33:10, 33:13, 33:18,
37:17, 49:3, 52:13
**terminated** [10] -
11:20, 12:14, 14:17,
32:1, 32:16, 32:19,
47:15, 48:3, 53:1,
59:21
**terminating** [3] - 9:16,
15:12, 38:12
**termination** [32] - 9:8,
9:10, 10:21, 10:22,
11:22, 12:12, 13:13,
13:15, 14:1, 14:5,
14:9, 14:12, 14:13,
14:16, 15:3, 17:3,
22:1, 27:9, 28:4,
29:9, 29:12, 30:17,
38:2, 46:21, 52:2,
52:18, 52:23, 59:11,
59:18, 59:20, 60:19
**terminations** [4] -
8:21, 8:22, 51:10
**terms** [3] - 34:23,
46:14, 58:17
**testified** [1] - 4:2
**testimony** [5] - 3:6,
3:7, 11:11, 11:16,
64:5
**THE** [37] - 1:6, 18:3,
21:6, 21:15, 24:7,
24:22, 27:4, 27:21,
32:4, 32:13, 34:15,
35:16, 36:7, 36:10,
37:10, 37:20, 38:18,
39:11, 39:23, 41:10,
43:11, 44:16, 46:1,
47:3, 47:18, 48:5,
49:7, 51:4, 52:5,
52:16, 53:4, 58:1,
58:8, 58:13, 60:5,
62:3, 62:19
**themselves** [1] - 37:8
**there'd** [1] - 46:13
**thereby** [1] - 3:12
**thereof** [1] - 64:8
**THERESA** [1] - 1:7
**Theresa** [2] - 14:21,
53:8
**third** [3] - 4:20, 22:20,
29:5
**thorough** [2] - 4:13,
24:16, 53:7
**thoughts** [1] - 53:15
**three** [21] - 22:17,
31:23, 32:6, 42:17,
42:23, 43:1, 43:2,
43:4, 43:8, 43:18,
44:1, 44:8, 44:9,

44:12, 44:23, 45:14,
45:20, 47:14, 48:14,
48:17, 48:19
**threw** [1] - 49:14
**throughout** [1] - 34:22
**title** [3] - 7:18, 62:22,
63:1
**titles** [1] - 7:2
**to/from** [2] - 11:3, 11:4
**today** [4] - 5:17, 11:11,
11:16, 41:22
**took** [3] - 27:5, 46:12,
46:21
**top** [2] - 18:14, 31:6
**totaling** [1] - 41:16
**totality** [3] - 44:19,
49:8, 51:5
**toward** [1] - 19:17
**trainee** [1] - 6:19
**training** [3] - 34:4,
34:5, 34:8
**transcript** [1] - 64:7
**transcription** [1] -
65:7
**treated** [2] - 51:23,
52:7
**trial** [1] - 3:8
**Trostle** [47] - 4:17, 9:1,
9:4, 11:19, 12:10,
14:19, 14:22, 15:3,
15:9, 16:5, 16:23,
17:6, 18:1, 20:10,
20:13, 21:23, 25:1,
25:8, 25:22, 28:13,
29:19, 30:22, 31:4,
31:13, 35:12, 35:13,
35:23, 36:17, 37:23,
38:6, 38:13, 42:3,
45:2, 45:6, 47:12,
50:17, 51:23, 53:9,
53:11, 53:21, 54:5,
58:16, 58:21, 58:22,
59:6, 59:16, 61:3
**TROSTLE** [1] - 1:3
**Trostle's** [13] - 9:6,
10:20, 16:8, 17:19,
23:21, 24:5, 29:9,
29:11, 41:2, 47:6,
52:13, 52:23, 53:20
**true** [4] - 17:12, 24:8,
64:6, 65:6
**trumped** [1] - 47:8
**try** [1] - 5:7
**trying** [6] - 13:5, 33:7,
39:8, 45:12, 46:19,
62:12
**two** [8] - 27:13, 28:23,
29:1, 31:2, 31:23,
32:5, 44:3, 46:17
**type** [1] - 9:16

**U**

**ultimate** [1] - 12:12
**unconscious** [1] -
39:5
**under** [3] - 21:4,
40:12, 48:1
**underlying** [1] - 17:11
**understood** [1] - 6:2
**Uniform** [1] - 3:4
**unit** [3] - 8:1, 9:21,
36:12
**UNITED** [1] - 1:1
**unless** [1] - 55:3
**up** [11] - 9:18, 13:21,
26:20, 35:7, 41:23,
46:23, 47:8, 48:14,
53:7, 57:13, 61:1

**V**

**vacancy** [1] - 61:20
**versus** [3] - 37:4, 47:9,
59:7
**view** [1] - 41:5
**violating** [2] - 16:17,
16:23
**visit** [1] - 40:14

**W**

**wait** [1] - 5:6
**waived** [1] - 3:13
**waiver** [2] - 3:7, 3:11
**walked** [1] - 26:11
**Washington** [2] -
1:14, 2:4
**week** [4] - 4:6, 11:14,
31:22, 32:5
**weeks** [1] - 44:10
**well-thought-out** [1] -
51:19
**West** [3] - 1:14, 2:3,
2:8
**whole** [1] - 64:7
**wife** [1] - 42:15
**willing** [1] - 37:13
**withstanding** [1] -
41:16
**witness** [3] - 3:9, 3:15,
5:9
**WITNESS** [36] - 18:3,
21:6, 21:15, 24:7,
24:22, 27:4, 27:21,
32:4, 32:13, 34:15,
35:16, 36:7, 36:10,
37:10, 37:20, 38:18,
39:11, 39:23, 41:10,

43:11, 44:16, 46:1,
47:3, 47:18, 48:5,
49:7, 51:4, 52:5,
52:16, 53:4, 58:1,
58:8, 58:13, 60:5,
62:3, 62:19
**witnesses** [1] - 55:5
**woman** [1] - 54:2
**word** [1] - 36:11
**workday** [3] - 40:4,
44:11, 44:12
**workplace** [5] - 21:20,
22:3, 22:8, 24:13,
57:19
**worth** [1] - 46:3
**wrap** [1] - 53:7
**wrapping** [1] - 57:13
**written** [4] - 12:4,
12:6, 46:23, 53:21

## Y

**year** [3] - 44:10, 48:22,
51:1
**years** [3] - 6:8, 6:15,
6:16
**YORK** [3] - 1:1, 1:6,
64:1
**York** [7] - 1:15, 1:17,
2:4, 2:8, 2:9, 16:23,
65:5
**young** [3] - 42:21,
43:9, 43:17
**yourself** [3] - 25:20,
40:1, 40:5

# Errata Sheet

I, _____, have read the transcript of my testimony and would like the following changes:
  (Print name)

| PAGE | LINE | CHANGE FROM: | CHANGE TO: | REASON FOR CHANGE: |
|------|------|--------------|------------|--------------------|
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |
|      |      |              |            |                    |

Subscribed and sworn to before me

this _____ day of _____ , 2013.


_____          _____
          Notary Public                                      Signature