1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - - - - - - - - - - - -
3
     MELISSA TROSTLE,
4
                         Plaintiff,
5
            - against -   Civil No: 1:13-CV-0709
6
     THE STATE OF NEW YORK,
7    THERESA KNAPP-DAVID, AND
     DOUG BOTSFORD,
8
                         Defendants.
9    - - - - - - - - - - - - - - - - - - - - - - - -

10

11        DEPOSITION of Defendant, by its Agent, DANIEL F.

12   MARTUSCELLO, III, held on the 17th day of October 2014,

13   commencing at 12:05 p.m., at the Law Offices of Elmer

14   Robert Keach, III, P.C., One Pine West Plaza, Suite 109,

15   Washington Avenue Extension, Albany, New York

16   12205-5531, before Jeanne O'Connell, Registered

17   Professional Reporter and Notary Public in and for the

18   State of New York.

19

20

21

22        NOV 10 2014                    ORIGINAL

23

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3   Law Offices of Elmer Robert Keach, III, P.C.
     One Pine West Plaza, Suite 109
 4   Washington Avenue Extension
     Albany, New York  12205-5531
 5   By:  Elmer Robert Keach, III, Esq.

 6
     For the Defendants:
 7
     Eric T. Schneiderman,
 8   Attorney General of the State of New York
     615 Erie Boulevard West
 9   Syracuse, New York  13204-2465
     By:  Heather R. Rubinstein,
10   Assistant Attorney General

11

12

13

14

15

16

17

18

19

20

21

22

23
```

```
1                S T I P U L A T I O N S

2     It is hereby stipulated and agreed by
      and between the attorneys for the respective
3     parties hereto that:

4     All rights provided by the C.P.L.R.,
      and Part 221 of the Uniform Rules for the
5     Conduct of Depositions, including the right
      to object to any question, except as to form, or to move
6     to strike any testimony at this examination is reserved;
      and in addition, the failure to object to any question
7     or to move to strike any testimony at this examination
      shall not be a bar or waiver to make such motion at,and
8     is reserved to the trial of this action.

9     This deposition may be sworn to by the
      witness being examined before a Notary Public other than
10    the Notary Public before whom this examination was
      begun, but the failure to do so or to return the
11    original of this deposition to counsel, shall not be
      deemed a waiver of the rights provided by Rule 3116 of
12    the C.P.L.R., and shall be controlled thereby.

13    The filing of the original of this
      deposition is waived.
14
      IT IS FURTHER STIPULATED, that a copy
15    of this examination shall be furnished to the attorney
      for the witness being examined without charge.
16

17

18

19

20

21

22

23
```

1  DANIEL F. MARTUSCELLO, III, after first having been duly

2  sworn, was examined and testified as follows:

3  EXAMINATION

4  BY MR. KEACH:

5      Q.  Mr. Martuscello, my name is Attorney Bob Keach,

6  civil rights lawyer.  You're being deposed in my office

7  here in Albany, New York.

8          I'm here to ask you some questions today about a

9  lawsuit that's been filed by Melissa Trostle against New

10  York State and several employees of the New York State

11  Department of Corrections.

12          You are not a defendant in this case.  You

13  understand that, right?

14      A.  I do.

15      Q.  And you understand that I am deposing you in your

16  capacity as a third party to get factual information

17  that may be in your possession that is relevant to these

18  proceedings.

19      A.  I do.

20      Q.  You've been deposed before, sir.

21      A.  I have.

22      Q.  On how many occasions?

23      A.  Once.

```
1       Q.   For what reason?

2       A.   A case involving a termination of a temporary

3   employee with the department.

4       Q.   Who would that be?

5       A.   I don't recall her name.

6       Q.   And what agency or what unit did that temporary

7   employee work in?

8       A.   Mount McGregor Correctional Facility, I believe.

9       Q.   Were they a corrections officer or something

10  else?

11      A.   Something else.

12      Q.   Was there an allegation in that case of racial

13  discrimination?

14      A.   No.  Not that I recall.

15      Q.   Do you know why the temporary employee lost their

16  job?

17      A.   Over-familiarity with inmates.

18      Q.   Does that mean they were having sex with inmates?

19      A.   No.

20      Q.   It just means they knew too many of them.

21      A.   No.

22      Q.   Or it means they were too friendly with them.

23      A.   Yes.
```

```
1    Q.  Have you ever been sued before?

2    A.  I believe so.

3    Q.  Were you sued as part of this situation with the

4    gentleman who was terminated or a man or woman who was

5    terminated for being overly familiar with inmates?

6    A.  I don't know that I was actually named in that

7    case or not, but I was deposed.

8    Q.  Well, have you been sued on another occasion to

9    the extent that you were sued in the first instance,

10   which we're not sure that you were?

11   A.  I believe that I've been named in other suits in

12   my capacity working for the department.

13   Q.  But you've never been deposed in any of them.

14   A.  Correct.  I was deposed in one other case.

15   Q.  What was that about?

16   A.  That was about a case when I was employed as a

17   correction officer at Greenhaven Correctional Facility,

18   and the inmate was alleging lack of medical care.

19   Q.  Any other times?

20   A.  Not that I can recall.

21   Q.  Were you ever deposed in a court under oath, or

22   have you ever testified in court?

23   A.  I have testified in court.
```

1    Q.   For what reasons?

2    A.   During my employment.  I was in my official

3 capacity.  I was the department's designee to testify in

4 court relative to certification of records.

5    Q.   Any other reason?

6    A.   I testified in court in a TRO hearing for a

7 temporary restraining order in the closure of a prison.

8    Q.   Gosh, somebody was trying to keep the prison from

9 being closed down, the union or something.

10   A.   Correct.  I don't know that it was the union,

11 but...

12   Q.   Someone was trying to keep the prison from

13 closing.

14   A.   Correct.

15   Q.   And you had to testify in that.

16   A.   Correct.

17   Q.   Any other occasions?

18   A.   No.

19   Q.   What's your current job title?

20   A.   I am the deputy commissioner for administration

21 with the Department of Corrections and community

22 supervision.

23   Q.   At some point in time did you fill the role of

1    director of human resources?

2        A.   I did.

3        Q.   And what does the director of human resources do

4    at the Department of Corrections?

5        A.   As the director of human resources, you're

6    charged with responsibility to recruit, hire, and retain

7    competent workforce to achieve the mission, and also

8    provide guidance relative to personnel practices,

9    administering personnel practices in New York State, as

10   well as act as the centralized -- the commissioner's

11   centralized appointing authority, dealing with all

12   matters related to personnel management but not the

13   disciplinary process.

14       Q.   Well, let's step back here a minute.

15            Who is responsible for determining disciplinary

16   issues in terms of pressing notices of discipline and

17   employees and the like?

18            Is that you or someone else -- you in your role

19   as director of human resources, excuse me, or something

20   else?

21                MS. RUBINSTEIN:  Objection.

22                THE WITNESS:  That was not me in my

23            director of human resources capacity.

1  BY MR. KEACH:

2      Q.   Then who would make those decisions about

3  pressing notices of discipline?

4      A.   The issuances of notice of discipline would rest

5  with the director of the Bureau of Labor Relations.

6      Q.   When you say the Bureau of Labor Relations, that

7  would be part of DOCCS, or is that somewhere else?

8      A.   It's a bureau within the Department of

9  Corrections and Community Supervision.

10     Q.   Now, you, as the director of human resources,

11  would have the ability to refer people to -- give me the

12  name of the -- labor relations.

13     A.   Labor relations.

14     Q.   You would be able to refer people to labor

15  relations if you felt that was appropriate, wouldn't

16  you?

17     A.   Yes.

18     Q.   Going forward, when I'm asking you questions, I'm

19  going to refer to your role as the director of human

20  resources.  So, I don't want to have to keep stopping

21  because it's just going to make things a lot more

22  complicated.

23          I'll figure out what your new position is in

1    terms of being the associate commissioner for

2    personnel -- or excuse me, for administration, at a

3    later time.   But the questions I'm obviously interested

4    in are at the times relevant to Mrs. Trostle's

5    situation, which would have been in the spring and in

6    the summer of 2011, and then what happened afterward.

7         So, can you and I go forward with that

8    understanding, that I'm going to ask you questions about

9    your role of director of human resources and not your

10   current job?

11   A.   That's fine.

12   Q.   So, I'm assuming, when you were the director,

13   that you would get calls from all over the state from

14   all of these various facilities asking you questions

15   about various personnel issues, correct?

16   A.   Yes.

17   Q.   And you would get calls saying, hey, for

18   instance, we caught someone doing something bad, what

19   should we do; fair to say?

20   A.   Not necessarily.

21   Q.   You never got a phone call from someone calling

22   you saying, we caught someone doing something bad, what

23   should we do, caught someone breaking the rules,

1   breaking policies, how should we handle this?

2      A.   Yes.   But it depends on the status of the

3   employee.

4      Q.   Why would it depend on the status of the

5   employee?

6      A.   As the director of human resources, I would be

7   involved in providing guidance relative to probationary

8   employees, temporary employees, or provisionally

9   appointed employees.   But any employee that had personal

10  retention and was covered by Section 75 of the civil

11  service law, those calls would go to the director of

12  labor relations.

13     Q.   Because there would be a whole separate set of

14  rights for people that were not in the status that you

15  just described as it relates to due process and notices

16  and that sort of thing; fair to say?

17     A.   Correct.

18     Q.   So, if a probationary employee -- let's just talk

19  about that.

20          COs, when they first start working for DOCCS,

21  they're on probation for like a year, right?

22          MS. RUBINSTEIN:   Objection.

23          THE WITNESS:   Correct.

1   BY MR. KEACH:

2      Q.  And then at any point in time during that

3   probationary year, if DOCCS decides they don't want to

4   retain that person, they can release them, and they

5   won't have any sort of due process rights in terms of

6   notice of discipline and hearing and that sort of thing;

7   fair to say?

8      A.  Correct.

9      Q.  That gives DOCCS the opportunity to basically

10  say, this person is not working out, we're going to let

11  them go, and we don't have to deal with -- during this

12  probationary period, we don't have to deal with putting

13  them through PERB and the disciplinary process; fair to

14  say?

15              MS. RUBINSTEIN:  Objection.

16              THE WITNESS:  Correct.

17              MR. KEACH:  She's objecting to how I

18          posed my question, but you should answer it

19          unless she tells you not to.

20              THE WITNESS:  Thanks.

21              MR. KEACH:  I'm sure you already know

22          that already.

23              THE WITNESS:  I appreciate that.

1          MR. KEACH:  I'm not trying to insult

2      you.  You're obviously an intelligent guy.

3      It's just we're just laying the ground

4      rules.

5  BY MR. KEACH:

6      Q.  And so, if someone has a provisional appointment,

7  then someone can come to you and also take steps to

8  address the provisional appointment.

9      A.  Correct.

10     Q.  Aren't most of the individuals that are employed

11 at the central office provisional employees?

12     A.  No.

13     Q.  At the time of these events, weren't most of the

14 individuals that were employed in the office of

15 classification and movement provisional employees?

16     A.  I don't know if most is accurate or not.  There

17 were provisional employees assigned to class and

18 movement.

19     Q.  Classification analysts were provisional

20 employees, were they not?

21     A.  Not all of them.  But, yes, they were.

22     Q.  And then how about individuals that would be in

23 the role of assistant director, director, would they be

```
 1  provisional employees?

 2      A.   The assistant director was, not the director.

 3      Q.   Why wasn't the director?

 4      A.   To my recollection.

 5      Q.   Why wouldn't the director be a provisional

 6  employee?

 7           Let me step back.

 8           The director, I think they have some sort of

 9  classification in the state called

10  "management/confidential" or something like that.

11           Did you ever hear of that?

12      A.   Yes.

13      Q.   And it's basically you serve at the pleasure of

14  the commissioner, and if it doesn't work out the

15  commissioner lets you go.

16           Is that fair to say?

17               MS. RUBINSTEIN:  Objection.

18               THE WITNESS:  That's not what

19          management/confidential is.

20  BY MR. KEACH:

21      Q.   Well, I've heard that term actually associated

22  with people in the attorney general's office.

23           What does that mean?
```

1    A.   What does what mean?

2    Q.   Management/confidential.

3    A.   It's somebody that's been designated as either

4    someone in a management role and/or serving in a

5    confidential capacity dealing with certain types of

6    work.  And there's parameters that civil service guides

7    on what types of positions fall into management or

8    confidential work.  But you can be a permanent

9    competitive employee and not serve at the pleasure and

10   still be management/confidential.

11   Q.   Well, what was the designation that would be

12   associated with Mrs. Trostle's position as the assistant

13   director for classification and movement in 2011?

14   A.   I believe it's management/confidential.

15   Q.   And so, if someone wanted to terminate the

16   employment of someone in a management/confidential

17   position, would they have to comply with civil service

18   rules or would they not have to?

19   A.   It depends on their employment status.

20   Q.   And so, what was Mrs. Trostle's employment status

21   in 2011 when she was removed from her position as

22   assistant director of classification and movement?

23   A.   She was a provisional in the title of assistant

1    director.

2        Q.   And so, that provisional appointment allowed her

3    to have that provisional appointment removed without

4    having to go through the disciplinary process.

5        Is that fair to say?

6        A.   Disciplinary process as defined by Article 75 of

7    the civil service law.  That's correct.

8        Q.   Well, what I understand -- I don't know if it's

9    defined by Section 75 or how it works, but in the past,

10   when I've -- and I have on one occasion represented a

11   corrections lieutenant who was, I feel, wrongfully

12   fired, but I lost the case.

13       But regardless, I represented this man until he

14   was given a notice of discipline that he was given a

15   hearing before PERB.  He was exonerated during the

16   hearing before PERB.  It was determined he was

17   wrongfully terminated and went back to work.

18       Is that what you understand also of what would

19   happen under Section 75?

20       A.   Yeah.  The discipline provisions.  Correct.

21       Q.   Now, did you know prior to your involvement in

22   this -- and I'll try to figure out when that is in a

23   minute, but prior to your involvement in this, did you

1  have any interaction with Melissa Trostle at all?

2      A.   No.

3      Q.   You didn't know the lady, did you?

4      A.   I may have seen her in the hall in passing, but I

5  had very limited experience with class and movement.

6      Q.   And I mean, it's not like you never worked with

7  her -- where did you work as a CO?

8      A.   I worked at Greenhaven Correctional Facility.

9      Q.   Now, I'm assuming you probably worked at some

10 other facilities as well on a limited basis, or were you

11 always at Greenhaven?

12     A.   I did a week at Bedford Hills and on-the-job

13 training for two weeks at Coxsackie.   Other than that,

14 Greenhaven.

15     Q.   So, you never met Mrs. Trostle before you came to

16 central office.   That's fair to say, right?

17     A.   Correct.

18     Q.   And other than seeing her pass by in the hall,

19 you didn't know anything about her before you were

20 involved in her situation about terminating her

21 provisional employment; fair to say?

22     A.   Correct.

23     Q.   Now, there's been some discussion in this case

1    about a program that's put in place about monitoring

2    people who have time and attendance issue.

3         Do you know anything about that?

4    A.   I do.

5    Q.   Explain to me -- well, I'll explain to you what

6    my understanding of the program is just so we can try to

7    talk about the same thing.  I may describe it

8    differently than you would, and then we'll go forward.

9         My understanding is that if an employee has time

10   and attendance issues, that they can be referred I

11   believe it would be to your department for monitoring

12   for time and attendance.  And this is a -- it's a

13   preventative or proactive measure to say, okay, you've

14   been having time and attendance issues, so we're going

15   to put a special monitoring on you to get you to conform

16   and to stop having these problems.  And if you keep

17   having these problems, then we may take extra action.

18         Do you know about the program that I described?

19             MS. RUBINSTEIN:  Objection.

20             THE WITNESS:  I don't know if the

21        program is quite as you describe it, but I

22        am familiar with the attendance control

23        program.

1   BY MR. KEACH:

2      Q.   Attendance control program, okay.

3           And what is the attendance control program?

4      A.   The attendance control program is a department

5   policy in the form of a directive that is administered

6   by the central office bureau of personnel as well as at

7   each of our institutions, and it tracks the number of

8   occasions of absence, unscheduled absences, and it

9   counts them as an employee, as they occur in the

10  employee's course of work.  And there are certain

11  thresholds and triggers when you reach a certain number

12  of occasions of absences as prescribed in the directive.

13          When it comes to tardiness, we do not have those

14  thresholds to be met.  Tardinesses are dealt with on

15  more of a case-by-case basis with the individual

16  facility or unit as depending on the job type.  One

17  instance of tardiness may warrant corrective action as

18  opposed to other jobs.  It may be different.

19     Q.   Now, when you're in central office, you don't

20  punch a timecard when you come to work there, do you?

21     A.   We do not.

22     Q.   And so, are there occasions where you've been

23  late to work when you worked at central office?

1    A.   I'm sure I've been late.  Not often.

2    Q.   Well, I'm not -- I didn't mean that in some

3    pejorative way.  I was late today because I was on the

4    phone with a realtor.  So, I don't mean that in a

5    critical way.

6         So, what would you do if you came in late, you

7    came in five minutes late?  How would you deal with it,

8    just stay five minutes extra to make up the time?

9    A.   I typically don't work eight hours, so.  But I

10   would notify my supervisor that I was late and either

11   charge appropriate accruals or a schedule adjustment as

12   approved by my supervisor.

13   Q.   Well, not everybody does it as formal as that, do

14   they?

15             MS. RUBINSTEIN:  Objection.

16             THE WITNESS:  I can't speak to what

17       everyone does.

18   BY MR. KEACH:

19   Q.   Well, let's assume for the moment that you're a

20   secretary and you come in five minutes late because you

21   got caught in traffic or whatever it is.  And so, you

22   say to your boss, hey, I was five minutes late so I'll

23   stay five minutes after time today to make it up, do you

1    care?

2         Wouldn't that be something that would be in the

3    ordinary course of business in the Department of

4    Correctional Services?

5              MS. RUBINSTEIN:  Objection.

6              THE WITNESS:  That could be something

7         that could be worked out.  Yeah.

8    BY MR. KEACH:

9    Q.   Well, when I was five minutes late, I'll take it

10   out of the lunch hour or I won't take a break in the

11   afternoon, something like that, right?

12   A.   No.  Not with your lunch hour or your breaks.

13   Q.   But people could stay after time or whatever it

14   is; fair to say?

15   A.   That's fair, with a supervisor's approval.

16   Q.   And so, absences are monitored but not tardiness;

17   is that accurate?

18   A.   Correct.

19   Q.   Because I was left with a contrary impression

20   from earlier testimony that tardiness could be part of

21   this attendance monitoring program, as well.

22   A.   It can be.

23         Let me rephrase my answer to the previous

1  question.

2       It can be part of the program, but it's not

3  prescribed with certain thresholds as is occasions that

4  are --

5    Q.  Got you.  I didn't mean to cut you off.  I

6  apologize.

7       Go ahead.

8    A.  Occasions of absence, there's thresholds such

9  that on nine occasions warrants informal.  And then

10  there's progressive steps until which point it can be

11  referred to a notice of discipline.  It's not so

12  prescribed for tardiness.

13    Q.  I understand.  So you've got different, just like

14  you said, nine days.  You're out nine days unexcused or

15  something like that, then this is what happens.

16       But the attendance monitoring program can also be

17  used to monitor tardiness; it just doesn't have the

18  threshold, right?

19    A.  Correct.

20    Q.  And so, if someone puts someone on attendance

21  monitoring for tardiness and they continued to be tardy,

22  then it would be treated on a case-by-case basis versus

23  having certain concrete thresholds as part of the

1   policy.

2      A.   Can you repeat the question.

3      Q.   Sure.   If someone is put on this program because

4   of tardiness problems and they continue to be tardy,

5   that would be subject to a case-by-case analysis versus

6   being guided by some sort of threshold about the number

7   of times or the amount of times they're tardy.

8      A.   You don't get put on the program.   It is a

9   program that's subject to all employees.

10      Q.   Once you reached certain levels or have problems,

11   isn't there a higher level of monitoring for some

12   individuals?

13      A.   Yes.

14      Q.   What's that higher level of monitoring called?

15      A.   It's part of the attendance control program.

16   It's just at a different step in the process, if you

17   will.

18      Q.   Well, I just want to be clear.   Let's assume that

19   I work in your agency, as hard as that is to assume,

20   right?   But I work in your -- I've sued your agency

21   like, I don't know, 30 times.

22         But anyway, regardless, let's assume for the

23   purposes of this hypothetical that I work at your

1   agency, and I've got a secretary out there, Kelly.  She

2   keeps coming in every day.  She's five minutes late.

3        Don't I have the ability to come to -- and you

4   called it personnel.

5   A.   Mm-hmm.

6   Q.   Is personnel different than the director of human

7   resources?

8   A.   No.  The director of human resources oversees the

9   department of personnel.

10  Q.   Thank you for clarifying that.

11       So let's assume I'm mad and I got this secretary.

12  She keeps coming in late.  I'm like, this is ridiculous.

13       Can I go to personnel and say, listen, we need to

14  put this person on more progressive monitoring to

15  correct their issues?

16  A.   Yes.

17  Q.   And so, that program would be called what?

18  A.   It's still the attendance control program.

19  Q.   But what would you call it?  If you were actively

20  monitoring someone for tardiness, what would you call

21  it?

22  A.   We actively monitor everyone for tardiness.  It's

23  just that, when it gets to a threshold of a point where

1    you want to go through the progressive steps of the

2    informal counseling and then on to formal counseling and

3    then to a recommendation for a notice of discipline for

4    permanent employees, then that's where we would then

5    begin having those conversations of beginning the

6    informal counseling process.

7        Q.   And so, the informal counseling process would

8    involve some sort of monitoring for tardiness as part of

9    it.

10       A.   Yeah.   The supervisor would continue to monitor

11   the tardiness and see if there's been a correction in

12   the behavior.   And if not, it could progress further.

13       Q.   And so, this is a written directive from the

14   Department of Corrections addressing this attendance

15   control program, right?

16       A.   There's a directive on the attendance control

17   program.

18       Q.   What's the directive number?

19       A.   I believe it's 2202.

20       Q.   I see you have some materials with you today.

21            Do you have a copy of that directive with you?

22       A.   No.

23       Q.   We're trying to figure out what I have and what I

1    don't have.  And I may not have this directive 2202.  So

2    I would ask now in the context of this deposition for

3    you to produce that to            Ms. Rubinstein so she

4    can send it to me so I can take a look at it.

5         But it's fair to say, if you have an employee

6    who's tardy on a regular basis, you have steps that you

7    can use to address that, right?

8        A.  Correct.

9        Q.  And that's short of, say, terminating someone's

10   employment.

11       A.  Yes.

12       Q.  That directive about time and attendance requires

13   progressive discipline, doesn't it?

14       A.  Again, it doesn't give steps on tardiness.  It

15   doesn't tell you -- because, depending on the nature of

16   the job, you could not do an informal counseling and you

17   could invoke other actions, depending on the totality of

18   the circumstances.

19       Q.  In general, that would involve COs that are late

20   and there are problems with shift changes and the like

21   caused by CO tardiness.  We can agree about that.

22            That's a serious issue, isn't it?

23            MS. RUBINSTEIN:  Objection.

```
 1              THE WITNESS:  It's not the only one,

 2        though.

 3              MR. KEACH:  I'm sorry.

 4              THE WITNESS:  That wouldn't be the only

 5        situation.

 6   BY MR. KEACH:

 7        Q.  Well, I'm trying to figure out, like, okay, if

 8   someone works in central office and they're late a

 9   handful of times five minutes, is that the type of

10   serious situation that would warrant more direct action,

11   or is that something that would be considered a minor

12   violation and would be subject to more progressive

13   steps?

14        A.  It would depend on the totality of what was going

15   on those particular days that they were late.

16        Q.  Now, you agree with me that the Department of

17   Correctional Services employs progressive discipline,

18   doesn't it?

19        A.  Yes.

20        Q.  And that that's something that's supposed to be

21   employed by supervisors in the Department of

22   Corrections.

23        A.  Yes.  Counseling is not discipline.
```

1      Q.  I understand.  Well, when I talk about

2   progressive discipline, you would agree with me that

3   counseling would be a form of discipline, but it's not

4   formal discipline.

5      A.  No.

6      Q.  Well, what would you describe it, then?

7          This is my understanding how it works in the

8   Department of Corrections, if someone is having a

9   problem.  We start off with informal counseling, words

10  or substance, listen, you're screwing up, get your act

11  together.  Then we go to formal counseling, a write-up

12  that goes in their file for a period of time.  Then we

13  would go to a notice of discipline and then even

14  potentially to a suspension without pay pending the

15  resolution of discipline issues.

16         Does that sound about right?

17     A.  You do not necessarily have to have counseling to

18  get to a notice of discipline.  And counseling is not

19  discipline.

20     Q.  I understand.  But is that what you would

21  describe as progressive discipline, or what term would

22  you use so you and I can use the same term of art this

23  afternoon?

1    A.   That would be a progressive process that

2  eventually could culminate in discipline.

3    Q.   Now, would you agree with me that the directives

4  of the Department of Corrections established the rules

5  by which corrections officers -- or corrections

6  employees should conduct themselves?

7    A.   Yes.

8    Q.   And you would agree with me that those directives

9  aren't optional; those directives are mandatory, are

10  they not?

11    A.   Correct.

12    Q.   How did you first learn about Mrs. Trostle's

13  situation?  Let me step back.

14      When did you first learn about an effort by

15  Mrs. Trostle's supervisors to demote her from her

16  position in the office of classification and movement?

17    A.   I don't know the specific date and time.

18    Q.   Well, how were you notified about a concern about

19  Mrs. Trostle?

20    A.   I received a memorandum from Douglas Botsford,

21  the director of classification and movement, relative to

22  Mrs. Trostle.

23    Q.   I'm going to show you a document we previously

1   marked in this case as Plaintiff's Exhibit 1.  Have you

2   take a look at it.

3       A.  Okay.

4       Q.  Is that the memo that you're referring to that

5   you received from Douglas Botsford?

6       A.  Yes.

7       Q.  Did anybody from the office of classification and

8   movement contact you about those issues before that

9   memoranda was sent?

10      A.  Not that I recall.

11      Q.  Did Theresa Knapp-David ever contact you about

12  those issues before that memorandum was sent?

13      A.  Not that I recall.

14      Q.  So, I just want to follow up here.  And let's go

15  through this a little bit.

16          In the course of that memorandum, Mr. Botsford

17  indicated to you that Mrs. Trostle had made an

18  inordinate amount of personal phone calls.  You agree

19  with me that it states that.

20      A.  I don't know that it states that verbatim, but

21  yes, that --

22      Q.  Says that in words or substance, doesn't it?

23      A.  Yes.

1    Q.  She made too many personal phone calls on the

2    job, right?

3    A.  Correct.

4    Q.  Now, isn't there a policy and procedure of the

5    Department of Corrections as it relates to the use of

6    state telephones to make personal calls?

7    A.  Yes.

8    Q.  And what's your understanding of that policy and

9    procedure?

10   A.  That state phones are to be limited to state

11   purposes, but when there comes an instance where a

12   personal call is necessary, we do issue employees their

13   phone record to go over and pay for personal calls.

14   Q.  Aren't those phones only supposed to be used for

15   phone calls in emergency situations?

16            MS. RUBINSTEIN:  Objection.

17            THE WITNESS:  The policy may say that.

18   BY MR. KEACH:

19   Q.  I'll show you the policy.  I don't want to be

20   unfair.  Let's take a look at this.  It's in Plaintiffs

21   Exhibit 3, which is the directive entitled

22   "State-Furnished Telephone Equipment and Services."

23   A.  I have the document, but if you want to ask me a

1   question, I may have to read it longer.

2      Q.   Yeah.   Sure.   Well, I'm just going to direct you

3   to the first page and not the page you're looking at.

4          And it says there that state phones are only

5   supposed to be used in emergency circumstances only with

6   the approval of a supervisor, doesn't it?

7      A.   It does.

8      Q.   And so, I guess we can agree that that directive

9   establishes the rules by which employees of the

10  Department of Corrections should follow if they're going

11  to use the state telephones for personal reasons,

12  correct?

13             MS. RUBINSTEIN:   Objection.

14             THE WITNESS:   This and the employees'

15       manual.

16  BY MR. KEACH:

17     Q.   Well, is there anything in the employees' manual

18  that talks about the use of state phones?

19     A.   Yes.

20     Q.   What does it say?   I'm not sure I have the

21  employees' manual.

22     A.   Well, this quotes 5.6 of the employees' manual,

23  so I assume it says that, but I don't have it, either.

1      Q.   So, 5.6 of the employees manual.

2           Would you agree with me that a directive on an

3      issue issued by the Department of Corrections would

4      generally mirror the employee manual?

5      A.   They should.

6      Q.   Maybe not always, and we'll try to figure that

7      out here.

8           So, here's what I'm trying to figure out:  At the

9      time that you got this memo from Mr. Botsford, do you

10     know what the policies and procedures were of the office

11     of classification and movement for the use of state

12     telephones to make personal calls?

13     A.   I do not.

14     Q.   Were you aware when you received this memo that

15     Theresa Knapp-David, the associate commissioner,

16     routinely made telephone calls off of her state-issued

17     cell phone for personal reasons?

18     A.   I'm not.

19     Q.   Were you aware that she routinely used her

20     landline to make personal calls?

21     A.   I'm not.

22     Q.   Were you aware that Mr. Botsford did the same

23     thing as it relates to his landline?

1    A.   I'm not.

2    Q.   Are you aware that a number of different

3   individuals in the office of classification and movement

4   routinely used their telephones to make personal phone

5   calls?

6    A.   I'm not.

7    Q.   And we have a series of these documents, and I'm

8   not going to bore you with reviewing the whole stack.

9   I'm going to show you Plaintiff's Exhibit 2, and ask if

10  you've ever seen a document like that before today.

11   A.   Yes, I have.

12   Q.   In what capacity have you seen that document?

13   A.   I want to say that I saw this document as a

14  review of the provisional removal of Ms. Trostle.

15   Q.   Well, we'll get back to that document.  When you

16  received this memo about Mrs. Trostle's employment, what

17  did you -- how did you respond when you saw that?

18   A.   It was forwarded to the appropriate unit within

19  the bureau of personnel to be in processing.

20   Q.   So that's where it went first before you saw it,

21  or it came to you and then you directed it to someone

22  for processing.

23   A.   I believe that it came to me first, and I

1    directed it through the review process.

2        Q.   And so, what is the review process?

3        A.   The review process is where bureau of personal is

4    broken up into several different units within the

5    bureau.  So the appropriate unit who does the personnel

6    management of that particular unit and/or facility would

7    receive the request for demotion and/or termination,

8    whichever was applicable.

9             They would review the request and any supporting

10   documentation and prepare what we call a termination

11   log.  And that could start with a senior personnel

12   administrator or, in the instance of the central office,

13   some units are assigned directly to an associate

14   personnel administrator.

15       Q.   And so, who did you send this to for review,

16   meaning this memo?

17       A.   The assistant director of personnel for central

18   office at that time would have been -- it would have

19   been assigned to that unit.

20       Q.   Would that have been Ms. Ayotte, do you know?

21       A.   He's not a miss.

22       Q.   My apologies.  I thought that was a lady.  I may

23   be confusing this with another case.

1          But was it sent to someone by the name of Ayotte

2    to review?

3      A.  No.

4      Q.  So, who was it sent to for review?

5      A.  The assistant director of personnel for that area

6    at the time would have been Carol McCowski.

7      Q.  And so, what would the review process entail as

8    it relates to Ms. McCowski's role in this?

9      A.  It would be assigned to either the associate

10   senior personnel administrator or the senior personnel

11   administrator, who had oversight of personnel activities

12   for that particular unit, to prepare a termination log

13   sheet.  They would review the packet of information, ask

14   any questions that they may have relative to the packet

15   or request, and prepare a termination log, for which

16   they would sign, and move on to the next level of

17   supervision within their chain of command.

18     Q.  And so, did that happen here?

19     A.  Yes.

20     Q.  And so, who would the next person be in the chain

21   of command after Ms. McCowski?

22     A.  Ms. McCowski wouldn't have been the associate

23   personnel administrator.  She would have been the

1  assistant director.  So typically it would have went

2  from the associate personnel administrator to the

3  assistant director, which would have been Ms. McCowski,

4  unless, of course, she was out of the office or on

5  vacation.  And then it may be assigned to a different

6  assistant director.

7      Q.  So do you know whether or not Ms. McCowski was

8  involved in this process or not?

9      A.  She did not sign the term log, but I don't know

10 if she was consulted.

11     Q.  Who signed the term log?

12     A.  That would be Mr. Ayotte.

13     Q.  And he was what, he was the associate -- he was

14 the assistant director?

15     A.  Yeah.  There's many assistant directors within

16 the bureau.

17     Q.  So, is he the one who started the review process?

18     A.  He was the second person to review after the

19 associate personnel administrator.

20     Q.  So, who is the associate personnel administrator?

21         It says here Jean Daniels.  Did Jean Daniels

22 review this?

23     A.  Yeah.  Her signature should be on the term.

1    Q.  It is.

2        So when you say the termination log, are you

3    referring to a document referred to as a termination

4    request?

5    A.  If you could show me the form.

6    Q.  I'm happy to.  Plaintiff's Exhibit 4, it's

7    entitled "Termination Request."

8    A.  Yes.

9    Q.  So who prepares the termination request?

10   A.  In that case Ms. Daniels would have prepared it.

11       Can I see that again, just to verify that that's

12   her name.

13   Q.  Sure.  It is.  It says Jean Daniels on it.

14   A.  Yeah.

15   Q.  And so, she prepares this, and then she sends it

16   on to Mr. Ayotte, and then it goes to you.

17   A.  Correct.

18   Q.  So, that third line there took me a while to

19   figure out because I thought that was an R.  But that's

20   your signature, Daniel Martuscello --

21   A.  The third.

22   Q.  -- on the third line down.

23   A.  That's me.

1    Q.   And then it was also reviewed by whom in

2 diversity management?

3    A.   Well, that says Deborah Nielson, who is the

4 director of our office of diversity management, but

5 there are initials after that.  It looks like someone

6 signed on her behalf.

7    Q.   Do you know who that is?

8    A.   With certainty, no.

9    Q.   Well, let's keep going forward here.

10   Do you agree with me in your capacity as director

11 of human resources that everyone should be treated the

12 same, shouldn't they?

13   A.   Correct.

14   Q.   That all employees, if they break the rules,

15 should be treated the same; fair to say?  Obviously it

16 depends on the individual circumstances.

17   A.   Mitigating and aggravating circumstances.

18   Q.   But there's a need in a large organization like

19 the Department of Corrections to show that there would

20 be objective application of discipline to employees who

21 violate the rules.

22   Can we agree on that?

23        MS. RUBINSTEIN:  Objection.

```
 1              THE WITNESS:  The same outcomes may not
 2         come, depending on the nature of the
 3         specific incidents.  There's so many
 4         variations.  But on a broad, sweeping
 5         statement, yes, we should apply discipline
 6         routinely.
 7    BY MR. KEACH:
 8         Q.  Evenhandedly, correct?
 9         A.  Correct.
10         Q.  Now, I want to start off and talk to you a little
11    bit about these phone calls that Mrs. Trostle is alleged
12    to have placed.
13              Any point in time prior to you signing the
14    termination letter for Ms. Trostle on June 20th, 2011,
15    did you learn that these telephone rules were not being
16    uniformly applied in the office of classification and
17    movement?
18              MS. RUBINSTEIN:  Objection.
19              THE WITNESS:  I don't understand your
20         question.
21    BY MR. KEACH:
22         Q.  Sure.  We've established already in testimony in
23    this case that Knapp-David, Ms. Knapp-David, routinely
```

1  used her state-issued telephone in violation of state

2  directives, that Douglas Botsford routinely used his

3  state-issued telephone in violation of state directives,

4  and that all of the employees of the office of

5  classification and movement routinely used their

6  state-issued telephones in violation of state

7  directives.

8          Did you learn that before you signed

9  Ms. Trostle's termination letter on June 20th, 2011?

10              MS. RUBINSTEIN:  Objection.

11              THE WITNESS:  We have a practice in

12          central office whereby the central office

13          Division of Budget and Finance on a monthly

14          basis issues bills with a memorandum for

15          staff to pay for personal phone calls, which

16          is what this document reflects, of who paid

17          what.

18              So, to the extent that I received a

19          bill myself and that I saw this document, to

20          that extent, I see that there was personal

21          use of phone calls which were paid for in

22          accordance with department practice.

23  BY MR. KEACH:

```
 1      Q.  Well, let's assume that I work in your department

 2   and I need to figure out how to conform my conduct to

 3   make sure that I'm going to follow the practice.

 4      Where would I look?

 5      A.  You would look at the directive and also, when

 6   you're issued the memorandum to review the phone logs,

 7   if there was any payment that was outside of the norms,

 8   the supervisor has a chance to review and signs off on

 9   that.

10      Q.  Again, here's what I'm trying to figure out.  I

11   see a woman who lost her job, who got demoted, who lost

12   $20,000 in pay, and had some pretty substantial

13   psychological problems after this event occurred.

14      And so, I'm trying to figure out, with the

15   benefit of hindsight, where Mrs. Trostle could have

16   looked to figure out that her conduct would have

17   violated department policy to such an extent it would

18   have resulted in that very harsh response?

19      Can you tell me where I can look to determine

20   this informal practice that you talked about and how one

21   could conform their conduct to avoid coming afoul of it,

22   which would result in their demotion?

23      MS. RUBINSTEIN:  Objection.
```

1          THE WITNESS:  We already talked about

2      the directive of telephone use and I've also

3      referenced the memorandum that's issued with

4      each phone bill to the employees, which

5      outlines and provides them with direction

6      for them to review the phone bill and

7      indicate which were personal and pay for

8      personal calls.

9          So in those two instances -- and

10      regardless of having personal calls, as long

11      as you have a phone on your desk assigned to

12      you, that memo would be generated to you

13      each and every month.

14  BY MR. KEACH:

15    Q.  So, that memo comes to you.  And let's assume

16  that you had to call your kid because you have a sick

17  kid at school or you had some emergency situation come

18  up.  I can understand that, but how would someone be

19  able to determine what level of personal phone calls

20  would be appropriate besides making emergency calls?

21          MS. RUBINSTEIN:  Objection.

22          THE WITNESS:  Part of that review

23      process where they identify what calls are

1          there and they pay for the calls, it

2          requires the employee to write out how much

3          they owe and to turn it in to the

4          supervisor, at which point the supervisor

5          could then conduct a review, if there are

6          calls that are outside of what would be

7          acceptable boundaries, the supervisor could

8          then address the conduct.  And that way the

9          behavior can be corrected.

10   BY MR. KEACH:

11     Q.  Well, I just want to be clear.  The directive

12   says no personal phone calls except for emergency

13   purposes.  And then every month you get a memo that's

14   sent out that says, review your phone bill to see if

15   you're making personal phone calls on state time on

16   state equipment.

17          What is there beyond that?

18               MS. RUBINSTEIN:  Objection.

19               MR. KEACH:  That I can look to.

20               THE WITNESS:  I just answered that.

21   BY MR. KEACH:

22     Q.  There's nothing, fair to say, besides those two

23   things?

1      A.   Again, so those two things, and then in

2  correspondence with when your supervisor reviews what

3  you're paying for, would initiate a discussion.

4      Q.   Well, let's just clear the air here.

5           Absent emergency circumstances, should you be

6  making personal phone calls while you're on state time

7  doing state business, yes or no?

8           MS. RUBINSTEIN:  Objection.

9           THE WITNESS:  The directive does not

10          call for it.

11 BY MR. KEACH:

12     Q.   The directive doesn't allow for it, does it?

13     A.   No.

14     Q.   In fact, that would be to some extent, if you're

15 claiming you're working and, in fact, you're doing

16 personal things that don't involve the interest of the

17 taxpayers, that would be inappropriate, wouldn't it?

18          MS. RUBINSTEIN:  Objection.

19          THE WITNESS:  Depends on the extent to

20          which you're doing it.

21 BY MR. KEACH:

22     Q.   Well, let's take that one step further.  There's

23 this -- and I want the record to reflect that when

1    Mr. Botsford was here, I offered to give the state $7 to

2    pay for Mrs. Trostle's phone calls, and he declined.

3           But regardless, would someone making $7 of

4    personal phone calls on state equipment in 14 months

5    rise to the level where it would cause you concern?

6           That's 50 cents of phone calls a month.

7                  MS. RUBINSTEIN:  Objection.

8                  THE WITNESS:  It was the totality of

9           the circumstance that led to my

10          determination.

11   BY MR. KEACH:

12      Q.  Well, we're going to walk through each part of

13   that.  So, I'm asking you -- let's step back.

14          Do you make personal phone calls --

15      A.  I do.

16      Q.  Well, let me finish.

17          Do you make personal phone calls on your

18   state-issued telephone?

19      A.  I do.

20      Q.  Do you review your bill every month?

21      A.  I do.

22      Q.  Have you made more than 50 cents of phone calls

23   in a month?

1    A.   Not routinely.

2    Q.   Have you done it?

3    A.   No.

4    Q.   You've never made more than 50 cents of personal

5    phone calls off your state-issued phone.

6    A.   I don't believe so.

7    Q.   Well, you can agree with me, by looking through

8    that list, that there are plenty of people -- and this

9    is just for one month, January of 2010 -- there are

10   plenty of people on there who made more than 50 cents of

11   phone calls off their personal state-issued phone; isn't

12   that right?

13   A.   That's correct.

14   Q.   Can you pass that over to me.

15   A.   Sure.

16   Q.   And, in fact, we've got Theresa Knapp-David

17   making a dollar's worth of phone calls in January 2010,

18   don't we?

19   A.   That's what's reported.

20   Q.   And we've had a whole bunch of other people --

21   there's at least five or six other people on that list

22   that made more than 50 cents worth of phone calls in

23   January 2010; isn't that correct?

1    A.   There are other people listed.

2    Q.   That made more than 50 cents in calls.

3    A.   That made more than 50 cents.

4    Q.   Well, here's what I'm trying to figure out:   Was

5  any effort made by anyone in your department to

6  determine how Mrs. Trostle's phone call activity

7  compared to others in her same unit?

8    A.   Not that I'm aware of.

9    Q.   And do you know whether anyone else's phone calls

10  were audited, like Mrs. Trostle's were by Mr. Botsford

11  to determine whether or not she was making personal

12  phone calls on state equipment?

13          MS. RUBINSTEIN:   Objection.

14          THE WITNESS:   I don't know.

15  BY MR. KEACH:

16    Q.   Well, I'm asking you:   Do you know --

17    A.   I said I don't know.

18    Q.   -- as you sit here today, whether anyone else had

19  their phone calls audited, or was it just Mrs. Trostle?

20          MS. RUBINSTEIN:   Objection.

21          THE WITNESS:   I don't know.

22  BY MR. KEACH:

23    Q.   I can tell you the undisputed proof in the case.

```
 1              MS. RUBINSTEIN:  We're not answering

 2         questions, Mr. Keach.  We're asking

 3         questions.

 4              MR. KEACH:  I'm going to conduct my

 5         examination how I see fit and have a right

 6         to build a foundation to ask further

 7         questions.  You have the right to object to

 8         the form of the question.

 9    BY MR. KEACH:

10      Q.  Now, it's undisputed -- Mr. Botsford admitted in

11    his deposition -- that the only person he looked at to

12    see whether or not they were making these personal phone

13    calls on state equipment was Melissa Trostle.  And he

14    didn't look at anyone else until after Ms. Trostle was

15    already demoted and was back in Greene Correctional

16    Facility.

17           So with that premise, sir, does that cause you

18    any concern that only Ms. Trostle was targeted in this

19    way?

20              MS. RUBINSTEIN:  Objection.

21              THE WITNESS:  When the employee signs

22         this document, he has the ability to look at

23         the phone record as they're signing this
```

```
 1              document so that would give him a chance to

 2              review all of these people that had

 3              indicated a personal phone call for

 4              utilization.

 5   BY MR. KEACH:

 6      Q.  You didn't answer my question.

 7          Does it cause you concern that only Mrs. Trostle

 8   had her phone records pulled and went through as a part

 9   of the process versus having everyone's records

10   considered?

11              MS. RUBINSTEIN:  Objection.

12              THE WITNESS:  Well, again, based on the

13              totality of what I know, and that people

14              were admitting to utilizing the phone, and

15              that the director would have had the

16              opportunity to review those calls, and that

17              Mrs. Trostle was not indicating any personal

18              calls, that he did a further review of

19              Mrs. Trostle, that does not cause me

20              concern.

21   BY MR. KEACH:

22      Q.  That does not cause you concern.

23          Well, do you know whether or not in the past
```

1    Mrs. Trostle had paid for her phone calls?

2       A.   I believe, as part of the period of times that

3    were reviewed, that she had no indication of submitting

4    documentation indicating that she had used her phone.

5       Q.   Do you know whether or not that she was actually

6    provided with those bills to review?

7       A.   My understanding is that each of the units

8    provided all of their employees with their bills to

9    review.

10      Q.   And I just want you to assume for a second, sir,

11   let's assume that someone had a personal grudge against

12   Mrs. Trostle and decided not to give her these bills to

13   review every month and so she didn't have an opportunity

14   to review these bills.

15         Would that cause you some concern?

16      A.   Yes.

17      Q.   You never bothered to determine whether or not

18   Mrs. Trostle was given an opportunity to review these

19   bills before you terminated her, did you?

20      A.   I had reason to believe that all employees are

21   provided the bills in accordance with the memorandum.

22      Q.   So your answer is no, you didn't determine

23   whether or not Ms. Trostle was provided with an

1    opportunity to review these bills before you terminated

2    her, correct?

3              MS. RUBINSTEIN:  Objection.

4              THE WITNESS:  It was my belief that she

5         had reviewed the bills and had not indicated

6         personal utilization.

7    BY MR. KEACH:

8      Q.  So, your answer is no, you did not check that

9    yourself, did you?

10     A.  No.

11     Q.  And no one below you checked that, either, in

12   terms of under your supervision as director of human

13   rights.

14             MS. RUBINSTEIN:  Objection.

15             THE WITNESS:  I don't know.

16   BY MR. KEACH:

17     Q.  Now, my understanding is that it's -- that

18   there's a policy and procedure in the Department of

19   Corrections that the first step that a supervisor should

20   take when they have a concern about an employee's

21   conduct is at least to sit down with that employee and

22   allow them to explain themselves.

23             Am I right about that?

1          MS. RUBINSTEIN:  Objection.

2          THE WITNESS:  It depends on the

3     totality of the situation.

4  BY MR. KEACH:

5     Q.   How does it depend on the totality of the

6  situation?

7     A.   Well, I can give you umpteen scenarios.

8     Q.   Well, I'll try to give a couple, and let's see if

9  you agree with me.

10         You and I would agree, if a correction officer

11  gets caught having sexual relations with an inmate,

12  they're not going to get an opportunity to explain

13  themselves; they're going to be removed from the

14  facility; fait to say?

15    A.   Agreed.

16    Q.   If an employee commits a crime, for instance, say

17  that they're caught bringing in heroin, they're not

18  going to be given an opportunity to explain themselves;

19  they're going to be removed from the facility, correct?

20    A.   Agreed.

21    Q.   So, give me some other less severe examples.

22         Apart from criminal conduct on the job, when is

23  an employee not going to be given an opportunity to

```
 1   explain themselves or at least explain their situation?

 2               MS. RUBINSTEIN:  Objection.

 3               THE WITNESS:  When we have the facts

 4         surrounding the situation and we don't need

 5         to request anything further of the employee.

 6   BY MR. KEACH:

 7     Q.  And is that the case here, that you didn't need

 8   to request anything further from Ms. Trostle, that you

 9   felt that you had the facts?

10     A.  I felt I had sufficient facts as reported to my

11   office to proceed with my determination to remove her

12   from her provisional position as assistant director.

13   Yes.

14     Q.  Is that what's required by the state's directive

15   on using state equipment for phone calls?

16               MS. RUBINSTEIN:  Objection.

17               THE WITNESS:  I don't understand the

18         question.

19   BY MR. KEACH:

20     Q.  That's what's allowed under the state's policies

21   for the use of phone calls is that the employee isn't

22   even to be consulted.

23     A.  Provisional employees have no rights.  They can
```

1  be removed from the position for no reason or reason.

2      Q.  Okay.

3      A.  That's the state policy.

4      Q.  And what if an employee is removed from her

5  provisional position for an impermissible reason under

6  federal law, that would change your opinion, wouldn't

7  it?

8              MS. RUBINSTEIN:  Objection.

9              THE WITNESS:  Yeah.  Any violations of

10         law would be problematic.

11  BY MR. KEACH:

12      Q.  If an employee was eliminated from her position

13  because she complained about racial discrimination in

14  the workplace, that would change your analysis about

15  whether or not that provisional employee's termination

16  was justified, wouldn't it?

17              MS. RUBINSTEIN:  Objection.

18              THE WITNESS:  Yes.  That was not my

19         determination, though, on that basis.

20  BY MR. KEACH:

21      Q.  Well, if an employee was terminated from their

22  employment because they took family medical leave, that

23  would also be problematic, wouldn't it?

1      A.   Yes.   We have a directive on family medical

2  leave.

3      Q.   So, are you aware that this memo that you were

4  sent by Mr. Botsford was the day after Mrs. Trostle had

5  to leave the office for family medical leave?

6      A.   I don't recall that.

7      Q.   Well, I'm telling you as a matter of fact that

8  that memo was prepared the day after Mrs. Trostle -- or

9  at least in the immediate proximity after Mrs. Trostle

10  had to leave the office for family medical leave to have

11  an emergency medical procedure.

12      A.   She had approved family Medical Leave Act under

13  the...

14      Q.   It is my understanding that she had to go on

15  family medical leave.   There was an emergency situation.

16  So that's different.

17      A.   FMLA is not necessarily just because you have a

18  family emergency or a personal emergency, medical.

19      Q.   I understand.   She had to have an emergency

20  medical procedure and left the office to go attend to

21  that.

22      A.   That's not necessarily Family Medical Leave Act.

23      Q.   Well, let's just take this one step further.

1          You would agree with me, under the Family Medical

2     Leave Act, that if an employee has to take an extended

3     absence because of an emergency medical situation, they

4     can do so and then apply for family medical leave later;

5     isn't that right?

6          A.   Yes.   The department has a policy in which, after

7     three days of absence, we pre-designate.   And then the

8     employee is required to fill out the DOL form and

9     submission, and it must be filled out in its entirety.

10    And it's reviewed and approved for Family Medical Leave

11    Act, and then you get 12 weeks of FMLA leave per

12    calendar year, depending on if you meet all of the

13    requirements of 1250 hours worked in the previous year.

14         Q.   And so, do you know whether or not Mrs. Trostle

15    filled out those forms to apply for family medical leave

16    after she had to leave and have surgery on her kidneys?

17         A.   I don't know.

18         Q.   But you would agree with me that, if she properly

19    applied for family medical leave and -- or was eligible

20    for -- was appropriately eligible for family medical

21    leave and then was terminated as a result of taking

22    family medical leave, that that would be problematic,

23    even if she was a provisional employee.

1     A.   Yes.

2     Q.   You claim you had all the facts that you needed,

3  right?

4     A.   Based on the facts that I had, I had sufficient

5  belief to render my decision.

6     Q.   Is it impermissible if someone uses their lunch

7  hour to make personal phone calls?

8     A.   I don't know.

9     Q.   The time that the state gives them for lunch, if

10  they're at their desk eating their lunch and they make

11  some calls, is that improper?

12     A.   No.

13     Q.   And so, can you tell me whether these personal

14  phone calls that Mrs. Trostle made, the $7 worth of

15  personal phone calls that justified her demotion, were

16  made at any point in time during the time that she

17  scheduled for her lunch break?

18               MS. RUBINSTEIN:   Objection.

19               THE WITNESS:   I'm not aware.

20  BY MR. KEACH:

21     Q.   So, that's not something you looked in to; fair

22  to say?

23     A.   There were the phone logs that were also attached

1    as supporting documentation which would have given the

2    times, but I can't recall that I was looking to that

3    detail.

4        Q.   Well, here's what I'm trying to figure out.

5    Let's assume that all $7 of Mrs. Trostle's personal

6    phone calls made over the course of 14 months were made

7    on her lunch hour.

8             That wouldn't be inappropriate, would it?

9        A.   Not if she was reimbursing us.

10       Q.   And assuming that she was given the chance to,

11   right, that was the assumption you made?

12       A.   Correct.

13       Q.   So, how about after hours, let's say you work

14   8:30 to 4:30.   4:30 rolls around.   You got to place a

15   couple of personal phone calls before you go home.

16            According to your understanding of how things

17   were done at central office, that wouldn't be

18   inappropriate, either, as long as an opportunity was

19   given for someone to be able to reimburse the calls.

20       A.   I don't know why you would be there after hours,

21   unless you were actually working.   She's an MC employee.

22   So, you work the hours until the job is done.   And if

23   you're eligible for overtime, you're paid overtime.   And

1    if you're not, you're not eligible for overtime.

2       Q.  I understand, but I'm just asking.  It's 4:30.

3    I'm trying to make plane reservations to go somewhere.

4    And so, I pick up the phone and call somebody.

5          Is that inappropriate?

6       A.  It happens.  According to the directive it might

7    be, but it happens.

8       Q.  So that wouldn't be inappropriate, either.

9          Here's what I'm trying to figure out.  You know,

10   you're the director of human resources for the entire

11   Department of Correctional Services.  What do you guys

12   have, like, 50-, 60,000 employees?  Am I right about

13   that -- or is it 28,000?

14      A.  About 29-.

15      Q.  29,000 employees and about 75,000 inmates; is

16   that accurate?

17      A.  No.

18      Q.  How many inmates do you have?

19      A.  54,000.

20      Q.  I think the numbers may have gone down.

21      A.  1999 was the high.

22      Q.  You have 29,000 employees, and you're the guy

23   that's the director of human resources for all of them,

```
 1    but your sphere is mainly the people that aren't

 2    protected by civil service issues; fair to say?

 3              MS. RUBINSTEIN:  Objection.

 4              THE WITNESS:  That are not subject to

 5         discipline under 75.

 6    BY MR. KEACH:

 7      Q.  What would the harm have been for you to sit down

 8    with Mrs. Trostle when she got back from her surgery and

 9    ask her to explain herself before you made a decision?

10              MS. RUBINSTEIN:  Objection.

11              THE WITNESS:  I had sufficient belief

12         that, based on the evidence I had before me,

13         that that wasn't necessary, and that I don't

14         afford that opportunity to employees on a

15         statewide basis.

16              Supervisors submit documentation to

17         support the recommendation for termination,

18         and I make the terminations.  Not to say

19         that it couldn't have been done, but I

20         didn't have any reason to believe that that

21         was necessary.

22    BY MR. KEACH:

23      Q.  How many other people have you demoted or
```

```
 1    terminated from their employment with the State of New

 2    York for making phone calls off state equipment?

 3        A.  You're assuming that that was the underlying --

 4    the only fact of why she was demoted, just for the phone

 5    calls.

 6        Q.  Well, we'll get to the other reasons in a minute,

 7    but I believe it was either Ms. Knapp-David or

 8    Mr. Botsford detailed to me in his testimony that the

 9    overriding reason was the phone calls.

10         But regardless, let's start with this:  How many

11    other people have had their phone calls on state-issued

12    equipment be one of the reasons in a totality of the

13    circumstances that they were either demoted or fired

14    from state employment?

15        A.  I can't answer that.  I don't know.

16        Q.  But is it fair to assume the answer would be

17    none?

18             MS. RUBINSTEIN:  Objection.

19             THE WITNESS:  I don't know.

20    BY MR. KEACH:

21        Q.  And you sign all these memos, right?  The buck

22    stops on your desk to determine whether or not one of

23    these probationary, these non-civil service protected
```

1  employees lose their job, the buck stops on your desk

2  when you were the director of human resources, right?

3      A.  Correct.

4      Q.  I'm asking you to detail to me one person who

5  lost their job with the State of New York because of a

6  claim that they misused state equipment as part of the

7  totality of the circumstances of the termination, one

8  person.  Give me one name.

9      A.  I've terminated people for misuse of state

10 equipment.  I can't give you a name for any of these

11 people.

12     Q.  Phones.

13     A.  You said state equipment.

14     Q.  Phones, state phones.

15     A.  I don't recall any phones.

16     Q.  The other occasions when you terminated someone

17 for misusing state equipment, that would be someone who,

18 say, uses a gas card and misuses a gas card and filled

19 their car up with state gas.  Is that an example?

20     A.  Could be.

21     Q.  Or uses a state car at a correctional facility

22 for personal reasons.

23     A.  Could be.

1    Q.   Can you give me some other examples of people who

2    used state equipment and that led to their either

3    demotion or termination from employment.

4    A.   Offhand, I can't really name anything for you.

5    Q.   So, the examples I gave would be a typical

6    example of a situation where someone misusing state

7    equipment could be terminated or demoted; fair to say?

8    A.   I couldn't say typical, but I would say they

9    could be examples.  Yes.

10   Q.   So, you can't name anybody that misused the

11   phones and that resulted in their termination from

12   employment, right, or demotion?

13   A.   Not offhand.

14   Q.   So now, do you know whether other employees that

15   were employed in the office of classification and

16   movement, whether or not they also committed the same

17   sorts of actions Mrs. Trostle did in making phone calls

18   that they didn't reimburse?

19            MS. RUBINSTEIN:   Objection.

20            THE WITNESS:   I don't know that.

21   BY MR. KEACH:

22   Q.   Wasn't that something that, again, if you're

23   going to take this sort of harsh action against one

1  person, shouldn't everyone have the same sort of

2  evaluation?

3    A.   I evaluate things that are referred to my office.

4  I can't do a statewide evaluation on every -- all 29,000

5  employees to determine if any employee is also under

6  this type of infraction.   I take the recommendation as

7  it comes to me, and I look at the facts and

8  circumstances.

9    Q.   How far is your office from the office of

10 classification and movement?

11   A.   It's two floors away.

12   Q.   You're in the same building.

13   A.   Yes.

14   Q.   You're over here at the Harriman campus.

15   A.   Correct.

16   Q.   And so, I understand you can't do an audit of all

17 28,000 employees, I'm not suggesting you should do that,

18 but I'm trying to figure out in this office,

19 classification and movement, wouldn't it have been

20 appropriate, if we're going to discipline one person for

21 something, we should discipline everybody?

22   A.   I didn't discipline Ms. Trostle.

23   Q.   What did you do?

1   A.   I removed her from her provisional status.

2   Q.   So I've had this discussion before.  You're

3   telling me that someone losing $20,000 in pay and being

4   removed in a central office and sent back to a

5   correctional facility wouldn't be considered discipline.

6   A.   It's not discipline.

7   Q.   Would you consider that a demotion?

8   A.   It was a demotion.  It's not discipline.

9   Q.   Fine.  So if you're going to demote somebody

10  based on the use of state phones, wouldn't it be fair to

11  see if anyone else was engaged in the same sort of

12  conduct?

13            MS. RUBINSTEIN:  Objection.

14            THE WITNESS:  Again, I already answered

15       that for you.

16  BY MR. KEACH:

17  Q.   You gave what, just that it was referred to you

18  and you don't look any further?

19  A.   Yeah.  I'm not going to go check 28,000

20  employees --

21  Q.   I'm taking about --

22  A.   I know, but to segregate a population of 28,000

23  employees, to follow your train of thought, would be

1    that I should check it all, and it would be unfair to

2    only check one segregation of a population.

3        Q.   Well, here's what I'm trying to figure out, sir:

4    Wouldn't it cause you concern from the position of a

5    person who is trying to have an even-handed application

6    of rules in the state government that one person was set

7    aside for a level of scrutiny that wasn't applied to

8    anybody else?

9                MS. RUBINSTEIN:  Objection.

10               THE WITNESS:  For the duration of time

11           spent on the phone as outlined on the phone

12           records themselves, the duration of time,

13           coupled with -- coupled with the

14           non-reporting of personal use of the phone

15           in accordance with the department practice,

16           that gives me great concern.

17   BY MR. KEACH:

18       Q.   The duration of time on the phone.

19       A.   That, coupled with a non-reporting.

20       Q.   My understanding is that Mrs. Trostle works seven

21   and a half hours a day; is that right?

22       A.   That doesn't include her lunch.

23       Q.   No, no, no.  If she works from 8:30 to 4:30 and

1    then she gets a half an hour lunch, that's unpaid,

2    right?

3          Isn't that how it works?

4    A.   That's correct.

5    Q.   So, she works 7.5 hours a day times 60 minutes in

6    an hour, so she works 450 minutes a day.

7    A.   Is that what it says?

8    Q.   No.   It's just what I added up.   I multiplied 60

9    times 7.5 hours.   So that's 450 minutes a day.   And we

10   multiply that by five days in a week.   So, that equals

11   2250 minutes working a week.   And we'll just say she

12   worked 50 weeks a year, took some vacation time.   So, we

13   get to 112,500 minutes of work a year.

14         So now we have 230 minutes of calls, and another

15   five of these were calls that were toll calls,

16   long-distance, personal calls.   And we have 500 minutes

17   of calls to 800 numbers.   So that adds up to 730 minutes

18   of calls a year.

19   A.   A year.

20   Q.   In a year, according to this.   Well, I gave you

21   the benefit of the doubt because I know she was on

22   family medical leave for part of the time.   It says

23   March 2010 to April 2010.

1    A.   I don't have the memo, so I'm going off of your

2  finding.

3    Q.   Well, that's 14, right?  March 2010 to April 2011

4  is 14 months, right?

5    A.   14.

6    Q.   Yeah.

7    A.   March to April.

8    Q.   Yeah.  We have two Marches in there.  You have

9  the first March and the second March.  So, you have 14

10  months.  But I'm giving you the benefit of the doubt and

11  the state.  12 months -- we're going to average it out

12  for 12 months instead of 14 because she was out on leave

13  for part of the time.  I know she was out for several

14  weeks.

15        So, we got 730 minutes, right?  So, I'll tell you

16  what.  We're going to do this by days.  So, we've got

17  five days of work times 50 days a year equals 250,

18  right?  250 days of work a year.  So, if we take 730

19  minutes --

20    A.   What was 730 minutes again?

21    Q.   From this memo it would be the combination of her

22  230 minutes of personal phone calls over the course of

23  14 months, plus her 500 minutes of toll-free calls over

1    the course of 14 months.  That's what the memo says.

2         It says here, because I'll read it to you, "I

3    consider the use of her work phone to such an extent for

4    personal reasons inappropriate.  As a manager,

5    Mrs. Trostle cannot function effectively or present a

6    positive example to her subordinates by consuming over

7    700 minutes on personal phone calls and not reimbursing

8    the state for her phone charges," right?  That's what it

9    says as a justification.

10        So, according to this, I added it up, 730

11   minutes.  You got 250 days in the year or 250 days

12   working in a year.  So we'll divide that by 250.  2.92

13   minutes a day on the phone for personal reasons.

14        You can look at me with a straight face across

15   this table and tell me that someone deserves to lose

16   their job and be demoted and sent back to their hold

17   item for making less than three minutes of personal

18   phone calls a day throughout the course of the entire

19   year; is that accurate?

20             MS. RUBINSTEIN:  Objection.

21             THE WITNESS:  It's a little misleading.

22             MR. KEACH:  I'm asking you a question.

23             THE WITNESS:  I know.  I'm answering.

1          When you look at her actual phone

2      calls, there was periods of time when there

3      were big blocks of 80 minutes at a clip

4      phone calls, not extrapolated out.

5          Yes, that might be the period reviewed,

6      but there are big blocks of 80 minutes, 60

7      minutes, 50 minutes, also.  Also, as I

8      indicated to you, it wasn't solely based on

9      the utilization of the phone.  It's also the

10     lack of reporting her personal use and the

11     practice of the department.  And it's a

12     manager at that level with the combination

13     of the utilization of the phone and the not

14     reporting under department practice, as

15     other employees are doing.  So that was the

16     reason why she was demoted.

17         And yes, I feel it's justified.

18  BY MR. KEACH:

19     Q.  Okay, great.

20         It says one day there were over 80 minutes of

21  long distance personal calls, March 8, 2011.

22         Do you know what happened on March 8, 2011?

23     A.  No.

1      Q.   Do you care?

2              MS. RUBINSTEIN:  Objection.

3              THE WITNESS:  I don't not care.

4  BY MR. KEACH:

5      Q.   Well, I mean, if there's a reason why

6  Mrs. Trostle had to make 80 minutes of phone calls that

7  day, wouldn't that factor in to what you're doing here?

8      A.   No.  Because she didn't report it.

9      Q.   How could she report it?  She went out on family

10  medical leave a month later.

11             MS. RUBINSTEIN:  Objection.

12             THE WITNESS:  When the bills came out

13        and they were under review, it wasn't

14        reported.

15  BY MR. KEACH:

16     Q.   How long does it take for these bills to go from

17  the office manager of budget, or whatever does it --

18     A.   I don't know.

19     Q.   -- to get to the employees?

20     A.   I don't know.

21     Q.   Well, how about you, what's your experience?

22          How long does it take?  If you make phone calls

23  in March 2011, when are you going to get that bill?

1    A.   Within weeks, maybe a couple weeks, four weeks.

2    I don't know.   I don't know when the bills came in.   I

3    don't pay that close attention.

4    Q.   Well, you would agree with me that that bill

5    would -- if a March 2011 phone call was generated, that

6    the earliest that the bill could be generated for that

7    month would be April 1st, right?

8    A.   Presumably.

9    Q.   And so, if there's some delay in getting those

10   bills out after April 1st, it would go into May, right?

11   A.   Probably not that late, but...

12   Q.   But you don't know as it relates to Ms. Trostle;

13   fair to say?

14   A.   That's what I'm trying to tell you.

15   Q.   And so, do you know, as you sit here today,

16   whether Mrs. Trostle had an opportunity to review her

17   bill for March of 2011 before she went out on medical

18   leave in May of 2011?

19            MS. RUBINSTEIN:   Objection.

20            THE WITNESS:   I don't know that.

21   BY MR. KEACH:

22   Q.   And so, if I told you that Mrs. Trostle's mother

23   become gravely ill on March 8, 2011, and she learned

1  about that while she was at work, wouldn't that affect

2  your opinion about whether or not what Ms. Trostle was

3  doing was appropriate?

4          MS. RUBINSTEIN:  Objection.

5          THE WITNESS:  For that one particular

6     call.

7          MR. KEACH:  Yeah.

8          THE WITNESS:  For that one call.

9  BY MR. KEACH:

10    Q.  So if she's calling her relatives to try to find

11  out how her mom's doing, that would be okay, wouldn't

12  it?

13          MS. RUBINSTEIN:  Objection.

14          THE WITNESS:  I would think that that

15     would be okay.

16  BY MR. KEACH:

17    Q.  And so, why didn't you ask her before you demoted

18  her?

19    A.  I already answered that for you.

20    Q.  Well, not really.

21    A.  Yeah.  I reviewed the totality of the

22  documentation in front of me and made a determination on

23  the demotion.

1      Q.   And that documentation doesn't include an

2   opportunity for Mrs. Trostle to come in and explain

3   herself, does it?

4      A.   No.

5      Q.   And if this would have been civil service

6   situation, Mrs. Trostle would have been given an

7   opportunity to explain herself, wouldn't she?

8      A.   What do you mean by civil service?

9      Q.   If this was covered under the ordinary discipline

10   that would be applied to someone that worked at the

11   Department of Correctional Services that has civil

12   service protection, that person would have been given an

13   opportunity to explain themselves, wouldn't they?

14      A.   At a hearing.

15      Q.   Or by filing a grievance, isn't that the first

16   step that you have to take to get a hearing, filing a

17   grievance, right?

18      A.   Yes.

19      Q.   If you and I can agree that Mrs. Trostle making

20   this particular phone call, these phone calls on one day

21   for 80 minutes, which would have been a third of the

22   total that is part of this $7 in phone calls, I just

23   can't figure out for the life of me why someone of your

1    experience and intelligence

2    wouldn't demand that she be given an opportunity to

3    explain herself before you sent her back down to her

4    hold item and demoted her and cost her $20,000 in pay.

5        A.    Was there a question?

6        Q.    Yeah.

7        A.    What was it?

8        Q.    Again, why would a man of your intelligence and

9    experience not give this woman an opportunity to explain

10   it?

11                    MS. RUBINSTEIN:    Objection.

12                    THE WITNESS:    I reviewed the totality

13           of the records and made a determination.

14   BY MR. KEACH:

15       Q.    Why would you not demand that people underneath

16   you and/or the people that were pushing this give her an

17   opportunity to explain herself first?

18                    MS. RUBINSTEIN:    Objection.

19                    THE WITNESS:    I was satisfied with what

20           was before me to render a determination.

21   BY MR. KEACH:

22       Q.    And giving Mrs. Trostle an opportunity to explain

23   herself wasn't something you felt was necessary for you

1    to make a determination; fair to say?

2    A.   Correct.

3    Q.   Do you understand that the term "pretext" as it's

4    applied in an employment discrimination case?

5    A.   No.

6    Q.   You've never learned that term in your years

7    working as a director of human resources for the

8    Department of Correctional Services.

9            MS. RUBINSTEIN:   Objection.

10           THE WITNESS:   If you want to shed light

11       on it, I would listen.

12   BY MR. KEACH:

13   Q.   Sure.   Pretext is basically where someone has an

14   imperishable reason for doing something that violates

15   the law, but they come up with some other excuse to get

16   rid of the person so that they don't have to tell the

17   real reason why they did it.

18       Did you ever hear that term?

19           MS. RUBINSTEIN:   Objection.

20   BY MR. KEACH:

21   Q.   Or do you understand it now that I've defined it?

22   A.   I understand it.

23           MS. RUBINSTEIN:   Objection.

1    BY MR. KEACH:

2       Q.   And would it cause you some concern, sir, if

3    Mrs. Trostle was the only member of the office of

4    classification and movement that was of Spanish heritage

5    and she was treated in this way, differently from

6    others?

7            Wouldn't that cause you some concern as the

8    director of human resources?

9                MS. RUBINSTEIN:  Objection.

10               THE WITNESS:  It causes me concern when

11           someone is treated differently based on

12           their Spanish descent.  I think that's the

13           term you used.

14   BY MR. KEACH:

15      Q.   And would it cause you some concern that that

16   person may have been treated differently because, in the

17   perception of her supervisor, she used too much family

18   medical leave?

19               MS. RUBINSTEIN:  Objection.

20               THE WITNESS:  Yes.

21   BY MR. KEACH:

22      Q.   Did Theresa Knapp-David ever come to you and

23   advocate for Mrs. Trostle to be terminated?

1    A.   Not that I recall.

2    Q.   Did Mr. Botsford and you ever talk and he

3  advocated to terminate Mrs. Trostle?

4    A.   Upon the submission of his memorandum.

5    Q.   Well, did he ever talk to you personally about

6  it?

7    A.   Just when he dropped the memo off.

8    Q.   What did he say?

9    A.   That he was dropping a memo off recommending

10 demotion.

11   Q.   Did you question him about it?

12   A.   No.

13   Q.   I mean, can you understand how someone that

14 doesn't work for the state government and look at this

15 memo here and think that this is really a petty reason

16 to demote someone?

17              MS. RUBINSTEIN:   Objection.

18              THE WITNESS:   No.   I don't think it's

19       petty.

20 BY MR. KEACH:

21   Q.   So, you can't understand, or anyone looking at

22 this objectively could say that these are really

23 ticky-tack reasons to show someone the road.

```
 1      A.   No.

 2      Q.   Did you have a chance to review any transcripts

 3  before you came here today?

 4      A.   No.

 5      Q.   Did you review any documents before your

 6  testimony?

 7      A.   Just the termination log.

 8      Q.   The termination log, that's it.

 9           Well, what do you have here in your notepad, or

10  under your notepad here?  Well, you got magazines.  I

11  can't see what those are.

12               MS. RUBINSTEIN:  Governing, a copy says

13           details guy --

14               MR. KEACH:  I know there's two -- come

15           on, Heather.

16               In October 2014.

17  BY MR. KEACH:

18      Q.   What's under the magazines?

19      A.   Memo that goes out from the central office

20  director of finance on phone bills, the directive,

21  employee probation, appointments, provisional, and court

22  find state negligent for rape of an inmate, couple other

23  documents, court case.
```

1    Q.   Which of those documents did you review to

2    testify today?

3    A.   I reviewed the directive and the memo relative to

4    records on the phone.

5              MS. RUBINSTEIN:   We can mark them.

6    BY MR. KEACH:

7    Q.   Could I have your assurance nothing else in there

8    addresses Mrs. Trostle's situation.

9    A.   Correct.   You can look.

10   Q.   I trust you.   You're a high ranking government

11   official.   What's there not to love?

12             MS. RUBINSTEIN:   It's 12 pages.

13             MR. KEACH:   These either I already have

14        or I don't really need, so I'm going to pass

15        these over to you.

16             MS. RUBINSTEIN:   Well, I would prefer

17        to mark them all as Defendant's 1 so it's

18        clear for the record.   Then you can do

19        whatever you want with the rest.

20             MR. KEACH:   I'm not really sure how

21        we're going to do that because we have

22        different documents that are stapled

23        together.

1          So, we'll let the record reflect that

2      there's a policy here, directive 2918 that

3      we've marked in this case, I believe.

4          Is that Exhibit 3 there, sir?

5          THE WITNESS:  3.

6          MR. KEACH:  So, we already have this

7      marked in the case.  I don't need that.

8      We'll reflect he pulled that out of his

9      envelope there.

10          Now we have a monthly telephone bill.

11          MS. RUBINSTEIN:  Can I just indicate

12      that the directive that Mr. Martuscello

13      brought is dated January 10, 2011, and the

14      one indicated in the Plaintiff's 3 is from

15      November 8, 2005.

16          MR. KEACH:  Well, the one I have is

17      what you gave me.

18          MS. RUBINSTEIN:  Presumably that

19      actually does not apply because it's post

20      the incident --

21          MR. KEACH:  This isn't post the

22      incident with Mrs. Trostle.  This is

23      pre-incident.  This is 1/10/2011.  So I

1      guess we are going to have to copy this one.

2           I appreciate you pointing that out to

3      me.

4           MS. RUBINSTEIN:  You're welcome.

5           MR. KEACH:  We'll mark this first one

6      here.  I'd like to get them copied so I

7      don't take his originals, okay?  And then

8      we'll continue from here.

9           (Recess taken.)

10  BY MR. KEACH:

11     Q.  You would have available in some centralized

12  location, would you not, memorandums comparable to

13  Mr. Botsford's memo to you requesting that an employee

14  be terminated or demoted?

15     A.  What was your question, would I have them

16  available?

17     Q.  Yeah.  Let's say I wanted to send a request to

18  the state either for trial purposes or discovery

19  purposes to come on in and look at all the memos that

20  were sent to you seeking to demote or terminate people.

21          Are they going to be in a central location?

22     A.  Yeah.  If they exist.

23     Q.  There's like a folder or something that says

1    termination memos, right?

2        A.   I don't know if that's what it says.

3        Q.   But they're all in one folder, aren't they?

4        A.   I don't know if they're in one folder.

5        Q.   They're going to be hard to find.

6        A.   We'd probably be able to find them.

7        Q.   And what about these termination request forms,

8    they can be found, too, right?

9        A.   Yeah.

10       Q.   We also go forward here, and there's some

11   discussion in this Plaintiff's Exhibit 1 about

12   Ms. Trostle being tardy on a couple of occasions.

13           Do you see that?

14       A.   I did see it.

15       Q.   Now, were you provided with any documentation

16   about that before you agreed that she should be demoted

17   for being tardy?

18       A.   I don't know if there was other attachments.   I

19   don't recall.

20       Q.   I remember seeing in this case some logs from the

21   door.   You guys have cards you get into the building

22   with.

23           Is that what you use, you have like a security

1    card to get in?

2       A.   Yes.

3       Q.   And so, there's a log generated from that.

4       A.   There is.

5       Q.   Did you see those log records as part of your

6    determination about whether or not Mrs. Trostle should

7    be demoted?

8       A.   I have a recollection, but I don't really

9    specifically recall.

10       Q.   Do you know if those log records were pulled

11    before or after she was demoted?

12       A.   I don't know.  I don't recall.

13       Q.   Well, do you know if anybody else had -- if this

14    happened before -- because I don't think it did.  I

15    think it happened after, but we'll figure that out

16    later.

17           Do you know if anyone else had their log entries

18    scrutinized to determine whether or not they were late?

19       A.   We have pulled logs before.

20       Q.   So, I think I already asked you.  I just want to

21    be thorough so I can move on to something else.

22           Do you know whether or not any effort was made to

23    audit anyone else's records to determine whether or not

1    they had the same level of tardiness, alleged tardiness,

2    that Mrs. Trostle did?

3        A.   I know that we have looked at those logs in the

4    past for other employees.

5        Q.   How about in the office of classification and

6    movement at the time that this was going on?

7        A.   I don't know.

8        Q.   I mean, you've looked at those logs in the past

9    when you're looking to substantiate someone for

10   tardiness and then you can document it based on when

11   they swiped their card, right?

12       A.   Yes.  For non-union employees.

13       Q.   For non-union employees, right.

14            So we've already established that it can be an

15   acceptable practice if someone is a few minutes late for

16   them to stay late; fair to say?

17       A.   With supervisor approval.

18       Q.   Fine, with supervisor approval.

19            But someone could just do that on their own, too;

20   isn't that right?  What if their supervisor's not

21   around, hey, I was five minutes late today; I'll stay

22   five minutes later?

23       A.   We don't have flex time in the agency.

1    Q.  I understand that.  I'm not suggesting you have

2    flex time.  I'm just basically saying, let's say I come

3    in to work today.  My boss isn't here.  I'm five minutes

4    late.  And I say to myself, you know what?  I'm just

5    going to stay five minutes extra today and make sure

6    that I make up the time that I was late.

7            Nothing wrong with that, is there?

8                MS. RUBINSTEIN:  Objection.

9                THE WITNESS:  They should have

10           supervisory approval.

11   BY MR. KEACH:

12   Q.  Should have but doesn't always happen; fair to

13   say?

14   A.  I don't know.  It doesn't always happen.

15   Q.  They don't have any timecards, right?

16   A.  There's timecards.

17   Q.  But not everybody uses them, do they?

18   A.  Everybody fills out a timecard.

19   Q.  It's like a written timecard.

20   A.  Right.

21   Q.  And doesn't it just say the hours, the number of

22   hours you work in a day?

23   A.  Actually, not for that position.

1      Q.   Well, what does it say?

2      A.   It tells the hours you don't work.

3      Q.   So if you're absent for a day, you fill that in

4   your timecard.

5      A.   For not overtime eligible.  It's the exclusions.

6      Q.   So, I work five hours this week but I'm sick a

7   day.  I'll fill in that I took seven and a half hours

8   sick leave on my timecard.

9      A.   On that day.

10     Q.   On that day.  And that's it.  That's all you fill

11   in.

12     A.   Yeah.

13     Q.   Do you have any knowledge of Mrs. Trostle

14   fraudulently filling out her timecards?

15     A.   No.

16     Q.   Do you have any knowledge that Ms. Trostle didn't

17   fill out her timecards accurately?

18     A.   No.

19     Q.   Now, do you know whether anybody formally

20   counseled -- meaning in a written counseling memo --

21   Mrs. Trostle for being late?

22     A.   I don't know.  I don't know.

23     Q.   So how many employees have you been involved with

1  either terminating or demoting based on tardiness

2  issues?

3      A.  I can't put a number on it.  I don't know if

4  there's any or if there's ten.  I don't know.

5      Q.  So, you don't know if there's any.

6      A.  Right.

7      Q.  Who works under your supervision?

8      A.  Directly.

9      Q.  Yeah.  You have a secretary.

10     A.  Yes.

11     Q.  You have some assistant directors.

12     A.  Correct.

13     Q.  Is your secretary ever late?

14     A.  There has been times.

15     Q.  Snow.

16     A.  Sure.

17     Q.  Inclement weather.

18     A.  Sure.

19     Q.  Kids.

20     A.  No.

21     Q.  She doesn't have any kids.

22     A.  No.  Adult.

23     Q.  Just running late, getting a late start in the

1  day, coming in a little late, that ever happen to her?

2      A.   Sure.

3      Q.   Did you write her up?

4      A.   No.

5      Q.   What did you do?

6      A.   She charged her time.

7      Q.   You had her charge her time.

8      A.   Typically.

9      Q.   And she did that.

10     A.   Yeah.

11     Q.   And that was the extent of any penalty she had to

12 pay.

13     A.   Yes.

14     Q.   Now, she's an hourly employee, isn't she?

15     A.   What do you mean by hourly?

16     Q.   I mean she works by the hour for the state.

17 She's an hourly employee versus a salaried employee.

18     A.   Sure.  Yes.

19     Q.   So, she comes in every day and she swipes a

20 timecard when she comes in to the office to show when

21 she comes and when she goes, right?

22     A.   No.

23     Q.   She does not.  She has to fill out a timesheet

1  like you're referring to.

2      A.   Recording hours actually worked but still filling

3  out manual timecards in central office.

4      Q.   Now, in your job there are occasions when you

5  have to stay late, isn't there?

6      A.   Yes.

7      Q.   You got something bad going on that needs your

8  attention, an immediate issue, you stay late; you're

9  working hard, right?

10      A.   Yes.

11      Q.   So, you routinely work more than the seven and a

12  half hours a day that you are paid to work; isn't that

13  right?

14      A.   Yes.

15      Q.   And do you know whether or not Mrs. Trostle ever

16  had to work after hours to address her job

17  responsibilities as assistant director for

18  classification and movement?

19      A.   I don't know.

20      Q.   And so, for these occasions when she is allegedly

21  late coming in to the office, do you know whether or not

22  she made that time up at some other point in time by

23  working hard or staying late one night to deal with

1  things?

2      Do you know whether or not that's the case?

3   A.  I don't.

4   Q.  So just so we're clear, you don't believe, as you

5  sit here today, that Mrs. Trostle was somehow defrauding

6  the state government in not working the hours she was

7  paid to work, do you?

8          MS. RUBINSTEIN:  Objection.

9          THE WITNESS:  I don't think she was

10         defrauding by not working.

11  BY MR. KEACH:

12  Q.  And you don't know whether on these limited

13  occasions where she was late, whether or not she made

14  that time up at some other point in time by working

15  really hard during an evening when there was a lot of

16  things going on; fair to say?

17         MS. RUBINSTEIN:  Objection.

18         THE WITNESS:  Correct.

19  BY MR. KEACH:

20  Q.  So, if we can't establish that Mrs. Trostle, in

21  fact, was not working -- or excuse me.  We can't

22  establish that there's some kind of fraud on

23  Mrs. Trostle's part that she wasn't working the hours

1    she was paid to work, then why would her being tardy on

2    a handful of occasions justify her demotion?

3                MS. RUBINSTEIN:  Objection.

4                THE WITNESS:  The tardiness was not the

5           sole reason why she was demoted.  It was the

6           totality of the memorandum.

7    BY MR. KEACH:

8       Q.  So, it was the totality of making on average

9    three minutes of personal phone calls a day and on one

10   occasion being on the phone for 80 minutes when her

11   mother was sick in Puerto Rico and being tardy on a

12   handful of occasions that justified her demotion; fair

13   to say?

14               MS. RUBINSTEIN:  Objection.

15               THE WITNESS:  And not reporting the

16          personal use.

17   BY MR. KEACH:

18      Q.  And not reporting the personal use of the phone.

19      A.  Yes.

20      Q.  You and I can't agree today that she even had an

21   opportunity to review the bills; fair to say?

22               MS. RUBINSTEIN:  Objection.

23               THE WITNESS:  I believe that all

1          employees review the bill.

2                (Exhibit 12 marked for identification.)

3     BY MR. KEACH:

4          Q.   Fine.   I got a memo here, and I'll pass the

5     originals back to you.   We can mark that as -- I think

6     we're up to Plaintiff's Exhibit 12.   It's entitled

7     "Monthly Phone Bills."

8                Now, my first concern, sir, looking at this is,

9     there's no date on it.   Do you have any idea when

10    Exhibit 12 came into being?

11         A.   This particular one.

12         Q.   Yeah.

13         A.   Would have been after the incident.

14         Q.   This policy was generated after the incident.

15         A.   This particular document.

16         Q.   Yeah.   Was generated after Ms. Trostle was

17    demoted.

18         A.   This document.

19         Q.   Yes.

20         A.   Yes.

21         Q.   How do you know that?

22         A.   Because it says I'm the deputy commissioner for

23    administrative services, and I know when that occurred.

1    Q.   I missed that.   I appreciate you pointing it out

2    to me.   I saw Anthony Antinucci, and I know when

3    Mr. Fisher left, but okay.

4         So when did you become the deputy commissioner

5    for administrative services?

6    A.   August of 2012.

7    Q.   And that would have been just shortly after --

8    two months after -- well, no, it would have been a

9    year-plus after Ms. Trostle left, right, or was demoted,

10   excuse me?

11   A.   Yeah.

12   Q.   Well, she was demoted in 2011, and you became

13   acting commissioner in 2012.   So what was in place

14   before that?

15   A.   Deputy commissioner.

16   Q.   Well, deputy commissioner.   So, what was in place

17   before this?

18   A.   I believe it was the same memo.   Just this

19   particular document with my letterhead I know happened

20   after the occasion.

21   Q.   Well, I guess it says here that -- and we don't

22   know if that memo applies to -- we don't know what the

23   prior memo is.   Maybe it's been served on me.   I have to

1   figure that out at a later time.

2          But it says here that, "an employee is to review

3   the calls listed and sign their individual call sheet to

4   verify that all calls were business related."

5          Do you see that?

6   A.    Mm-hmm.

7   Q.    Now, are you familiar with the crime of offering

8   a false record for filing?

9   A.    Yeah.

10  Q.    Did you ever hear of that?

11  A.    Sure.

12  Q.    And so, if an employee signed their toll sheet

13  and falsely represented that all the calls were business

14  related, that would arguably be a crime under the New

15  York Penal Law, wouldn't it?

16              MS. RUBINSTEIN:  Objection.

17              THE WITNESS:  I'm not an attorney.

18  BY MR. KEACH:

19  Q.    Well, I can tell you that that would be a crime.

20  A.    Okay.

21  Q.    Do you know, as you sit here today, whether or

22  not Mrs. Trostle actually signed her individual toll

23  sheet and reflected that her calls were business

1  related?

2     A.  We have no record that Ms. Trostle indicated

3  personal calls on the toll sheet.

4     Q.  Well, what's the toll sheet?

5       Is that this form that was filled out by Sethann

6  Bogardus?  I know that Sethann Bogardus is the one who

7  handwrote those entries.  And we've also established

8  that Sethann Bogardus strongly disliked Mrs. Trostle.

9       So, apart from what we have from Sethann

10  Bogardus, these monthly toll sheets, do we have anything

11  to show in writing that Mrs. Trostle received these

12  bills?

13     A.  No.

14     Q.  But it says here she's supposed to sign -- it

15  says, "each employee is to review the calls list and

16  sign their toll sheet to verify that all calls were

17  business related."

18       Do you see that?

19     A.  I do.

20     Q.  Is that being done now?

21     A.  I don't know what they do in class and movement.

22     Q.  Well, did you see any documentation that would

23  reflect that Mrs. Trostle, in fact, reviewed her calls

1    and affirmatively represented that all her calls were

2    business related?

3        A.    No.    I saw the document that she did not report

4    any personal call or pay for any personal calls.

5        Q.    But the document you were referring to wasn't

6    signed by Mrs. Trostle, was it?

7        A.    No.

8        Q.    That was prepared by someone else.

9        A.    I don't know who prepared the document.

10       Q.    We've established that Sethann Bogardus prepared

11   the document.    So, again, I just want to establish, you

12   didn't see anything in your -- at any point in time

13   reflect that Mrs. Trostle, in fact, had an opportunity

14   to review her phone bills; fair to say?

15       A.    Correct.

16                    (Exhibit 13 marked for identification.)

17                    MR. KEACH:    Now, we'll mark the

18            directive, which is the new directive that

19            was in place at the time of Mrs. Trostle's

20            demotion.    And we'll mark that as

21            Exhibit 13.    This is the same number

22            directive 20918, and it's entitled "State

23            Furnished Telephone Equipment and Services."

BY MR. KEACH:

Q.   Just before we go too far into this, whose signature is up there?

A.   Gail Haponik.

Q.   Who is Gail Haponik?

A.   My predecessor.

Q.   So, she was previously the deputy commissioner for administrative services.

A.   Correct.

Q.   So, let's take a look at the second page.  And just so we're clear, the phrase on this policy is still the same, "state telephones are intended for transaction of business only.  With the approval of the employee's supervisor, employee may make personal phone calls in emergency situations."

That's the same as the one we looked at previously, which was marked as Exhibit 3; is that correct?

A.   Yeah.  I think the policy statement is different, though.

Q.   What's the policy state?

A.   The section above that's labeled "policy statement."

1    Q.   Sure.   Let's take a look at Exhibit 3 and make

2   sure we're all on the same page here.

3        I don't see any difference between 3 and 13.

4    A.   Okay.

5    Q.   It's certainly formatted a little differently.

6    A.   Okay.   I didn't have this in front of me.   I just

7   thought that this --

8    Q.   But that policy statement also says, "employees

9   should use public telephones to conduct personal

10   business during rest breaks, meals, before and after

11   working hours."

12        It says that, right?

13   A.   Yup.

14   Q.   So, I want you to go on to part G.

15   A.   I'm sorry, G.

16   Q.   Part 2-G on the second page.

17   A.   Yup.

18   Q.   And it says here, "deputy superintendent for

19   administration reviews our reports.   If inappropriate

20   calling activity is reported or otherwise detected, the

21   following measures would be contemplated, depending on

22   the situation involved and the circumstances involved:

23   monetary reimbursement, informal counseling, formal

1    counseling, disciplinary action."

2         Do you see that?

3    A.   I do.

4    Q.   Now, apart from Ms. Trostle reviewing the bills,

5    which we don't know if that happened or not, was she

6    ever given an opportunity to make monetary reimbursement

7    for her $7 of phone calls over a 14-month period?

8    A.   She's given that opportunity on a monthly basis.

9    Q.   I said apart from that, because we don't know --

10   and frankly, I haven't seen any documentation in this

11   case of Mrs. Trostle actually getting those bills.

12   A.   Okay.

13   Q.   But I understand your testimony that it's your

14   opinion she was given an opportunity on a monthly basis.

15        I'm asking:  Apart from that, was Mr. Trostle

16   given an opportunity to make monetary reimbursement for

17   her calls before she was demoted?

18   A.   No.

19   Q.   And she wasn't either informally or formally

20   counseled, was she?

21   A.   No.

22   Q.   But here's what I don't understand.  Even though

23   she's a provisional employee, you had the ability to

1  take disciplinary action against her, didn't you?

2    A.  No.

3    Q.  You didn't.  You didn't have the ability to,

4  apart from her provisional status, to take additional

5  disciplinary action against her.

6              MS. RUBINSTEIN:  Objection.

7              THE WITNESS:  She was subject to

8         discipline in her hold item, which she

9         returned to, but I didn't have that

10        authority.

11  BY MR. KEACH:

12    Q.  So, but you had the ability to recommend

13  discipline, don't you?

14    A.  Yes.

15    Q.  The way that this is written up sounds like a

16  really serious situation.  This woman was doing all this

17  bad stuff, and she was demoted and sent back to her hold

18  item.

19        Why wasn't she also referred for discipline by

20  labor relations?

21              MS. RUBINSTEIN:  Objection.

22              THE WITNESS:  I didn't refer it to

23         discipline because I felt that the return to

1           her hold item was sufficient.

2    BY MR. KEACH:

3       Q.  Sufficient for what?

4       A.  Based on the totality of what was presented, I

5    didn't feel it was necessary to recommend disciplinary

6    action against her in her permanent position but just a

7    removal from her provisional appointment.

8       Q.  Well, explain that to me.  If this is serious

9    enough to substantiate removing her from central office

10   and costing her $20,000 a year, sending her back to

11   Greene Correctional Facility to work as a correctional

12   counselor, why isn't this serious enough to enter a

13   notice of discipline against her and try to terminate

14   her employment with the state government?

15      A.  Again, my opinion was that that was sufficient,

16   and I didn't make further referral.

17      Q.  Well, the reason, though, you didn't make the

18   referral is because, if it went to a notice of

19   discipline, then there would have to be a hearing; isn't

20   that right?

21              MS. RUBINSTEIN:  Objection.

22              THE WITNESS:  That's not why.

23              MR. KEACH:  That's not why.

```
 1                    THE WITNESS:  No.

 2    BY MR. KEACH:

 3       Q.  I mean, basically your office was judge, jury,

 4    and executioner as it related to demoting her back to

 5    her hold item, right?

 6                    MS. RUBINSTEIN:  Objection.

 7                    THE WITNESS:  I am the designated

 8          appointed authority in that capacity.

 9    BY MR. KEACH:

10       Q.  But if it went over to labor relations, then

11    there would have to be action in front of the public

12    employee relations board, wouldn't there, if it went to

13    a hearing?

14                    MS. RUBINSTEIN:  Objection.

15                    THE WITNESS:  It doesn't actually

16          happen in front of PERB, but they would have

17          had a hearing.

18    BY MR. KEACH:

19       Q.  Well, the hearing officer is appointed by PERB,

20    right?

21          But there would have been a hearing and there

22    would have been scrutiny about what you did, right?

23                    MS. RUBINSTEIN:  Objection.
```

```
 1              THE WITNESS:  No.  There would have
 2         been scrutiny relative to whatever penalty
 3         we were seeking to impose in her permanent
 4         position, but no scrutiny over this.  This
 5         is not subject to review over local
 6         provisional.
 7    BY MR. KEACH:
 8         Q.  Who else up the chain of command above you
 9    reviewed this determination?
10         A.  Up my chain of command.
11         Q.  Yeah.
12         A.  No one.
13         Q.  Did you have any involvement in the --
14         A.  Not that I'm aware of.
15         Q.  So, this didn't go to, for instance, the -- you
16    would have been acting under the deputy commissioner for
17    administrative services, correct?
18         A.  That is my direct supervisor, would have been.
19         Q.  That would have been your direct supervisor at
20    the time this occurred.
21         A.  Yes.
22         Q.  And the deputy commissioner didn't have any
23    involvement in making this determination.
```

1     A.   No.

2     Q.   Meaning your predecessor.

3     A.   Correct.

4     Q.   Did it ever enter your mind when you were doing

5     this that the state was going to get sued?

6     A.   No.

7     Q.   No one ever talked about that up and down the

8     chain of command, if we do this, we might get sued.

9     A.   No.

10         MS. RUBINSTEIN:   Objection.

11    BY MR. KEACH:

12    Q.   Well, how about after, you know Ms. Trostle filed

13    an application with the New York State Division of Human

14    Rights, don't you?

15    A.   No.

16    Q.   You're not aware of that.

17    A.   No.

18    Q.   You're not aware that the Division of Human

19    Rights found probable cause to believe that she was

20    discriminated against on the basis of race in the

21    workplace.

22         MS. RUBINSTEIN:   Objection.

23         THE WITNESS:   No.   Other than my

1          testimony being necessary here today, I have

2          not seen a complaint, read a complaint.  So

3          no.

4    BY MR. KEACH:

5       Q.   Before you became deputy commissioner, did you

6    ever discuss this with any of your supervisors about

7    what happened here?

8       A.   No.

9       Q.   Were you aware that there was an investigation

10   made by diversity management?

11      A.   No.

12      Q.   Did you have any role in the investigation by

13   diversity management?

14      A.   No.

15      Q.   There was a report prepared by a woman by the

16   last name of Brooks.  I think the first name was

17   Marlene.  I could be wrong about that, but I think her

18   last name was Brooks.  Prepared a memorandum to Ms.

19   Nazon that expressed some concern about the fact that

20   Mrs. Trostle wasn't given an opportunity to pay for her

21   phone calls before she was demoted.

22          Do you know anything about that?

23      A.   No.

1    Q.   Were you provided with a copy of the memo?

2    A.   No.

3    Q.   Did you ever have a chance to review it?

4    A.   No.

5    Q.   Did you ever have any input to it?

6    A.   No.

7    Q.   And so, you never saw it after the fact.

8    A.   No.

9    Q.   And no one ever interviewed you as part of that.

10   A.   Not that I recall.  No.

11   Q.   Now, I want to establish just a couple of things,

12   and then I want to wrap up and get you out of here.

13        I want you to -- if there was an impermissible

14   motive for demoting Mrs. Trostle, meaning that there was

15   an effort made to get rid of her because of her national

16   origin or her race, that decision would not implicate

17   your actions in this case, would it?

18             MS. RUBINSTEIN:  Objection.

19             THE WITNESS:  Say it again.

20   BY MR. KEACH:

21   Q.   I'll phrase it differently.  It probably wasn't

22   the best worded question.

23        If Theresa Knapp-David didn't like people who

1    were Hispanic and directed Mr. Botsford to get rid of

2    Melissa Trostle because she didn't like Hispanics, and

3    utilized all this stuff as pretext to get rid of a

4    Hispanic, that wouldn't implicate your decision, would

5    it?

6              MS. RUBINSTEIN:  Objection.

7              THE WITNESS:  No.

8    BY MR. KEACH:

9      Q.  So if that happened, that happened, that would be

10   Theresa Knapp-David's responsibility, not yours,

11   correct?

12            MS. RUBINSTEIN:  Objection.

13            THE WITNESS:  Yes.

14   BY MR. KEACH:

15      Q.  And if Theresa Knapp-David decided that she

16   wanted to get rid of an employee who could have used too

17   much family medical leave, in her opinion, and used this

18   information as pretext to get rid of that employee, that

19   decision would rest with Theresa Knapp-David, not with

20   you, wouldn't it?

21            MS. RUBINSTEIN:  Objection.

22            THE WITNESS:  Decisions in terms of the

23              same context you just described, right?

```
 1                 MR. KEACH:  Yeah.

 2                 THE WITNESS:  Yes.

 3      BY MR. KEACH:

 4          Q.  Just to make it clear, race didn't enter into

 5      your decision about this, right?

 6          A.  No.

 7          Q.  And family medical leave didn't enter into your

 8      decision about that, right?

 9          A.  No.

10          Q.  And you weren't aware when you made this decision

11      that Mrs. Trostle had already told her supervisor,

12      Mr. Botsford, that when she returned from family medical

13      leave she was going to file a diversity complaint

14      against Ms. Knapp-David.

15          A.  No.

16          Q.  You didn't know about that.

17          A.  No.

18          Q.  And did you know that Mrs. Trostle confronted

19      Theresa Knapp-David about her treatment of her based on

20      national origin before she left on family and medical

21      leave and then was ultimately demoted?

22          A.  No.

23          Q.  Are you aware that Ms. Knapp-David, in the
```

1   limited e-mail that I've been able to get in this case,

2   referred to Mrs. Trostle as an albatross?

3       A.   No.

4       Q.   Now, if you knew at the time that you were

5   reaching this decision that Mrs. Trostle had, in fact,

6   complained to her supervisor about Ms. Knapp-David's

7   conduct toward her on the basis of race, that would have

8   potentially affected your decision here, wouldn't it?

9               MS. RUBINSTEIN:  Objection.

10              THE WITNESS:  I don't know that it

11          would have changed the outcome, but it would

12          have been something that I would have wanted

13          to know.

14  BY MR. KEACH:

15      Q.   Yeah.  It would have been something you would

16  have looked into it, isn't it?

17              MS. RUBINSTEIN:  Objection.

18              THE WITNESS:  Yes.

19  BY MR. KEACH:

20      Q.   Because it's illegal to retaliate against someone

21  when they're complaining about discrimination in the

22  workplace, isn't it?

23              MS. RUBINSTEIN:  Objection.

1              THE WITNESS:  Yes.

2    BY MR. KEACH:

3        Q.  And it's the policy of the New York State

4    Department of Corrections that one of the options you

5    have to complain about racial discrimination in the

6    workplace is to first complain to your supervisor as

7    part of the process; isn't that right?

8        A.  Yes.  And the office of diversity management, as

9    well.

10       Q.  Well, you have different options.  My

11   understanding of the policy is you have different

12   options.  You can complain to your supervisor, you can

13   complain to the office of diversity management, or I

14   believe it's the case in DOCCS, you can also just go

15   straight to the EOC, if you choose to.

16       A.  Or DHR.

17       Q.  Or DHR.  But you have those three options, right?

18           And that policy also has a strict prohibition

19   against retaliating against someone for complaining

20   about racial discrimination in the workplace, doesn't

21   it?

22       A.  Absolutely.

23       Q.  And so, if Mrs. Trostle took the first step of

1  complaining to her supervisor, Mr. Botsford, about

2  racial discrimination in the workplace, and then she was

3  retaliated against for that, that would be improper

4  under the state's rules, wouldn't it?

5          MS. RUBINSTEIN:  Objection.

6          THE WITNESS:  Retaliation is not

7      appropriate.

8  BY MR. KEACH:

9      Q.  What's that?

10      A.  Retaliation -- yes.

11      Q.  If she started the process by complaining to her

12  supervisor and then was terminated, that would be

13  improper under the state's rules, right?

14          MS. RUBINSTEIN:  Objection.

15          THE WITNESS:  If that was a cause and

16      effect, yes.

17  BY MR. KEACH:

18      Q.  And the same can be said that if she was

19  terminated for taking too much family medical leave,

20  that also would be impermissible, wouldn't it, under the

21  state's rules?

22          MS. RUBINSTEIN:  Objection.

23          THE WITNESS:  If that was the cause and

1          effect, yes.

2    BY MR. KEACH:

3      Q.  Were you present at the time that Mrs. Trostle

4    was demoted?

5      A.  No.

6      Q.  So, she was just handed this letter -- and we

7    have this as Exhibit 5, which has your signature, right?

8      A.  Yes.

9      Q.  So you weren't present when that was provided to

10   her.

11     A.  No.

12     Q.  Do you know who gave it to her?

13     A.  I don't.  Most likely the supervisor of that

14   unit.

15     Q.  Well, if you're signing off a letter to terminate

16   somebody, why don't you be there in person?

17              MS. RUBINSTEIN:  Objection.

18              THE WITNESS:  I can't be all over the

19         state.

20   BY MR. KEACH:

21     Q.  This is like two floors away, though.

22     A.  I know.  But if you can't be in Sing Sing, then

23   why would I be two floors away?  Supervisor serves the

1    notice.

2       Q.   Has anything you learned today in your deposition

3    today caused you to question your action in terminating

4    her -- excuse me, demoting Ms. Trostle?

5                   MS. RUBINSTEIN:   Objection.

6                   THE WITNESS:   No.   I stand by the facts

7            that I had to make the determination that

8            the demotion was appropriate.

9    BY MR. KEACH:

10      Q.   I'm talking about today, after what you learned

11   in this deposition, are you still standing by your

12   decision?

13                  MS. RUBINSTEIN:   Objection.

14                  THE WITNESS:   I don't know, based on

15           what I learned, what's fact and what's not.

16           I mean, I heard you ask a lot of questions.

17           So, I mean, depending on what of the

18           information is actually factual, I would

19           have concern if there were factual things

20           that flowed from that.

21   BY MR. KEACH:

22      Q.   And so, what facts would we -- would you want to

23   see established today that would cause you to question

1   your decision?

2          MS. RUBINSTEIN:  Objection.

3          THE WITNESS:  Well, we talked about

4      retaliation for the purpose of the

5      utilization of FMLA and for what is a

6      complaint relative to origin or ethnicity.

7      Those are things that, if this was a

8      pretext, to use your term, then that would

9      cause me for concern.  But that somebody

10      made a complaint and this is separate and

11      aside and not a pretext, then I may view

12      that differently.

13   BY MR. KEACH:

14     Q.  How about the difference in treatment?

15          MS. RUBINSTEIN:  Objection.

16   BY MR. KEACH:

17     Q.  Meaning the level of scrutiny applied to

18   Mrs. Trostle that was not applied to others in her

19   department who were similarly situated.

20          Does that cause you some concern?

21          MS. RUBINSTEIN:  Objection.

22          THE WITNESS:  In terms of reviewing the

23      phone bills?

1           MR. KEACH:  Yeah, sure.

2           THE WITNESS:  Well, when things arise

3      to a level that you have to look further

4      into it, it depends what precipitated the

5      review.

6  BY MR. KEACH:

7      Q.  Well, it depends on what precipitated the review.

8      A.  For instance --

9      Q.  I just want you to assume for a minute here that

10 any number of individuals -- and I'm not going to engage

11 in this sort of analysis for the jury because we'll end

12 up having a three-week trial, and that's not in

13 anybody's best interest here.  If we're going to do

14 that, I'm going to let the state do it, and they can

15 bore the jury to tears and get punished accordingly.

16           But let's assume that I had -- and I don't.  But

17 let's assume that I had access to some of these phone

18 bills and I could find a comparable number of 800 calls

19 made during working hours, and I could also find a

20 number of questionable phone charges that people didn't

21 pay for, okay?

22           Those people -- you would agree with me that

23 individuals in that situation would be similarly

1  situated to Mrs. Trostle, didn't pay for their calls,

2  made a lot of 800 calls off their state-issued phones,

3  right?

4      A.  Correct.

5      Q.  So, those individuals weren't subjected to the

6  same scrutiny as Mrs. Trostle was, assuming that they

7  did these things, that they were similarly situated.

8          Wouldn't that cause you some concern?

9              MS. RUBINSTEIN:  Objection.

10             THE WITNESS:  Yeah.

11  BY MR. KEACH:

12     Q.  Because that would violate the rule of providing

13  people with equal treatment, wouldn't it?

14             MS. RUBINSTEIN:  Objection.

15             THE WITNESS:  We should be looking at

16         those individuals, as well.

17             MR. KEACH:  I want to move forward just

18         briefly.  And we'll mark as Exhibit 14 this

19         employee probation policy.

20             (Exhibit 14 marked for identification.)

21  BY MR. KEACH:

22     Q.  Now, I looked that over.  My understanding was --

23  meaning Exhibit 14.  My understanding is that

1    Mrs. Trostle was not a probationary employee at the time

2    that she was demoted back to her hold item.

3        A.   Correct.

4        Q.   Is there any part of this policy that would apply

5    to Ms. Trostle?

6        A.   No.  I didn't review this as part of this case.

7        Q.   Well, then that makes that set of questions

8    pretty easy to address.  We'll move on past that.

9             I also have a policy entitled "1800

10   Appointments."

11            MR. KEACH:  We'll mark that as

12        Exhibit 15.

13            And, Heather, I think that covers the

14        landscape of everything you handed over to

15        me.  Am I right about that?

16            MS. RUBINSTEIN:  My understanding.

17            (Exhibit 15 marked for identification.)

18   BY MR. KEACH:

19       Q.   Now, I guess I want to start with:

20   Mrs. Trostle's position today is not provisional

21   employment, is it?

22       A.   Her current position.

23       Q.   No.  Her position -- the position that she held

 1   today, meaning assistant director of classification and

 2   movement, that is no longer a provisional appointment,

 3   is it?

 4       A.   I don't know offhand.

 5       Q.   How about classification analyst?

 6       A.   No.

 7       Q.   And that reminds me:  Can you tell me, sir, why,

 8   if you didn't think that this justified disciplinary

 9   action under DOCCS policies as it relates to her job

10   back in Greene Correctional Facility, why wasn't

11   Mrs. Trostle given an opportunity to stay at central

12   office and do something else?

13           For instance, if her being an assistant director

14   wasn't working out, why wasn't she allowed to stay as a

15   classification analyst?

16               MS. RUBINSTEIN:  Objection.

17               THE WITNESS:  The process by which we

18           review probationary demotions and/or

19           provisional removal or temporary removal is

20           that they go back to the position that they

21           actually have property rights or tenure in,

22           which would be the last permanent

23           competitive position that they maintained.

1              In accordance with this policy that you

2         just handed me as Exhibit 15, when you are

3         appointed to a provisional position in the

4         same appointing authority or agency, you

5         retain a hold on your last permanent

6         position, which was at Greene Correctional

7         Facility.  I believe at that time it would

8         have been a correction counselor now or an

9         offender rehabilitation coordinator, ORC.

10   BY MR. KEACH:

11     Q.   Well, Ms. Trostle worked for several years as a

12   classification analyst.

13          How can you work for years as a provisional

14   appointment without having to take a civil service exam?

15     A.   Civil service administers the examination process

16   for the positions in state government.  So it was that

17   it probably wasn't scheduled for an examination during

18   her period of time as a provisional, and/or another

19   instance could have been -- and I don't believe it's the

20   case -- that there was an exam, and there were -- when

21   canvassed, there were less than three acceptors breaking

22   the eligible list, allowing for continued provisional

23   appointments.

1    Q.  But you don't know what the case was with

2  Mrs. Trostle's employment, fair to say, whether there

3  was no test or whether there weren't enough people who

4  applied?

5    A.  I believe there was no examination for a long

6  period of time.

7    Q.  Well, now, I have here a series of -- I'm trying

8  to figure it out.  Maybe you can help me out.  I don't

9  see anything in here about the circumstances under which

10  a provisional appointment would be revoked for purposes

11  of disciplinary action, or I know you don't consider it

12  discipline, but whatever you call it, demotion,

13  misconduct.  I don't see anything in that in here.

14         Can you help me find that.

15         MS. RUBINSTEIN:  Objection.

16         MR. KEACH:  And when I say in here, I

17     mean in Exhibit 15.

18         MS. RUBINSTEIN:  Objection still

19     stands.

20         MR. KEACH:  No problem.  I understand.

21     Go ahead.

22         THE WITNESS:  Under the .2 policy,

23     specifically .211, "a provisional employee

1          will not serve a probationary term, nor will

2          a provisional appointment bestow any

3          property right or right of tenure to the

4          position.  The appointing authority may

5          remove somebody from a provisional

6          appointment at any time for any reason or no

7          reason."

8    BY MR. KEACH:

9       Q.  It's fair to say that you didn't even have to

10   give a reason.

11      A.  Correct.

12      Q.  And neither did Ms. Knapp-David or Mr. Botsford.

13   They didn't have to give a reason.  They just could have

14   said, it's not working out, Ms. Trostle is not working

15   out, we want her removed and sent back to her old item;

16   fair to say?

17      A.  They had to give me a reason.

18      Q.  Why did they have to give you a reason?

19      A.  Because I'm the centralized appointing authority.

20      Q.  Well, if their reason was, we don't like her and

21   we don't want to work with her anymore, we want her sent

22   back to her hold item, that that would be appropriate,

23   right, because she doesn't have any right to the

1   position?

2     A.   No.

3            MS. RUBINSTEIN:   Objection.

4   BY MR. KEACH:

5     Q.   Here's what I'm trying to figure out:   What are

6   the standards by which someone would lose their

7   provisional appointment for misconduct, because I can't

8   find it here?

9            MS. RUBINSTEIN:   Objection.

10           THE WITNESS:   The standard is me, as

11          the appointing authority, looks at the facts

12          and circumstances presented and makes a

13          determination on rather than to revoke

14          somebody from a provisional appointment.

15  BY MR. KEACH:

16    Q.   And so, where is that in here, in this

17  provisional appointment?   Well, first off, what is this?

18  What is this?

19          It says 1800 appointments.   It's personnel --

20  state personnel management manual.

21    A.   That's what it is.

22    Q.   And so, you didn't just let Ms. Trostle go

23  because people didn't like her and wanted her sent back

1    to her hold item.  You let her go for reasons that would

2    be considered misconduct.

3           We can agree about that, right?

4                  MS. RUBINSTEIN:  Objection.

5    BY MR. KEACH:

6      Q.  Misconduct, misuse of state phones, and being

7    tardy all the time.

8      A.  Yes.

9      Q.  And so, where in here do we have a process by

10   which that can happen?

11          I don't see it anywhere.  There's --

12     A.  Again, section 2.11, in that she does not bestow

13   any property rights to the position.  And the review

14   process, which I define that I go through, is something

15   that I go through or we go through at DOCCS as an agency

16   whether she can be moved for no reason or reason.

17     Q.  I understand she can be removed for no reason.

18          I show up.  Let's assume tomorrow I get appointed

19   to be the director of classification and movement, and I

20   decide I want to have a new team.  And I said, you know

21   what?  I don't like this assistant director.  I want her

22   to go back to her hold item.  I want to get someone that

23   I know.

```
 1          I can do that, right?
 2    A.   No.
 3    Q.   Well, that's what I'm trying to figure out here.
 4          What is the standard, other than -- well, let me
 5    step back and ask this a different way.
 6          Where is the standard in writing for how to
 7    address demoting a provisional employee?
 8          Where is it?
 9              MS. RUBINSTEIN:  Objection.
10              THE WITNESS:  In directive 2200, the
11          functions of the bureau of personnel, and
12          then -- I'm not quoting it -- but it
13          outlines that the director of human
14          resources and now the director of personnel
15          as the centralized appointing authority.
16          One of the duties, as I previously
17          described, as reviewing requests for
18          managers of probationary terminations,
19          provisional and temporary removal from
20          service.  So, it is outlined in that
21          directive that that's where the authority
22          lies.  So the managers would submit
23          justification for that removal.
```

1    BY MR. KEACH:

2        Q.   It says here that the provisional appointment may

3    be revoked at any time by the department of civil

4    service, right?

5        A.   Where are you referencing?

6        Q.   It would be the second page at the bottom, .230.

7        A.   The one above that says a provisional employee

8    may be terminated at any time by the appointing

9    authority.   And the secondary reason is by the

10   department of civil service for another reason, not

11   secondary.   And I was the appointing authority.

12       Q.   I'll look at this 2200 issue.   I'm sure I can

13   find it here at the same website that this came from,

14   Exhibit 15, the 1800 appointments policy.   But I

15   understand you're the appointing authority.   You get to

16   decide whether or not to let someone go from their

17   provisional appointment.

18           But can you and I agree that there are no

19   concrete standards, meaning rules, which would show when

20   someone should or should not be removed from a

21   provisional appointment for misconduct?

22               MS. RUBINSTEIN:   Objection.

23               THE WITNESS:   Correct.

```
 1   BY MR. KEACH:

 2       Q.   We agree on that, don't we?

 3       A.   Yes.

 4       Q.   There are no formal hard and set rules about

 5   that.

 6                MS. RUBINSTEIN:  Objection.

 7                MR. KEACH:  Correct.

 8                THE WITNESS:  Correct.

 9   BY MR. KEACH:

10       Q.   So, it's left to your sole discretion, right?

11       A.   Correct.

12       Q.   Now, there's nothing in this policy that would

13   preclude Mrs. Trostle, if she's being removed from the

14   position of assistant director, to be allowed to then

15   become a classification analyst as a provisional

16   appointment, is there?

17                MS. RUBINSTEIN:  Objection.

18   BY MR. KEACH:

19       Q.   And I understand what you believe the procedures

20   are, but that doesn't say anything in this policy about

21   that, does it?

22                MS. RUBINSTEIN:  Objection.

23                THE WITNESS:  The policy talks about
```

1          provisional appointments.  So in terms of

2          the class analyst position, the practice is

3          to return to what you have property rights

4          in.  But as far as another appointment in

5          provisional service, it would have to follow

6          the appropriate processes as it's outlined

7          in the collective bargaining agreement of

8          the said position, as well as the law as

9          outlined in section 65 of the civil service

10         law, which is amplified by title four of the

11         civil service rules and regulations and 1800

12         of the state personnel management manual.

13   BY MR. KEACH:

14      Q.  I understand all of that, but there's no reason

15   why Mrs. Trostle couldn't be returned to a lower-level

16   provisional appointment if all that stuff was complied

17   with, right?

18      A.  If everything was complied with and there was no

19   preferred list and there was no eligibility list and the

20   posting was completed, if all of the provisions were

21   complied with, civil service approved, then no, there

22   would be nothing that precluded it.  Those are a lot of

23   things.

1   Q.   I understand.   Beyond this conversation where
2   Mr. Botsford comes in with his memo and hands it to you,
3   did you have any further conversations with him about
4   Mrs. Trostle's demotion?
5   A.   No.
6   Q.   Do you know if any of your subordinates had any
7   additional conversations with him about Mrs. Trostle's
8   demotion?
9   A.   I don't.
10   Q.   How about Theresa Knapp-David, did you ever talk
11   to her about this?
12   A.   No.
13   Q.   Do you know if any of your subordinates talked to
14   Theresa Knapp-David about this?
15   A.   I do not.
16   Q.   Jean Daniels used to supervise Theresa
17   Knapp-David, didn't she?
18   A.   No.
19   Q.   Jean Daniels used to be the director of
20   classification and movement.
21   A.   No.
22   Q.   I'm wrong about that.
23        MS. RUBINSTEIN:   Jean Daniels.

1              THE WITNESS:  Yes.

2    BY MR. KEACH:

3       Q.  Didn't she used to work as either an assistant

4    director or director of classification and movement?

5       A.  No.

6       Q.  Well, what was her job before she became the -- I

7    forget what her title is her.  Give me just a second.

8            What does associate personnel administrator mean?

9    What does that mean?

10      A.  It's a grade supervisory position within the

11   bureau of personnel.  It's a mid-level manager.

12      Q.  So, did Jean Daniels ever work in the office of

13   classification and movement?

14      A.  Not to my knowledge.

15      Q.  I could be wrong, a lot of names are flying

16   around here, but it is my recollection that at some

17   point in time she was Theresa Knapp-David's supervisor

18   before she got promoted to that job.

19      A.  No.

20      Q.  Well, do you know whether any of your

21   subordinates had conversations with Ms. Knapp-David

22   about Mrs. Trostle?

23      A.  I don't know.

1    Q.  Would it cause you some concern in your decision

2  if there was personal animus between a supervisor and

3  someone who was recommended for demotion?

4              MS. RUBINSTEIN:  Objection.

5              THE WITNESS:  What do you mean personal

6         animus?

7              MR. KEACH:  I mean like outright

8         personal hatred between the two people.

9              MS. RUBINSTEIN:  Objection.

10             THE WITNESS:  People don't have to like

11        each other, but they have to make sure that

12        they behave in the workplace between the

13        policies and the practices and conform to

14        the laws in the state.  I mean, when there's

15        somebody that has personal feelings and then

16        there's true reasons for a demotion, the two

17        shouldn't intersect.

18  BY MR. KEACH:

19    Q.  Well, let's assume they did in this case.  Let's

20  assume that -- well, I don't agree.  I think -- let me

21  just rephrase this.

22             Let's assume that there was just personal animus,

23  personal hatred, between Mrs. Trostle and Theresa

1    Knapp-David, and that is what underlined this decision

2    to demote her back to her hold item.

3          Would that cause you some concern?

4               MS. RUBINSTEIN:  Objection.

5    BY MR. KEACH:

6      Q.  That this decision was actually pretext for

7    personal animus.

8               MS. RUBINSTEIN:  Objection.

9               You can answer, if you can.

10              THE WITNESS:  And when you say that,

11         you mean the referral for demotion, because

12         the decision rested with me.

13              MR. KEACH:  Yes.  Correct.

14              THE WITNESS:  So, could you rephrase it

15         for me.

16   BY MR. KEACH:

17     Q.  Sure.  The referral, if that was based on

18   personal animus and these other issues were just pretext

19   for personal animus, would that cause you some concern?

20              MS. RUBINSTEIN:  Objection.

21              THE WITNESS:  It would cause me

22         concern.

23   BY MR. KEACH:

1    Q.  And just to wrap things up here, the information

2  that you had about Mrs. Trostle, that all originated

3  from Mr. Botsford and the people in classification and

4  movement, didn't it?

5    A.  Yes.

6    Q.  You relied on what he told you or what you were

7  informed by them to substantiate your decision against

8  Ms. Trostle.

9    A.  What they told me and the supporting

10 documentation.

11   Q.  And so, if there was a problem with some of that

12 supporting documentation, that could potentially

13 undermine your decision to take action here, couldn't

14 it?

15             MS. RUBINSTEIN:  Objection.

16             THE WITNESS:  Yes.

17 BY MR. KEACH:

18   Q.  And so, we talked about 700 minutes worth of

19 phone calls.

20        Do you know the basis to coming up with the 700

21 minutes -- I'll take the 800 numbers out of here because

22 I'll concede that generally people don't call 800

23 numbers as part of their employment with the Department

1    of Correctional Services.  It doesn't cost any money.

2         We agree that calling an 800 number from a state

3    phone doesn't cost the state any money, does it?

4        A.  Just lost productivity.

5        Q.  It's not like the state gets charged if someone

6    calls Delta Airlines 800 on their lunch hour, right?

7        A.  No.

8        Q.  So, when we're talking about these -- and I think

9    it was like 230 minutes worth of calls, if the

10   representations that were made to you that those 230

11   minutes worth of phone calls were all related to

12   Mrs. Trostle's personal matters and that representation

13   was false, that would also cause you some concern,

14   wouldn't it?

15       A.  Yeah.

16       Q.  And if the source of information that was

17   utilized to try to determine whether or not these phone

18   calls related to personal reasons was a Google search,

19   you'd have some concerns about the accuracy of that

20   determination, wouldn't you?

21            MS. RUBINSTEIN:  Objection.

22            THE WITNESS:  I don't know.  I'd have

23        to...

1    BY MR. KEACH:

2        Q.   Look at it more particularly.

3        A.   Yeah.

4        Q.   You would agree with me that a Spanish speaking

5    assistant director for classification and movement could

6    have cause to call Puerto Rico as part of her official

7    job duties with the state, wouldn't you?

8        A.   I don't know about that.

9        Q.   Well, can we establish -- you were a CO, right?

10       A.   Mm-hmm.

11       Q.   You had a whole bunch of people that you were

12   supervising as inmates that were of Spanish origin,

13   didn't you?

14       A.   Yes.

15       Q.   Reyes, Hernandez, Gonzalez; fair to say?

16       A.   Yes.

17       Q.   And some of the individuals could have loved ones

18   in Puerto Rico, couldn't they?

19       A.   Yes.

20       Q.   And so, if they called into the office of

21   classification and movement and for whatever reason,

22   Mrs. Trostle returned the phone calls because everybody

23   was overwhelmed, she could be talking to someone in

1    Puerto Rico about their loved one and where they're

2    going to be housed; isn't that right?

3        A.  If the family member called in to class movement,

4    okay, I guess that could happen.

5        Q.  Well, class and movement doesn't just address

6    where people go; it also addressed release dates,

7    doesn't it?

8        A.  I mean, the facility inmate records coordinator

9    really is the one that coordinates the release dates,

10    but they oversee the IRCs.  And we have a sentencing

11    review unit also.

12        Q.  I'll give you a better example.  It's my

13    understanding there's a policy in the state Department

14    of Corrections that, if someone has a loved one who is

15    dying, like a mother or a brother, a close relative,

16    that that person has the opportunity to go to that loved

17    one's funeral as long as they're escorted by someone

18    from the Department of Corrections.

19            Am I right about that?

20        A.  It's not a right, but we do allow it.

21        Q.  As long as the inmate reimburses the state for

22    the cost of going back and forth to the funeral or not.

23        A.  I wish.

1    Q.   But there's a policy.   It's not a right, but it's

2   allowed under policy.   Hey, an inmate had -- their

3   mother's dying.   They've got a right to go have a

4   deathbed visit with that person --

5    A.   Not a right.

6    Q.   An opportunity to have a deathbed visit and an

7   opportunity to attend the funeral.

8    A.   Opportunity, yes.

9    Q.   And is that opportunity granted for people

10  outside the State of New York?

11      For instance, if you're from Florida and your

12  mother dies, do you have the ability to go to Florida or

13  is it just in the state?

14   A.   In the state.

15   Q.   What if the person can reimburse the state for

16  his travel expenses, would they be given the

17  opportunity?

18   A.   No.   Not to my knowledge.   No.   I don't grant

19  those approvals.

20   Q.   And I think there were also some calls to Hawaii

21  on that list.

22      If an inmate's family called in from Hawaii and

23  made an inquiry, that would also be a reason for an

1   assistant director to call Hawaii, right?

2       A.   Yes.   I think it would be odd for families to be

3   calling class and movement, but could happen.

4       Q.   So we can be clear, there could be calls to

5   Puerto Rico that were related to Ms. Trostle's official

6   duties, correct?

7       A.   Yes.

8       Q.   And there are calls to Hawaii that could be

9   related to Ms. Trostle's official duties, correct?

10      A.   Could be.

11      Q.   And I mean, do you know whether or not

12  Mrs. Trostle took a vacation to Hawaii?

13          Was that ever told to you?

14      A.   No idea.

15              MR. KEACH:   That concludes my

16          examination, absent any clarification that

17          Heather has.

18              MS. RUBINSTEIN:   I have nothing.

19              (Deposition concluded at 2:36 p.m.)

20

21

22

23

```
1                    INDEX OF EXHIBITS

2    Exhibit                                    Marked

3      12   Monthly phone bills                   93

4      13   State furnished telephone directive   98

5      14   Unidentified document                118

6      15   1800 appointments                    119

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

```
 1    STATE OF NEW YORK      )

 2    COUNTY OF

 3

 4    I, DANIEL F. MARTUSCELLO, III, do hereby certify that I

 5    have read the foregoing record of my testimony taken at

 6    the time and place noted in the heading hereof and that

 7    it is a true and correct transcript of the same and the

 8    whole thereof.

 9

10

11

12

13                       _____

                                  DANIEL F. MARTUSCELLO, III
14    Subscribed and sworn to

15    before me this _____ day

16    of _____, 2014

17

18

19

20

21    _____

22

23
```

C E R T I F I C A T I O N

I, Jeanne O'Connell, Registered Professional Reporter

and Notary Public in and for the State of New York, do

hereby certify that the foregoing to be a true and

accurate transcription of the stenographic notes as

taken by me of the aforesaid proceedings.

_____                    _____
Date                                   Jeanne O'Connell